Edward E. Shapiro (CA SBN 326182)
Ashley Zitrin (CA SBN 262238)
GLENN AGRE BERGMAN & FUENTES LLP
580 California Street, Suite 1420
San Francisco, CA 94104
(415) 599-0880
eshapiro@glennagre.com
azitrin@glennagre.com

Adam S. Ziffer*
Nicholas R. Maxwell*
Ruofei Qu*
COHEN ZIFFER FRENCHMAN & MCKENNA, LLP
1325 Avenue of the Americas, 31st Fl.
New York, New York 10019
Telephone: (212) 584-1890
Fax: (212) 584-1891
aziffer@cohenziffer.com
nmaxwell@cohenziffer.com
rqu@cohenziffer.com
*admitted *pro hac vice*
*Attorneys for Plaintiff Vivo Capital, LLC*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| VIVO CAPITAL, LLC, <br><br> Plaintiff, <br><br> v. <br><br> COLUMBIA CASUALTY COMPANY, XL SPECIALTY INSURANCE COMPANY, ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, ARGONAUT INSURANCE COMPANY, U.S. SPECIALTY INSURANCE COMPANY, SAMSUNG FIRE & MARINE INSURANCE CO. LTD. (US BRANCH), OLD REPUBLIC INSURANCE COMPANY, MSIG SPECIALTY INSURANCE USA INC., TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, AND ASCOT INSURANCE COMPANY, <br><br> Defendants. | Case No. 5:26-cv-00175-BLF_____ <br><br> **FIRST AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Vivo Capital, LLC ("Vivo" or "Plaintiff"), by and through its undersigned counsel, for its First Amended Complaint against Defendants Columbia Casualty Company ("CNA"), XL Specialty Insurance Company ("XL"), Allianz Global Risks US Insurance Company ("Allianz"), Argonaut Insurance Company ("Argonaut"), U.S. Specialty Insurance Company ("U.S. Specialty"), Samsung Fire & Marine Insurance Co. Ltd. (US Branch) ("Samsung Fire & Marine"), Old Republic Insurance Company ("Old Republic," and together with XL, Allianz, Argonaut, U.S. Specialty, and Samsung Fire & Marine, the "2023 Excess Insurers," and with CNA, the "2023 Insurers"), MSIG Specialty Insurance USA Inc. ("Mitsui"), Travelers Casualty and Surety Company of America ("Travelers"), and Ascot Insurance Company ("Ascot," and together with XL, Travelers, Ascot, U.S. Specialty, Samsung Fire & Marine, and Old Republic, the "2025 Excess Insurers," and with MSIG, the "2025 Insurers") (collectively, "Insurers" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. This action arises from Insurers' failure to honor their contractual coverage obligations to Vivo under primary and excess directors and officers ("D&O") insurance policies they sold to Vivo.

2. Vivo is a healthcare investment firm that has funded and supported hundreds of healthcare companies around the world.

3. Vivo acquired equity stakes in Sinovac Biotech Ltd. ("Sinovac" or the "Company"), an Antigua-incorporated Chinese biopharmaceutical company, and its Beijing operating subsidiary, Sinovac Life Sciences Co., Ltd. ("SLS"), through a private investment in public equity transaction in 2018 (the "PIPE Transaction," with the shares obtained in the PIPE Transaction being the "PIPE Shares") and a convertible bond transaction in 2020, respectively (the "CB Transaction" and, collectively with the PIPE Transaction, the "Vivo Transactions").

4. On January 16, 2025, after years of litigation between activist shareholder 1Globe Capital LLC ("1Globe") and Sinovac as to the proper composition of the Sinovac board of directors, the Privy Council, sitting as the highest appellate court in Antigua and Barbuda, issued a decision that

1  retroactively invalidated Sinovac's then incumbent board of directors (the "Former Incumbent
2  Board").

3          5.      Shortly after the Privy Council ruling, the competing board of directors, led by 1Globe
4  and another aligned shareholder, OrbiMed Advisors LLC (collectively with its affiliates, "OrbiMed"),
5  publicly announced that they had initiated a process to determine which shares of the Company were
6  validly issued and outstanding, which was a thinly veiled threat to cancel Vivo's PIPE Shares. 1Globe
7  and its owner, Dr. Jiaqiang "Chiang" Li, also expressly threatened to commence litigation against
8  Vivo. Given the value of Vivo's equity in Sinovac, Vivo expected that 1Globe would in fact do so.

9          6.      Based on 1Globe's public threats, and to proactively defend against 1Globe's
10 imminent litigation, Vivo commenced proceedings against Sinovac and the 1Globe-controlled board
11 seeking, amongst other things, a declaration as to the validity of the PIPE Shares.

12         7.      As Vivo had anticipated, on May 6, 2025, Sinovac and its controlling shareholders,
13 1Globe and OrbiMed, filed a claim in the High Court of Justice for Antigua and Barbuda against Vivo
14 and numerous funds affiliated with Vivo (the "2025 Antigua Proceeding"). The 2025 Antigua
15 Proceeding seeks, among other things, declarations that: (i) the Vivo Transactions are invalid due to
16 the Former Incumbent Board not having authority to allot or issue the PIPE Shares or enter into the
17 CB Transaction; and (ii) the Former Incumbent Board breached their fiduciary duties by allotting or
18 issuing the PIPE Shares or entering into the CB Transaction. If 1Globe were to prevail in the 2025
19 Antigua Proceeding, Vivo would be exposed to significant monetary loss based on the increase in
20 value of Vivo's equity stake in Sinovac since the Transactions.

21         8.      The 2025 Antigua Proceeding alleges, among various other alleged wrongful conduct
22 by Vivo, that Vivo (i) led a consortium of parties including the Former Incumbent Board (the
23 "Management Consortium") in an effort to privatize Sinovac without consideration of competing
24 offers; (ii) entered into the PIPE Transaction SPA knowing that the Former Incumbent Directors had
25 ceased to be directors of the Company and (according to 1Globe and OrbiMed) therefore could not
26 lawfully enter the PIPE Transaction; (iii) participated in a transaction designed to consolidate the
27 Management Consortium's control of the Company to the detriment of other shareholders; and (iv)
28

acquired the PIPE Shares at less than market value in a transaction facilitated by the Former Incumbent Board (members of the Management Consortium Vivo allegedly led) that was not arm's length, to the detriment of other shareholders.

9.      Vivo and its principal who was appointed to the Sinovac board pursuant to the PIPE Transaction, Shan Fu, were also named as defendants in a class action commenced in Delaware Chancery Court on May 16, 2025, by various minority shareholders of Sinovac (the "2025 Delaware Proceeding" and, collectively with the 2025 Antigua Proceeding and other above-referenced 2025 Sinovac-related proceedings, the "Sinovac Proceedings"). The 2025 Delaware Proceeding alleges, among other things, counts against Vivo for aiding and abetting shareholder oppression and unjust enrichment.

10.     To protect itself against this type of dispute alleging wrongful conduct on the part of Vivo and/or its directors and officers, Vivo paid significant premiums for comprehensive D&O liability insurance coverage from the 2023 Insurers (the "2023 Program") providing up to $35 million in coverage for the period December 30, 2022, through December 30, 2023 (the "2023 Policy Period"), and from the 2025 Insurers (the "2025 Program") providing up to $35 million in coverage for the period December 30, 2024, through December 30, 2025 (the "2025 Policy Period").

11.     Vivo initially provided a notice of circumstances relating to the anticipated dispute with 1Globe et al. to the 2025 Program, led by Mitsui, and followed up with actual notice of the various Sinovac Proceedings.

12.     Mitsui denied coverage for the Sinovac Proceedings based on their alleged interrelationship with a dismissed 2023 claim in Delaware Chancery Court against Mr. Fu (the "2023 Delaware Proceeding"). Vivo anticipates that upon attachment of their respective policies, the 2025 Excess Insurers will adopt Mitsui's denial.

13.     Immediately after Mitsui's denial, Vivo provided notice to the 2023 Insurers. Vivo's notice to the 2023 Program advised that the primary insurer on the 2025 Program had denied coverage.

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

14.     Despite Mitsui's position that only the 2023 Program should respond for the 2025 Sinovac Proceedings, Defendant CNA denied coverage for the 2025 Antigua Proceeding on the purported basis that the 2025 Antigua Proceeding does not allege a Wrongful Act against Vivo or any other insureds, and that in any event the 2025 Antigua Proceeding and 2023 Delaware Proceeding are not interrelated, therefore only the 2025 Program could potentially provide coverage.[1] Vivo anticipates that upon attachment of their respective policies, the remaining 2023 Insurers will adopt CNA's denial.

15.     Vivo has incurred millions of dollars in defense costs for the Sinovac Proceedings already, and its defense costs continue to mount. The amounts at stake for Vivo in the Sinovac Proceedings are significant. Vivo's initial investment in Sinovac was for US $43.365 million and its PIPE Shares were worth US $724.815 million as at May 2025.

16.     Defendants Mitsui and CNA's unfounded denials, and the 2025 and 2023 Excess Insurers' anticipated adoption of the denials, has forced Vivo to commence this action.

## THE PARTIES

17.     Plaintiff Vivo is a California limited liability company with its principal place of business in Palo Alto, California. The members of Vivo and their respective citizenships are:

Frank Kung, a citizen of California;

Ed Engleman, a citizen of California;

Shan Fu, a citizen of the People's Republic of China;

Gaurav Aggarwal, a citizen of California;

Michael Chang, a citizen of California;

Cinthia Sheu, a citizen of California; and

Zhanping Wu, a citizen of California.

---

[1] Vivo exercised its right under the CNA 2023 policy to elect not to give notice of the 2023 Delaware Proceeding because it did not appear reasonably likely to exceed the applicable retention.

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

18.     Upon information and belief, Defendant CNA is an Illinois corporation with its principal place of business in Illinois. Upon further information and belief, CNA is authorized to sell or write insurance in California and, at all material times, has conducted and continues to conduct substantial insurance business in California, including issuing a policy to Vivo, a California entity.

19.     Upon information and belief, Defendant XL is a Delaware corporation with its principal place of business in Connecticut. Upon further information and belief, XL is authorized to sell or write insurance in California and, at all material times, has conducted and continues to conduct substantial insurance business in California, including issuing a policy to Vivo, a California entity.

20.     Upon information and belief, Defendant Allianz is an Illinois corporation with its principal place of business in Illinois. Upon further information and belief, Allianz is authorized to sell or write insurance in California and, at all material times, has conducted and continues to conduct substantial insurance business in California, including issuing a policy to Vivo, a California entity.

21.     Upon information and belief, Defendant Argonaut is a Nebraska corporation with its principal place of business in New York. Upon further information and belief, Argonaut is authorized to sell or write insurance in California and, at all material times, has conducted and continues to conduct substantial insurance business in California, including issuing a policy to Vivo, a California entity.

22.     Upon information and belief, Defendant U.S. Specialty is a Texas corporation with its principal place of business in Texas. Upon further information and belief, U.S. Specialty is authorized to sell or write insurance in California and, at all material times, has conducted and continues to conduct substantial insurance business in California, including issuing a policy to Vivo, a California entity.

23.     Upon information and belief, Defendant Samsung Fire & Marine was incorporated under the laws of New York as the United States branch of Samsung Fire & Marine Insurance Co. Ltd., a Republic of Korea corporation, and maintains a principal place of business in New Jersey. Upon further information and belief, Samsung Fire & Marine is authorized to sell or write insurance

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

1  in California and, at all material times, has conducted and continues to conduct substantial insurance

2  business in California, including issuing a policy to Vivo, a California entity.

3       24.    Upon information and belief, Defendant Old Republic is a Pennsylvania corporation

4  with its principal place of business in Pennsylvania. Upon further information and belief, Old

5  Republic is authorized to sell or write insurance in California and, at all material times, has conducted

6  and continues to conduct substantial insurance business in California, including issuing a policy to

7  Vivo, a California entity.

8       25.    Upon information and belief, Defendant Mitsui is a New York corporation with its

9  principal place of business in New Jersey. Upon further information and belief, Mitsui is authorized

10  to sell or write insurance in California and, at all material times, has conducted and continues to

11  conduct substantial insurance business in California, including issuing a policy to Vivo, a California

12  entity.

13       26.    Upon information and belief, Defendant Travelers is a Connecticut corporation with

14  its principal place of business in Connecticut. Upon further information and belief, Travelers is

15  authorized to sell or write insurance in California and, at all material times, has conducted and

16  continues to conduct substantial insurance business in California, including issuing a policy to Vivo,

17  a California entity.

18       27.    Upon information and belief, Defendant Ascot is Colorado corporation with its

19  principal place of business in New York. Upon further information and belief, Ascot is authorized to

20  sell or write insurance in California and, at all material times, has conducted and continues to conduct

21  substantial insurance business in California, including issuing a policy to Vivo, a California entity.

22                 **JURISDICTION VENUE AND DIVISION**

23       28.    <u>Jurisdiction</u>: This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

24  1332(a)(1), 1332(a)(3), and 2201, as the required diversity of citizenship exists between the parties

25  and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs,

26  and Vivo seeks declaratory relief with respect to a case or actual controversy within this Court's

27  jurisdiction.

28

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

29.    <u>Jurisdiction:</u> This Court has personal jurisdiction over each Insurer because each is or was authorized either to sell or to write insurance in California and/or, at all material times, has conducted business within the state of California, including by issuing a policy to Vivo, a California entity.

30.    <u>Venue:</u> Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in the Northern District of California.

31.    <u>Divisional Assignment:</u> Assignment to the San Jose Division of the Northern District of California is appropriate as Vivo's principal place of business is in Palo Alto, California, and "a substantial part of the events or omissions giving rise to the claim occurred, [and] a substantial part of the property that is the subject of the action is situated" in Palo Alto, California. Civil L.R. 3-2(c), (e).

**FACTUAL BACKGROUND**

**I.    THE INSURANCE PROGRAMS**

32.    To protect itself and its directors and officers from third-party claims alleging wrongful conduct by Vivo, its directors and officers, and any subsidiaries, Vivo purchased the 2023 and 2025 Programs in exchange for significant premium.

**A.    The 2023 Program**

33.    The 2023 Program provides $35 million in coverage for Vivo, its Ds & Os and its affiliates, and is comprised of CNA primary policy No. 652290339 (the "CNA Policy"), which provides $5 million in total aggregate limits excess of any applicable retention(s), and the following excess policies (collectively with the CNA Policy, the "2023 Policies"):

a.    XL:  $5 million aggregate limit excess of $5 million;

b.    Allianz:  $5 million aggregate limit excess of $10 million;

c.    Argonaut:  $5 million aggregate limit in excess of $15 million;

d.    U.S. Specialty:  $5 million aggregate limit excess of $20 million;

e.    Samsung Fire & Marine:  $5 million aggregate limit excess of $25 million; and

- 8 -

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

1    f.    Old Republic: $5 million aggregate limit in excess of $30 million.

2    34.    In all relevant respects, the foregoing excess policies follow form to the CNA Policy.[2]

3    35.    The CNA Policy contains the following pertinent Insuring Agreements:

**B.    Management Liability (Reimbursement)**

The Insurer will pay **Loss** on behalf of an **Insured Entity**, for which an **Insured Entity** has indemnified an **Insured Person**, resulting from any **Claim** first made against such **Insured Person** during the **Policy Period**.

**C.    Insured Entity Liability**

The Insurer will pay **Loss** on behalf of an **Insured Entity** resulting from any **Claim** first made against such **Insured Entity** during the **Policy Period**.

Ex. A, CNA Policy, § I.

36.    The CNA Policy defines "**Claim**" as:

(1) a written demand (excluding a subpoena) for monetary, non-monetary, injunctive, or declaratory relief;

(2) a written request for arbitration, mediation, or other alternative dispute resolution;

(3) a written request to toll or waive a statute of limitations;

(4) a civil, criminal, administrative, or regulatory proceeding commenced by the earlier of: (a) the return of service of a complaint or indictment upon an **Insured**; (b) the filing of an indictment or information with respect to an **Insured**; or (c) the arrest or detainment of an **Insured Person**;

(5) an Extradition; or

(6) a Formal Investigation,

against an **Insured** for a **Wrongful Act**, including any appeal therefrom. **Claim** also includes an **Internal Investigation. Claim** does not include a **Shareholder Derivative Demand**.

*Id.* at § II.

---

[2] Capitalized terms not otherwise defined herein are defined terms within the 2023 and 2025 Policies, all of which are incorporated by reference herein.

- 9 -

37. The CNA Policy defines "**Wrongful Act**" as:

> any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by:
>
> 1. any **Insured Person** in: (a) his/her capacity as such; or (b) any matter claimed against such **Insured Person** solely by reason of his/her status as such;
>
> 2. an **Insured Entity**, except while rendering, or failure to render, **Investment Activities**; or
>
> 3. any **Insured Entity**, or by any natural person for whom an **Insured Entity** is legally liable, in the rendering of, or failure to render, **Investment Activities**.

*Id.*

38. The CNA Policy defines "**Interrelated Wrongful Acts**" as "any **Wrongful Acts** that are causally connected by reason of any common fact, circumstance, situation, transaction, or event, or series of common facts, circumstances, situations, transactions, or events." *Id.*

39. The CNA Policy includes the following provision entitled "Interrelatedness":

> With respect to any Claims involving the same Wrongful Act or Interrelated Wrongful Acts, such Claims will be deemed one Claim which was first made on the earlier of:
>
> > (a) the date on which the earliest such Claim was first made; or
> >
> > (b) the earliest date valid notice was given and accepted by an Insured to the Insurer under this Policy or under any prior policy of any Wrongful Act or any fact, circumstance, situation, event, or transaction that underlies any such Claim.
>
> In no event will an individual lawsuit or proceeding constitute more than one Claim.

*Id.* § VII.4, End. 11.

## B. The **2025 Program**

40. The 2025 Program similarly provides $35 million in coverage for Vivo, its Ds & Os and its affiliates, and is comprised of Mitsui primary policy No. DOP1000007 (the "Mitsui Policy"),

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

which provides $5 million in total aggregate limits, and the following excess policies ("collectively with the Mitsui Policy, the "2025 Policies"):

      a.  XL:  $5 million aggregate limit in excess of $5 million;

      b.  Travelers:  $5 million aggregate limit in excess of $10 million;

      c.  Ascot:  $5 million aggregate limit in excess of $15 million;

      d.  U.S. Specialty:  $5 million aggregate limit in excess of $20 million;

      e.  Samsung Fire & Marine:  $5 million aggregate limit in excess of $25 million; and

      f.  Old Republic:  $5 million aggregate limit in excess of $30 million.

41.    In all relevant respects, the foregoing excess policies follow form to the Mitsui Policy.

42.    The Mitsui Policy contains the following pertinent Insuring Agreements:

> (B) The insurer shall pay on behalf of each **Insured Entity** all **Loss** that the **Insured Entity** has agreed to pay or has paid as indemnification to, for or on behalf of each **Insured Person** and that the **Insured Person** incurs on account of any **Claim** first made against such **Insured Person**, individually or otherwise, during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts**.

> (C) The Insurer shall pay on behalf of each **Insured Entity** all **Loss** that the **Insured Entity** incurs on account of any **Claim** first made against the **Insured Entity** during the **Policy Period**, or if applicable, the Optional Extension Period, for **Wrongful Acts**.

Ex. D, Mitsui Policy, Investment Fund Management and Professional Liability Coverage Part, § I.

43.    The Mitsui Policy defines "**Claim**" as:

> (1) any written demand for monetary or non-monetary (including, but not limited to, injunctive) relief commenced by the receipt of such demand by an **Insured**;

> (2) any civil, administrative or regulatory proceeding (including without limitation an enforcement proceeding or other proceeding by an **Investigating Authority**) commenced by the filing or receipt by an **Insured** of a notice of charges, notice of deposition, notice of hearing, Wells Notice, notice of investigation, filing or service of a complaint, counterclaim, third-party complaint, summons, writ, motion or order or subpoena or receipt of any of the foregoing or similar documents by, on or against an **Insured**;

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

(3) any arbitration, mediation or other alternative dispute proceeding commenced by the service of a demand for arbitration, demand for mediation or similar document or pleading on an **Insured**;

(4) any written request to toll or waive any applicable statute of limitations commenced by the receipt of such written request by an **Insured**;

(5) any criminal proceeding that is commenced by the return of an indictment or the filing or receipt by an **Insured** of an information, criminal complaint or similar charging document or the foreign equivalent thereof against an **Insured**;

(6) any written request or other written statement for **Extradition** of any **Insured** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**

(7) any **Investigation**.

**Claim** shall also include the foreign equivalent of any of the foregoing, and any appeal in connection with any of the foregoing.

*Id.*, General Terms and Conditions, § II(C).

44.    The Mitsui Policy defines "**Wrongful Act**" as:

(1) for purposes of INSURING AGREEMENTS (A) and (B):

(a) any actual or alleged act, error, omission, neglect, statement, misstatement, misleading statement or breach of fiduciary duty or other duty or the aiding or abetting of any breach of duty, committed or attempted, or allegedly committed or attempted, by an **Insured Person** in his or her capacity as such;

(b) any matter asserted against an **Insured Person** by reason of his or her status as such;

(c) any actual or alleged act, error, omission, neglect, recklessness, statement, misstatement, misleading statement or breach of fiduciary duty or other duty or the aiding or abetting of any breach of duty, committed or attempted, or allegedly committed or attempted, by an **Insured Person** in his or her **Outside Capacity** or **Portfolio Company Capacity** or by reason of his or her status as such;

(d) any actual or alleged act, error, omission, neglect, recklessness, statement, misstatement, misleading statement or breach of fiduciary duty or other duty or the aiding or abetting of any breach of duty, committed, or allegedly committed or attempted, by an **Insured Person** in

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

the performance of, or failure to perform **Fund Management Activities**;

(e) any actual or alleged libel, slander, or oral or written publication of defamatory or disparaging material committed by an **Insured Person** in the performance of or failure to perform **Fund Management Activities**;

(f) any actual, attempted or possible violation of any foreign, offshore, federal, state or local domestic or self-regulatory statute, article, decree, rule or regulation by an **Insured Person**, where such actual, alleged, attempted or possible violation is in such **Insured Person's** capacity as such or by reason of such **Insured Person's** status as such;

(g) any actual or alleged act, error, omission, neglect, statement, misstatement, misleading statement or breach of fiduciary duty or other duty or the aiding or abetting of any breach of duty, committed or attempted, or allegedly committed or attempted, by an **Insured Person** in his or her capacity as a **Controlling Shareholder** or **Selling Shareholder** or by reason of his or her status as such; or

(h) any actual or alleged act, error, omission, neglect, misconduct, recklessness, statement, misstatement, misleading statement or breach of fiduciary duty or other duty committed, or allegedly committed or attempted, by an **Employed Lawyer**, but only in connection with such **Employed Lawyer's** performance of, or actual or alleged failure to perform, legal services to or for the benefit of an **Insured Entity** or a **Portfolio Company** within the scope of his or her employment with an **Insured Entity**.

(2) for purposes of INSURING AGREEMENT (C) only:

(a) any actual or alleged act, error, omission, neglect, recklessness, misconduct, statement, misstatement, misleading statement or breach of fiduciary duty or other duty or the aiding or abetting of any breach of duty, committed, or allegedly committed or attempted, by any person or entity for whom or which an **Insured** is liable or is alleged to be liable in relation to such **Insured's** performance of, or failure to perform, **Fund Management Activities**;

(b) or any actual or alleged libel, slander, or oral or written publication of defamatory or disparaging material committed by an **Insured** or by a person or organization for whose acts an **Insured** is legally responsible in the performance of **Fund Management Activities**; or

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

> (c) any actual or alleged act, error, omission, neglect, recklessness, misconduct, statement, misstatement, misleading statement or breach of fiduciary duty or other duty or the aiding or abetting of any breach of duty, committed, or allegedly committed or attempted, by an **Insured**.

*Id.*, Investment Fund Management and Professional Liability Coverage Part, § III(E).

45.     The Mitsui Policy defines "**Interrelated Wrongful Act**" as "**Wrongful Acts** which are based on, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events.

46.     The Mitsui Policy contains an Alternative Dispute Resolution Process provision, which provides:

> It is hereby understood and agreed that all disputes or differences which may arise with regard to the construction or **interpretation** of the provisions of this Policy, whether arising before or after termination of this policy shall be submitted to the alternative dispute resolution ("**ADR**") process set forth in this Clause.
>
> . . .
>
> If mediation is selected, either party shall have the right to bring litigation in any applicable state or federal court sixty (60) days after either party has elected mediation as the ADR process (unless the Insured rejects the Insurer's choice of mediation as the ADR process).

*Id.*, General Terms and Conditions, § II(T).

## II. THE UNDERLYING SINOVAC DISPUTE

47.     Sinovac is a Chinese biopharmaceutical company incorporated in Antigua and Barbuda. It specializes in the development and production of vaccines against human infectious diseases.

### A.     The 2018 Sinovac Annual Shareholders' Meeting and Related Legal Proceedings

48.     In February 2018, at Sinovac's annual general meeting ("AGM"), activist shareholders 1Globe and OrbiMed attempted to install their own slate of directors without prior notice. Although

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

1   a vote was held and results indicated support for the new slate, no result was declared at the AGM,

2   and Sinovac subsequently declared the alternative ballot invalid and re-elected the Former Incumbent

3   Board.

4        49.    After the AGM, in March 2018, 1Globe commenced legal action in Antigua and

5   Barbuda against Sinovac, which was at the time controlled by the Former Incumbent Board. 1Globe

6   sought, amongst other things, a declaration that the alternative slate of directors proposed at the AGM

7   had been duly elected and should control Sinovac.

8        50.    The Former Incumbent Board prevailed before the Antigua trial and intermediate

9   appellate courts, retained control of Sinovac, and was in fact in control of Sinovac at the time of the

10  Transactions.

11  **B.    The PIPE Transaction**

12       51.    On July 3, 2018, Vivo and Prime Success, L.P. ("Prime Success") entered into the

13  PIPE Transaction under a Securities Purchase Agreement ("SPA"), each acquiring 5.9 million shares

14  of Sinovac common stock for approximately USD 43.365 million.

15       52.    The SPA was signed by Mr. Weidong Yin, the CEO of Sinovac, and approved by the

16  Former Incumbent Board.

17       53.    As part of the PIPE Transaction, Vivo designated one of its Managing Partners, Mr.

18  Fu, to the Sinovac board.

19  **C.    The CB Transaction**

20       54.    In early 2020, Sinovac needed capital to research and develop a COVID-19 vaccine

21  that would be the first publicly available vaccine in China, known as CoronaVac.

22       55.    In or around May 2020, during the early stage of CoronaVac's development, Vivo and

23  Prime Success entered into the CB Transaction by making an investment in Sinovac's Beijing

24  operating subsidiary, SLS, through the purchase of bonds that were convertible to equity. The CB

25  Transaction was entered into by Vivo and SLS, under the control of the Board of SLS.

26       56.    In or around December 2020, Vivo executed on its right to convert the SLS bonds into

27  equity in Sinovac.

28

- 15 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     **D.**     **Legal Proceedings Culminating in the Privy Council Decision**

     57.     As noted, the Former Incumbent Board prevailed against 1Globe's legal action in the Antigua trial and intermediate appellate courts.

     58.     On January 16, 2025, the Privy Council (the tribunal of last resort for disputes in Antigua and Barbuda) reversed the lower courts' decisions and held that 1Globe's proposed directors were validly appointed at the AGM and that the Former Incumbent Board had been an "imposter" Board from that point forward.

     59.     However, the Privy Council did not consider whether to invalidate any corporate actions taken by the Former Incumbent Board, including the Transactions, or invalidate Mr. Fu's appointment to Sinovac's board and it did not order that as relief.

     60.     Following the Privy Council's decision, 1Globe and OrbiMed took control of Sinovac's board.

     61.     Subsequently, 1Globe and Dr. Li expressly stated their intention to pursue legal action against Vivo to cancel the PIPE and CB shares.

     **III. THE 2025 SINOVAC PROCEEDINGS**

     **A. Vivo's Preemptive Actions**

     62.     Based on 1Globe's express threats to seek legal action to invalidate Vivo's shares, Vivo strategically commenced numerous legal actions in its dispute with 1Globe, including an arbitration in Hong Kong against Sinovac under the binding arbitration agreement in the PIPE SPA; suits in New York state court, New York federal court, and Massachusetts federal court concerning 1Globe and OrbiMed's breaches of fiduciary duty and deficiencies in their SEC reporting; and an injunctive proceeding by Mr. Fu in Antigua to confirm the validity of his Sinovac board seat.

     63.     Via these proceedings, Vivo proactively defended against the anticipated claims by 1Globe and OrbiMed and Mr. Fu's exclusion from the Sinovac Board.

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

**B.    The 2025 Antigua Proceeding**

64.    On May 6, 2025, Sinovac, 1Globe, and OrbiMed filed a Statement of Claim in the High Court of Justice for Antigua and Barbuda and filed an Amended Statement of Claim on June 17, 2025.

65.    The Statement of Claim and Amended Statement of Claim sought:

(1) A declaration that each of the SPA, the Shareholders Agreement (and any related agreements) is, and always has been, invalid and/or void.

(2) A declaration that the issue of the PIPE Shares should be set aside.

(3) Rectification of the Company's register of shareholders to delete any entries in respect of the purported allotments and transfers of the PIPE Shares (save for the 48,577 Prime Success Shares which are no longer beneficially owned by Prime Success or its affiliates).

(4) A declaration that the purported appointment of Mr Shan Fu as an additional director of the Company on or around 3 July 2018 was ineffective and invalid.

(5) A declaration that the Purported Guarantees are, and always have been, invalid and/or void.

(6) A declaration that the Former Incumbent Directors had no authority to procure, cause and/or allow SLS to enter into the Convertible Loan Agreements or to pay the SLS Dividends, acting as purported directors of, and (purportedly) on behalf of, the Company.

(7) A declaration that the Former Incumbent Directors, as purported directors of the Company, acted in breach of their duties under section 95(1)(a) and (b) of IBCA 1982 in procuring, causing and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends.

(8) Such other relief as to the Court seems fit.

(9) Costs.

Ex. B, Statement of Claim, at 30-31; Ex. C, Amended Statement of Claim, at 31-32.

66.    The Amended Statement of Claim alleges that Vivo led a "Management Consortium" that included the Former Incumbent Board, Ex. C ¶ 24.1, whose alleged breach of fiduciary duty renders the SPA and the PIPE Transaction invalid, *id.* ¶¶ 80-85.

67.     The Amended Statement of Claim alleges that the PIPE Transaction served the "Improper Purpose" of "consolidat[ing] the Management Consortium's control of" Sinovac. *Id.* ¶ 80. As support, the Amended Statement of Claim alleges that Vivo led the Management Consortium, that the Management Consortium negotiated the below-market price of the PIPE Shares without consideration of other shareholder offers, and that in connection with the PIPE Transaction, Vivo agreed to vote in support of the Former Incumbent Board regarding any director appointments. *Id.* ¶ 81.

68.     Regarding the subsequent CB Transaction, the Amended Statement of Claim similarly alleged that the Former Incumbent Board, which now included Vivo's representative, engineered the Transaction in circumstances where they did not have authority to procure, cause and/or allow SLS to enter into the Transaction and where they did so in breach of their fiduciary duties. *Id.* ¶¶ 98-104. The Amended Statement of Claim further alleged that Vivo knew or ought to have known that the Former Incumbent Board had ceased to be directors of the Company before the Transaction. *Id.* ¶ 102.

69.     Vivo and its affiliated funds have objected to the jurisdiction of the Antiguan courts, including because the PIPE SPA contains a valid arbitration agreement and there is an arbitration pending in Hong Kong.

70.     The 2025 Antigua Proceeding remains pending at the time of this filing.

**C.      The 2025 Delaware Proceeding**

71.     On April 17, 2025, MW Gestion, as putative class representative for a class of other minority shareholders, filed the 2025 Delaware Proceeding against Vivo and the Former Incumbent Board.

72.     In the 2025 Delaware Proceeding, MW Gestion asserted a breach of fiduciary duty claim against all director defendants, alleging that they adopted the poison pill, acted as imposter directors, and increased the shares of the Yin group, including Vivo, through the PIPE transaction.

73.     On May 16, 2025, plaintiffs filed an amended class action and derivative complaint and added Vivo and its affiliates for aiding and abetting and unjust enrichment claims.

### IV. THE 2023 DELAWARE PROCEEDING

74.     On September 6, 2023, MW Gestion, the Sinovac minority shareholder that would later file the 2025 Delaware Proceeding, filed a class action complaint in the Chancery Court of Delaware against, among others, the Former Incumbent Board and Vivo's Managing Partner, Mr. Fu.

75.     The complaint alleged, *inter alia*, that the director defendants breached their fiduciary duties by conducting an exchange of rights through a "poison pill" agreement, which allowed PIPE investors, including Vivo, to receive rights at the expense of ordinary shareholders.

76.     On September 23, 2024, the court dismissed the 2023 Delaware Proceeding on statute of limitations grounds.

77.     Vivo does not seek insurance coverage from Defendants for the 2023 Delaware Proceeding, because the only Vivo insured named in the suit was Mr. Fu, and Mr. Fu did not incur any defense costs or indemnity obligation. The proceeding remains relevant, however, because the primary insurer on Vivo's 2025 Program, Mitsui, denied coverage for the Sinovac Proceedings on the basis that they relate back to the 2023 Delaware Proceeding and are therefore not first made during the 2025 Program's policy period.

### V. VIVO'S CLAIM FOR INSURANCE COVERAGE FOR THE SINOVAC PROCEEDINGS

78.     On March 5, 2025, in anticipation that 1Globe would commence legal action against it, Vivo sent a Notice of Circumstances to the 2025 Insurers via its broker, informing them of the anticipated lawsuit(s) and requesting consent for the retention of Simpson Thacher & Bartlett LLP as defense counsel.

79.     On March 11, 2025, Mitsui acknowledged receipt of the matter and consented to Vivo's engagement of counsel.

80.     On September 15, 2025, Mitsui denied coverage for the Sinovac Proceedings on the purported basis that they arose from one or more Interrelated Wrongful Acts also alleged in the 2023 Delaware Proceeding.

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

81.      On October 7, 2025, and November 5, 2025, respectively, Vivo's counsel sent a letter urging Mitsui to withdraw its denial and Mitsui's counsel responded to Vivo affirming its denial of coverage.

82.      On September 18, 2025, shortly after Mitsui's denial of coverage, Vivo sent a Notice of Claim to the 2023 Insurers, informing them of the 2025 Antigua Proceeding and Mitsui's position that the 2025 Sinovac Proceedings are interrelated with the 2023 Delaware Proceeding.

83.      On November 17, 2025, CNA denied coverage for the 2025 Antigua Proceeding on the purported bases that: (i) the 2025 Antigua Proceeding is not a Claim triggering the CNA Policy because it was not brought against an Insured for a Wrongful Act; and (ii) even if the 2025 Antigua Proceeding was a Claim, it is not interrelated with the 2023 Delaware Proceeding, therefore the 2023 Program does not provide coverage.

84.      On January 6, 2026, Vivo's counsel sent a letter urging CNA to withdraw its denial and copying the 2023 Excess Insurers. CNA has not withdrawn its denial.

85.      On the same day, pursuant to the Alternative Dispute Resolution Process provision, Vivo demanded non-binding mediation with the 2025 Insurers, four of which are also 2023 Insurers (XL, U.S. Specialty, Samsung Fire & Marine, and Old Republic), and invited the remaining three 2023 Insurers (CNA, Travelers, and Argonaut) to participate in the forthcoming mediation.

86.      Pursuant to Section II(T) of the General Terms and Conditions of the Mitsui Policy, the 60-day waiting period after Vivo's mediation demand expired on March 7, 2026. Therefore, Vivo now joins Mitsui, Travelers, and Ascot as additional Defendants in this action.

## FIRST CAUSE OF ACTION

### (Declaratory Relief Against the 2023 Insurers)

87.      Vivo repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

88.      Vivo has valid and enforceable contract rights against the 2023 Insurers under the 2023 Policies.

89.    Vivo paid all premiums, provided prompt notice of the relevant claims, and otherwise performed and complied with all obligations, terms, conditions, and prerequisites to coverage set forth in the 2023 Policies, or has been excused from compliance by the 2023 Insurers' breaches, denials of coverage, or other conduct.

90.    Pursuant to the terms of the CNA Policy, to the relevant terms of which all 2023 Excess Insurers follow form, the 2023 Insurers are obligated to pay Vivo's Defense Costs and, to the extent applicable, other Loss in connection with the 2025 Sinovac Proceedings, subject only to the attachment points and limits of liability of their respective policies.

91.    As detailed above, the Sinovac Proceedings fall within the insuring agreements of the CNA Policy and are not otherwise excluded by any terms of the CNA Policy or the respective policies issued by the 2023 Excess Insurers.

92.    The 2023 Insurers have denied or failed to acknowledge their legal obligations to pay Vivo's Defense Costs in the Sinovac Proceedings, despite Vivo's demand.

93.    Vivo reasonably anticipates that its Defense Costs will ultimately implicate some or all of the 2023 Excess Insurers' policies; Vivo further reasonably anticipates that if there is an adverse settlement or judgment in one or more of the Sinovac Proceedings, it may implicate some or all of the 2023 Excess Insurers' policies.

94.    These facts demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the 2023 Policies and the rights and obligations of the parties thereunder, which claims are ripe for adjudication.

95.    A declaratory judgment regarding coverage for loss in connection with the Sinovac Proceedings will assist the parties in determining their respective rights and obligations under the 2023 Policies.

96.    Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of Vivo and against the 2023 Insurers, declaring that the 2023 Insurers are obligated to pay Vivo's Defense Costs and, to the extent applicable, other Loss in connection with the 2025 Sinovac Proceedings, subject only to the attachment points and limits of liability of their respective policies.

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

**SECOND CAUSE OF ACTION**

**(Breach of Contract Against Defendant CNA)**

97.     Vivo repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

98.     Vivo has valid and enforceable contract rights against CNA under the CNA Policy.

99.     Vivo paid all premiums, provided prompt notice of the relevant claims, and otherwise performed and complied with all obligations, terms, conditions, and prerequisites to coverage set forth in the CNA Policy, or has been excused from compliance by CNA's breaches, denials of coverage, or other conduct.

100.     As described above, Vivo has incurred, and is continuing to incur, Defense Costs in connection with the Sinovac Proceedings.

101.     Pursuant to the terms of the CNA Policy, CNA is obligated to pay Vivo's Defense Costs and, to the extent applicable, other Loss in connection with the Underlying Actions, subject only to any applicable retention(s) or limits of liability.

102.     As detailed above, the Sinovac Proceedings fall within the insuring agreements of the CNA Policy and are not otherwise excluded by any terms of the CNA Policy.

103.     CNA has breached its legal obligation by denying coverage for Vivo's Defense Costs in the Sinovac Proceedings, despite Vivo's demand.

104.     As a direct and proximate result of CNA's breach of its obligations under the CNA Policy, Vivo has suffered damages to be determined at trial, including compensatory and consequential damages regardless of the CNA Policy's limits, as well as attorneys' fees and costs.

**THIRD CAUSE OF ACTION**

**(In the Alternative to First Cause of Action)**

**(Declaratory Relief Against the 2025 Insurers)**

105.     Vivo repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

- 22 -

1    106.    Vivo has valid and enforceable contract rights against the 2025 Insurers under the 2025

2    Policies.

3    107.    Vivo paid all premiums, provided prompt notice of the relevant claims, and otherwise

4    performed and complied with all obligations, terms, conditions, and prerequisites to coverage set forth

5    in the 2025 Policies, or has been excused from compliance by the 2025 Insurers' breaches, denials of

6    coverage, or other conduct.

7    108.    Pursuant to the terms of the Mitsui Policy, to the relevant terms of which all 2025

8    Excess Insurers follow form, the 2025 Insurers are obligated to pay Vivo's Defense Costs and, to the

9    extent applicable, other Loss in connection with the 2025 Sinovac Proceedings, subject only to the

10   attachment points and limits of liability of their respective policies.

11   109.    As detailed above, the Sinovac Proceedings fall within the insuring agreements of the

12   Mitsui Policy and are not otherwise excluded by any terms of the Mitsui Policy or the respective

13   policies issued by the 2025 Excess Insurers.

14   110.    The 2025 Insurers have denied or failed to acknowledge their legal obligations to pay

15   Vivo's Defense Costs in the Sinovac Proceedings, despite Vivo's demand.

16   111.    Vivo reasonably anticipates that its Defense Costs will ultimately implicate some or

17   all of the 2025 Excess Insurers' policies; Vivo further reasonably anticipates that if there is an adverse

18   settlement or judgment in one or more of the Sinovac Proceedings, it may implicate some or all of

19   the 2025 Excess Insurers' policies.

20   112.    These facts demonstrate the existence of an actual, justiciable controversy involving

21   specific, adverse claims regarding the interpretation and effect of the 2025 Policies and the rights and

22   obligations of the parties thereunder, which claims are ripe for adjudication.

23   113.    A declaratory judgment regarding coverage for loss in connection with the Sinovac

24   Proceedings will assist the parties in determining their respective rights and obligations under the

25   2025 Policies.

26   114.    Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor

27   of Vivo and against the 2025 Insurers, declaring that the 2025 Insurers are obligated to pay Vivo's

28

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

Defense Costs and, to the extent applicable, other Loss in connection with the 2025 Sinovac Proceedings, subject only to the attachment points and limits of liability of their respective policies.

### **FOURTH CAUSE OF ACTION**

#### **(In the Alternative to Second Cause of Action)**

#### **(Breach of Contract Against Defendant Mitsui)**

115.    Vivo repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

116.    Vivo has valid and enforceable contract rights against Mitsui under the Mitsui Policy.

117.    Vivo paid all premiums, provided prompt notice of the relevant claims, and otherwise performed and complied with all obligations, terms, conditions, and prerequisites to coverage set forth in the Mitsui Policy, or has been excused from compliance by Mitsui's breaches, denials of coverage, or other conduct.

118.    As described above, Vivo has incurred, and is continuing to incur, Defense Costs in connection with the Sinovac Proceedings.

119.    Pursuant to the terms of the Mitsui Policy, Mitsui is obligated to pay Vivo's Defense Costs and, to the extent applicable, other Loss in connection with the Underlying Actions, subject only to any applicable retention(s) or limits of liability.

120.    As detailed above, the Sinovac Proceedings fall within the insuring agreements of the Mitsui Policy and are not otherwise excluded by any terms of the Mitsui Policy.

121.    Mitsui has breached its legal obligation by denying coverage for Vivo's Defense Costs in the Sinovac Proceedings, despite Vivo's demand.

122.    As a direct and proximate result of Mitsui's breach of its obligations under the Mitsui Policy, Vivo has suffered damages to be determined at trial, including compensatory and consequential damages regardless of the Mitsui Policy's limits, as well as attorneys' fees and costs.

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

**PRAYER FOR RELIEF**

WHEREFORE, Vivo prays for relief as follows:

(a)     On the First Cause of Action, Vivo requests that the Court enter a judgment in favor of Vivo and against the 2023 Insurers, declaring that the 2023 Insurers have a duty to pay Vivo's Defense Costs and, to the extent applicable, other Loss in connection with the Sinovac Proceedings, and to award all other further relief necessary or proper pursuant to 28 U.S. Code §§ 2201 and 2202;

(b)     On the Second Cause of Action, Vivo requests that the Court enter a judgment in favor of Vivo and against Defendant CNA, awarding Vivo compensatory and consequential damages, regardless of the CNA Policy's limits, in an amount to be determined at trial in this action, plus attorneys' fees, costs, and pre- and post-judgment interest;

(c)     On the Third Cause of Action, Vivo requests that the Court enter a judgment in favor of Vivo and against the 2025 Insurers, declaring that the 2025 Insurers have a duty to pay Vivo's Defense Costs and, to the extent applicable, other Loss in connection with the Sinovac Proceedings, and to award all other further relief necessary or proper pursuant to 28 U.S. Code §§ 2201 and 2202;

(d)     On the Fourth Cause of Action, Vivo requests that the Court enter a judgment in favor of Vivo and against Defendant Mitsui, awarding Vivo compensatory and consequential damages, regardless of the Mitsui Policy's limits, in an amount to be determined at trial in this action, plus attorneys' fees, costs, and pre- and post-judgment interest;

(e)     On all causes of action, Vivo requests that this Court award Vivo all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees, as well as pre-judgment interest from the time since the costs were incurred and post-judgment interest; and

(f)     Vivo additionally requests such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Vivo hereby demands a jury trial on all triable issues and claims raised by this Complaint.

FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF

Dated: March 9, 2026

GLENN AGRE BERGMAN & FUENTES LLP

By: /s/ *Ashley Zitrin*_____
    Edward E. Shapiro (CA SBN 326182)
    Ashley Zitrin (CA SBN 262238).
    580 California Street, Suite 1420
    San Francisco, CA 94104
    (415) 599-0880
    eshapiro@glennagre.com
    azitrin@glennagre.com

    Adam S. Ziffer*
    Nicholas R. Maxwell*
    Ruofei Qu*
    COHEN ZIFFER FRENCHMAN & MCKENNA, LLP
    1325 Avenue of the Americas, 31st Fl.
    New York, New York 10019
    Telephone: (212) 584-1890
    Fax: (212) 584-1891
    aziffer@cohenziffer.com
    nmaxwell@cohenziffer.com
    rqu@cohenziffer.com
    *admitted *pro hac vice*

    *Attorneys for Plaintiff Vivo Capital, LLC*

- 26 -
FIRST AMENDED COMPLAINT
Case No. 5:26-cv-00175-BLF