# EXHIBIT A



February 15, 2023

Mr. Justin H. Cohen
WILLIS TOWERS WATSON NORTHEAST, INC.
200 LIBERTY ST, 7TH FLOOR
BROOKFIELD PLACE
NEW YORK, NY 10281

Re:   Vivo Capital, LLC
      Private Equity Liability Solutions
      Insurance Contract 652290339
      Expiration Date 12/30/2023
      CNA Customer Number 318789

Dear Justin:

We are pleased to enclose the proposed insurance contract for Vivo Capital, LLC.  Please review this proposed insurance contract carefully to ensure that it fulfills the agreed-upon specifications.  Should you detect any problem, please contact me within five (5) business days of the receipt of this proposed insurance contract to advise us of any concerns or questions.  As the surplus lines broker, it is your responsibility to comply with surplus lines stamping requirements prior to releasing this proposed insurance contract to an insured and all other surplus lines laws.

**Please note that this proposed insurance contract is issued in consideration of payment of the quoted premium. If this condition is not fulfilled within 30 days of the proposed effective date of coverage, coverage will not take effect, and we will close our file on this matter without further notice to you or Vivo Capital, LLC.**

If commissions or other compensation are payable hereunder, Insurance Producer will comply with all applicable federal and state laws, rules, regulations and/or orders governing disclosure by an agent, broker or producer to an insured or prospective insured of commissions or other compensation.

Please note that CNA offers a broad array of industry leading products.  To learn more about these products, please visit our website at www.cnapro.com.

We appreciate the opportunity to do business with Vivo Capital, LLC and with you.  If you should have any comments, questions, or concerns, please do not hesitate to contact me.

Sincerely,

*Maggie Gialessas*

Maggie Gialessas
Assistant Vice President - Industry Leader
Phone: (312) 639-7869

margaret.gialessas@cna.com

**NOTICE:**

1.    THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2.    THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3.    THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4.    THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357 OR INTERNET WEB SITE WWW.INSURANCE.CA.GOV. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5.    FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6.    FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF

APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7.    CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8.    IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

**D-2 (Effective January 1, 2017)**



**PRIVATE EQUITY LIABILITY SOLUTIONS**
**DECLARATIONS**

**NOTICE:**

**THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. CLAIMS MUST BE REPORTED TO THE INSURER IN ACCORDANCE WITH THE POLICY.  THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED TO THE RETENTION. THE INSURER SHALL NOT BE LIABLE FOR DEFENSE COSTS OR ANY OTHER AMOUNT UPON EXHAUSTION OF THE APPLICABLE LIMIT OF LIABILITY.**

**PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**Terms in bold face type have the special meaning.  See the DEFINITIONS section of this Policy.**

| NAMED INSURED AND ADDRESS | | PRODUCER |
|---|---|---|
| Item 1. <br><br> Attn: | Vivo Capital, LLC<br>192 Lytton Avenue<br>Palo Alto, CA  94301 | WILLIS TOWERS WATSON NORTHEAST, INC.<br>Justin H. Cohen<br>200 LIBERTY ST, 7TH FLOORBROOKFIELD PLACE NEW YORK, NY  10281 |
| **CUSTOMER NUMBER** | | **INSURER** |
| 318789 | | Columbia Casualty Company |
| **POLICY NUMBER** | | 151 North Franklin Street |
| 652290339 | | Chicago, IL -60606 |

Item 2.     **Policy Period**: 12/30/2022  to   12/30/2023
            12:01 a.m. local time at the address stated in Item 1.

Item 3.     Policy Premium  $215,000

Item 4.     Notices to Insurer:

| **Claims:** | All other notices: |
|---|---|
| CNA – Claims Reporting | CNA Global Specialty Lines |
| P.O Box 8317 | CNA Pro - Chicago, IL |
| Chicago, IL 60680-8317 | |
| Email: SpecialtyNewLoss@cna.com | |
| Fax Number: 866-773-7504 | |

Item 5.     **Extended Reporting Period**:

            a.  1  year @ 150%
            b. 3 years @ 200%
            c. 6 years @ 250%

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS
DECLARATIONS**

Item 6.        Limit of Liability (Inclusive of **Defense Costs**):

      a. Aggregate Limit of Liability
         $5,000,000 for all **Loss** from all **Claims** for which this Policy provides coverage

      b. **Shareholder Derivative Demand Investigation Costs** Sublimit of Liability (exclusive of **Defense Costs** and subject to the Aggregate Limit of Liability): $250,000

Item 7.                Retentions:

      Insuring Agreement A:  No Retention
      Insuring Agreement B:  each **Claim**  $1,000,000
      Insuring Agreement C:  each **Claim**  $1,000,000
      Insuring Agreement D:  No Retention

Item 8.        Prior or Pending Date: 3/29/2007

Item 9.        Endorsements forming a part of this Policy at issuance:

| | | |
|---|---|---|
| CNA-74300-XX | 06/2014 | Service of Suit |
| CNA-69560-XX | 01/2013 | State Amendatory Inconsistency Endorsement |
| CNA-94406-XX | 02/2019 | Crisis Event Expenses Extension Endorsement |
| CNA-94348-XX | 02/2019 | Portfolio Company Successor Liability Extension Endorsement - |
| CNA-94393-XX | 02/2019 | Employed Lawyers Endorsement (full limit) |
| CNA-94351-XX | 02/2019 | Employment Practices Liability Insuring Agreement Endorsement (Discrimination in Third Party Wrongful Employment Practices Wrongful Act) |
| CNA-97933-XX | 09/2020 | Biometrics Exclusion Endorsement |
| CNA-94364-XX | 12/2021 | Mock Regulatory Compliance Examination Contribution Endorsement |
| CNA-96544-XX | 08/2019 | Amend Illegal Profits and Deliberate Acts Exclusion Endorsement |
| CNA-102362-XX | 10/2021 | Amend Section X. Representations and Severability of Application |
| CNA-102360-XX | 11/2021 | Amendatory Endorsement |
| CNA-94378-XX | 02/2019 | Schedule of Funds Endorsement |

CNA94400XX (02-19)

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS
DECLARATIONS**

These Declarations, along with the completed and signed **Application**, this Policy, and any written endorsements attached shall constitute the contract between the **Insureds** and the Insurer.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be executed by its Chairman and Secretary, but this Policy will not be binding upon us unless completed by the attachment of the Declarations.

Chairman          Secretary

CNA94400XX (02-19)

Page 3 of 3

© CNA  All Rights Reserved.

**CNA**

**PRIVATE EQUITY LIABILITY SOLUTIONS**

In consideration of the premium, and in reliance upon the **Application**, the Insurer and **Insureds** agree as follows:

## I.     INSURING AGREEMENTS

### A.     Management Liability (Individual)

The Insurer will pay **Non-Indemnifiable Loss** on behalf of an **Insured Person** resulting from any **Claim** first made against such **Insured Person** during the **Policy Period**.

### B.     Management Liability (Reimbursement)

The Insurer will pay **Loss** on behalf of an **Insured Entity**, for which an **Insured Entity** has indemnified an **Insured Person**, resulting from any **Claim** first made against such **Insured Person** during the **Policy Period**.

### C.     Insured Entity Liability

The Insurer will pay **Loss** on behalf of an **Insured Entity** resulting from any **Claim** first made against such **Insured Entity** during the **Policy Period**.

### D.     Shareholder Derivative Demand Investigation Costs

The Insurer will pay **Shareholder Derivative Demand Investigation Costs** on behalf of an **Insured Entity** resulting from any **Shareholder Derivative Demand** first received by such **Insured Entity** during the **Policy Period**.

## II.     DEFINITIONS

**Additional Insured** means any natural person who is:
1.     an **Advisory Board Member**; or
2.     any past, present, or future independent contractor or consultant, provided that such person is acting on behalf and at the specific direction of an **Insured Entity**, and only to the extent that such person is indemnified by an **Insured Entity**.

**Advisory Board Member** means any past, present, or future member of an advisory board, investment committee, or advisory committee, acting in his/her capacity on behalf of an **Insured Entity**.

**Affiliate** means any entity that is directly or indirectly, through one or more intermediaries, controlled by, or is under common control or common co-control with, an **Insured Entity** (other than an **Insured Entity** that is an **Affiliate**):
1.     on or before the effective date of this Policy; or
2.     after the effective date of this Policy by reason of an **Insured Entity** gaining control over, or coming under common control or common co-control with, such entity, subject to paragraph 1.(b) of Section XI, Change of Control or Status of Insureds.
**Affiliate** does not include an **Outside Entity**.

**Application** means any application, whether the Insurer's or otherwise, including attachments to such application, and any other materials or representations provided to the Insurer by or on behalf of an **Insured** in connection with the underwriting or negotiation of the terms and conditions of this Policy.

**Claim** means:
1.     a written demand (excluding a subpoena) for monetary, non-monetary, injunctive, or declaratory relief;
2.     a written request for arbitration, mediation, or other alternative dispute resolution;
3.     a written request to toll or waive a statute of limitations;
4.     a civil, criminal, administrative, or regulatory proceeding commenced by the earlier of: (a) the return of service of a complaint or indictment upon an **Insured**; (b) the filing of an indictment or information with respect to an **Insured**; or (c) the arrest or detainment of an **Insured Person**;
5.     an **Extradition**; or
6.     a **Formal Investigation**,

© CNA  All Rights Reserved.

**CNA**

**PRIVATE EQUITY LIABILITY SOLUTIONS**

against an **Insured** for a **Wrongful Act**, including any appeal therefrom. **Claim** also includes an **Internal Investigation. Claim** does not include a **Shareholder Derivative Demand**.

Unless specifically articulated otherwise herein, a **Claim** is deemed first made on the earliest of the date on which the **Claim** is first served upon or first received by any **Insured**, or the applicable notice or order is filed or entered.

**Clean-Up Costs** mean any fees, costs, or expenses, including legal and professional fees, incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying, or assessing the effects of **Pollutants**.

**Control Person** means the same as the definition set forth in Section 15 of the Securities Act of 1933, as amended or Section 20(a) of the Securities Exchange Act of 1934, as amended.

**Defense Costs** mean reasonable and necessary fees, costs, and expenses, incurred by an **Insured** in the investigation, defense, or appeal of any covered **Claim**, including the premium for appeal, attachment, or similar bonds arising out of a covered judgment. **Defense Costs** do not include **Shareholder Derivative Demand Investigation Costs**, or salaries, wages, fees, overhead, or benefit expenses associated with any **Insured Person**.

**Domestic Partner** means any person qualifying as such under any federal, state, local, or foreign law, or under an **Insured Entity's** employee benefit plans.

**Employee** means any past, present, or future full-time, part-time, seasonal or temporary employee, intern, or any volunteer of an **Insured Entity**. **Employee** does not include any **Executive**.

**ERISA, COBRA or any Similar Act** means the Employee Retirement Income Security Act of 1974 (ERISA), (including the Consolidated Omnibus Budget Reconciliation Act of 1985)(COBRA), as amended, or any other similar federal, state, or local statutory or regulatory law in the United States.

**Executive** means any:
1.   natural person who is a past, present, or future duly elected or appointed director, officer, trustee, governor, entrepreneur-in-residence, board observer, management committee member, member of the board of managers, or managing partner (or holder of a functionally equivalent position in a **Foreign Jurisdiction**), of an **Insured Entity**;
2.   natural person who is a past, present, or future In-House General Counsel, Chief Compliance Officer, or Risk Manager of the **Named Insured**;
3.   natural person who is a past, present, or future **General Partner**; or
4.   **Outside Entity Executive**.

**Executive** does not include any **Employee**.

**Extended Reporting Period** means the additional period of time purchased by an **Insured** after termination or cancellation (except for non-payment of premium) of this Policy within which to report a **Claim** subject to the provisions of Section VIII, Extended Reporting Period.

**Extradition** means a formal process by which an **Executive** located in any country is surrendered, or requested to surrender, to another country to respond to a criminal accusation, commenced by an arrest, detainment, or incarceration of an **Executive** by any law enforcement authority of a **Foreign Jurisdiction**.

**Extradition Costs** mean reasonable and necessary fees, costs, and expenses incurred by an **Executive** in lawfully opposing or defending an **Extradition**. **Extradition Costs** do not include salaries, wages, fees, overhead, or benefit expenses associated with any **Insured Person**.

**Facilitation Costs** mean reasonable and necessary fees, costs, and expenses (including loan interest) incurred by an **Executive** in connection with a covered **Claim**, solely to facilitate the return of amounts required to be repaid by such **Executive** pursuant to a court ordered, statutory mandated, or settlement negotiated  reimbursement of any amount to which such **Executive** was not legally entitled. **Facilitation Costs** do not include the actual amounts required or sought to be repaid, reimbursed, disgorged, or otherwise surrendered by such **Executive**.

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS**

**Financial Insolvency** means the appointment of a receiver, conservator, liquidator, trustee, rehabilitator, or similar official, or creditors' committee to take control of, supervise, manage, or liquidate an **Insured Entity** or **Outside Entity**.

**Foreign Jurisdiction** means any jurisdiction, other than the United States or any of its territories or possessions.

**Formal Investigation** means any formal investigation of an **Insured** by a **Regulatory Body** alleging violations of securities laws or **ERISA, COBRA or any Similar Act** by such **Insured**, evidenced by a subpoena, grand jury subpoena, formal order or formal notice of investigation, search warrant, civil investigative demand, Wells Notice, or target letter (within the meaning of Title 9, §11.151 of the United States Attorney's Manual), or Securities Exchange committee form 1661 or 1662, from a **Regulatory Body** identifying the nature of the investigation and specific allegations of **Wrongful Acts** against such **Insured**. **Formal Investigation** does not include any informal investigation, matter under inquiry, routine examination, routine inspection, "sweep" examination, general request for information, or any other similar review, inquiry, or investigation.

**Fund** means any pooled investment vehicle or any separately managed account created, sponsored, controlled, or managed by an **Insured Entity**:
1.       on or before the effective date of this Policy; or
2.       after the effective date of this Policy by reason of being acquired or created by an **Insured Entity**, subject to paragraph 2.(a) of Section XI, Change of Control or Status of Insureds.

**General Partner** means any natural person or entity designated as such in an **Organizational Document** of an **Insured Entity** other than the **Organizational Documents** of an **Affiliate**.

**Insured** means any **Insured Person** or any **Insured Entity**.

**Insured Entity** means:
1.       the **Named Insured**, any **Affiliate**, or any **Subsidiary**;
2.       any **Fund**;
3.       any entity **General Partner**;
4.       any entity managing member or entity management company identified in an **Organizational Document**;
5.       any **Investment Holding Company**;
6.       any **Investment Manager**;
7.       any other entity specifically included as an **Insured Entity** by endorsement to this Policy; or
8**.**       any such entity referenced in paragraphs 1. through 7. above as a debtor in possession under United States bankruptcy law or any similar state, local, or foreign law.
**Insured Entity** does not include any **Outside Entity**.

**Insured Person** means an **Executive**, **Employee**, or **Additional Insured**.

**Internal Investigation** means any investigation commenced by or on behalf of the board of directors (or functionally equivalent management body) of an **Insured Entity**, against an **Executive**, in his/her capacity as such, to determine whether to bring a **Shareholder Derivative Suit** against such **Executive**. An **Internal Investigation** will be deemed commenced upon the **Executive's** receipt of a written communication indicating the initiation of such investigation.

**Interrelated Wrongful Acts** mean any **Wrongful Acts** that are causally connected by reason of any common fact, circumstance, situation, transaction, or event, or series of common facts, circumstances, situations, transactions, or events.

**Investment Activities** mean:
1.       the formation, capitalization, operation, management, administration, marketing, solicitation, dissolution, or liquidation of a **Fund** or **Investment Holding Company** by an **Insured**;
2.       any investment management, portfolio management, or asset allocation services performed for or on behalf of a **Fund**;
3.       any actual or proposed purchase or sale of any debts, securities, or other equities of a **Portfolio Company** by an **Insured Entity**;
4.       any services performed by an **Insured** for a **Portfolio Company** arising from the extension or grant of a loan or credit, or any similar transaction or functional equivalent of a loan;

© CNA  All Rights Reserved.

**PRIVATE EQUITY LIABILITY SOLUTIONS**

5.  any investment advice, advisory, or other services performed by an **Insured** directly or indirectly to or for the benefit of an **Insured Entity** or **Portfolio Company**, including services performed by an **Insured** in the capacity as a **Control Person** of a **Portfolio Company**;

6.  the selection and oversight of outside service providers by an **Insured** for or on behalf of a **Fund**;

7.  any services performed solely in the capacity as a **Shareholder Representative**; or

8.  any compliance or regulatory services performed by an **Insured** in connection with any of the services described in paragraphs 1. through 7. above.

**Investment Holding Company** means any entity which is created or acquired for the sole purpose of acquiring the securities, debentures, or voting rights representing the present right to vote for the election of directors or to select managing partners or managing members of a **Portfolio Company** and in which an **Insured Entity** has **Management Control**. **Investment Holding Company** does not include any **Portfolio Company**.

**Investment Manager** means any entity that provides **Investment Activities** to a **Fund**.

**Loss** means those amounts that an **Insured** is legally obligated to pay as a result of any **Claim**, including awards, settlements, judgments, pre-judgment and post-judgment interest, and claimant's attorney fees and costs attributable to the covered portion of a settlement or imposed as a result of a covered judgment.

**Loss** also includes:

1.  punitive, exemplary, and multiplied damages if such punitive or exemplary damages are insurable in the jurisdiction which is most favorable to an **Insured**, provided that such jurisdiction has a substantial relationship to the relevant **Insureds**, to the Insurer, or to the **Claim** giving rise to such damages;

2.  solely with respect to an **Insured Person**, penalties assessed pursuant to the Foreign Corrupt Practices Act, 15 U.S.C. Section 78dd-2(g)(2)(B), as amended;

3.  solely with respect to Insuring Agreement D, **Shareholder Derivative Demand Investigation Costs**;

4.  **Facilitation Costs**;

5.  **Extradition Costs**; and

6.  **Defense Costs**.

Provided, **Loss**, other than **Defense Costs**, does not include:

(a)  any amount attributable to the cost of any non-monetary relief, including without limitation any costs associated with compliance with any injunctive relief of any kind or nature;

(b)  fines, penalties, or taxes assessed or imposed against an **Insured**, with the exception of penalties in paragraph 2. above;

(c)  amounts which are deemed uninsurable under the law pursuant to which this Policy is construed;

(d)  any amount for which an **Insured** is absolved from payment by reason of any covenant, agreement, or court order;

(e)  payment of any dividends or other similar profit distributions of an **Insured Entity** to any shareholder, stakeholder, or equity holder of an **Insured Entity**;

(f)  **Clean-Up Costs**;

(g)  solely with respect to any **Claim** based upon or arising out of **Investment Activities**, the return of any fees, expenses, or charges paid or incurred by an **Insured**, regardless of whether claimed as restitution of specific funds, forfeiture, financial loss, set-off, or otherwise, or injuries that are a consequence of the foregoing;

(h)  amounts, awards, settlements, or judgments that represent or are substantially equivalent to the price or consideration differential in connection with a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of any of the ownership interest in or assets of an entity is inadequate;

(i)  any amount that represents the return of any contribution of capital to any **Insured Person** or any **Fund**; or

(j)  any actual principal, interest, or other similar amounts for which an **Insured** is liable pursuant to any express or implied promise to contribute or lend money to a **Portfolio Company**.

Provided, that the Insurer will not assert that the portion of any damage, judgment, or settlement or **Defense Costs** that relate to any alleged violations of Sections 11, 12, or 15 of the Securities Act of 1933, as amended, is uninsurable and will treat that portion of such damage, judgment, or settlement or **Defense Costs** as constituting **Loss** under this Policy, subject to all terms, conditions, and exclusions of this Policy.

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS**

**Management Control** means:
1.  owning or controlling interests of an entity representing more than fifty percent (50%) of the right to control or manage such entity as evidenced by the present power to elect, designate, or appoint the majority of the board of directors, management committee members, management board members, general partners, or managing partners of such entity; or
2.  with respect to an entity having the present right, pursuant to written contract or an **Organizational Document**, to elect, designate, or appoint the majority of the board of directors, management committee members, management board members, general partners, or managing partners of such entity.

**Named Insured** means the entity named in Item 1. of the Declarations.

**Non-Indemnifiable Loss** means any **Loss** incurred by an **Insured Person** that an **Insured Entity** fails or refuses to pay, advance, or indemnify:
1.  due to **Financial Insolvency**; or
2.  because such indemnification is not permitted pursuant to law.

**Not-for-Profit Outside Entity** means any charitable not-for-profit entity exempt from federal income taxation, provided that such entity is not an **Insured Entity**.

**Organizational Document** means the articles of incorporation or association, certificate of incorporation, charter, by-laws, offering memorandum, limited liability company agreement, partnership agreement, operating agreement, subscription agreement, advisory or management agreement, separate indemnification agreement, and all other similar documents, instruments, or certificates executed, adopted, or filed in connection with the creation, formation, organization, or governance of an **Insured Entity**, including any amendments thereto.

**Outside Entity** means any **Not-for-Profit Outside Entity** or any **Portfolio Company**.

**Outside Entity Executive** means any natural person who is a holder of such functionally equivalent position to those included in paragraph 1. of the definition of **Executive** in an **Outside Entity** while serving at the specific request or direction of an **Insured Entity**.

**Policy Period** means the period from the effective date of this Policy to the Policy expiration date stated in Item 2. of the Declarations, or its earlier termination or cancellation date. **Policy Period** also includes the **Extended Reporting Period**, if purchased.

**Pollutants** mean any substance exhibiting hazardous characteristics as defined on any list of hazardous substances issued by the United States Environmental Protection Agency or any state, local, or foreign counterpart. **Pollutants** also mean, without limitation, any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, or waste (including materials to be recycled, reconditioned, or reclaimed), as well as any air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos, or asbestos products, or any noise.

**Portfolio Company** means any entity in which a **Fund** has, had, or proposes to have, directly or indirectly with another **Fund** or through an **Investment Holding Company**, an outstanding debt or equity interest before or during the **Policy Period**.

**Regulatory Body** means the Securities Exchange Commission, Department of Justice, Attorneys General, Commodities Futures Trading Commission, or any similar federal, state, local, or foreign government authority, or any self-regulatory organization of which an **Insured** is a member.

**Responsible Person** means any past, present, or future Chief Executive Officer, Chief Financial Officer, Chief Compliance Officer, or In-House General Counsel, while holding such position, or any holder of a functionally equivalent position in the **Named Insured**.

**Shareholder Derivative Demand** means any written demand letter by one or more shareholders of an **Insured Entity** upon the board of directors (or functionally equivalent management body) of such **Insured Entity** to commence an **Internal Investigation** or to bring a **Shareholder Derivative Suit**.

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS**

**Shareholder Derivative Demand Investigation Costs** mean reasonable and necessary fees, costs, and expenses incurred by an **Insured Entity** (including its board of directors or any committee of its board of directors) in connection with the investigation of or responding to a **Shareholder Derivative Demand**. **Shareholder Derivative Demand Investigation Costs** do not include salaries, wages, fees, overhead, or benefit expenses associated with any **Insured Person** or any costs, fees, or expenses incurred in a **Claim**.

**Shareholder Derivative Suit** means a lawsuit brought derivatively on behalf of an **Insured Entity** by a shareholder of such **Insured Entity** against:
1.    an **Executive** of such **Insured Entity**; or
2.    such **Insured Entity** as a nominal defendant.

**Shareholder Representative** means any **Insured Person**, **Insured Entity**, or natural person or entity for whom or which an **Insured** is legally liable, and appointed by the shareholders of a **Portfolio Company** solely for the purpose of acting as an agent of such **Portfolio Company** in accordance with applicable law in order to conduct:
1.    the liquidation or closing of such **Portfolio Company**; or
2.    the management, administration, or distribution of proceeds resulting from the disposition of, or investment in such **Portfolio Company**,
 for, or on behalf of, a **Fund**.

**Subsidiary** means any entity in which an **Insured Entity** (other than a **Fund**) has **Management Control** directly or indirectly through one or more other **Subsidiaries** or **Affiliates**:
1.    on or before the effective date of this Policy; or
2.    after the effective date of this Policy by reason of being acquired or created by an **Insured Entity**, subject to paragraph 1.(a) in Section XI, Change of Control or Status of Insureds.
**Subsidiary** does not include any **Affiliate**, **Portfolio Company**, or **Fund**.

**Takeover** means:
1.    the acquisition by another entity or person, or group of entities or persons acting in concert, of the:
   (a)    ownership or control of voting stock of the **Named Insured** resulting in such entity, person, or group owning or controlling more than fifty percent (50%) of the voting stock of the **Named Insured**;
   (b)    ownership or control of the **Named Insured** as evidenced by the present power to elect, designate, or appoint the majority of the board of directors, management committee members, management board members, general partners, or managing partners of the **Named Insured**; or
   (c)    assets of the **Named Insured** resulting in such entity, person, or group owning more than fifty percent (50%) of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent audited consolidated financial statement prior to such acquisition;
2.    the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity; or
3.    the consolidation of the **Named Insured** with another entity.

**Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by:
1.    any **Insured Person** in: (a) his/her capacity as such; or (b) any matter claimed against such **Insured Person** solely by reason of his/her status as such;
2.    an **Insured Entity**, except while rendering, or failure to render, **Investment Activities**; or
3.    any **Insured Entity**, or by any natural person for whom an **Insured Entity** is legally liable, in the rendering of, or failure to render, **Investment Activities**.

**III.    EXCLUSIONS**

The Insurer will not be liable for **Loss** under this Policy in connection with any **Claim**:

1.    **Contractual Liability**

      for:
      (a)    an **Insured's** actual or alleged liability under any contract or agreement, including express warranties or guarantees; or
      (b)    the actual or alleged liability of others an **Insured** assumes under any contract or agreement, provided that this exclusion does not apply to:

© CNA  All Rights Reserved.

**PRIVATE EQUITY LIABILITY SOLUTIONS**

i.    an **Insured's** liability that exists in the absence of such contract or agreement;
ii.   any **Claim** arising out of the rendering of, or failure to render, **Investment Activities**; or
iii.  any **Claim** based upon, arising out of, or relating to any actual or alleged breach of any **Organizational Document**;

2.    **Employment Related**

based upon or arising out of any **Wrongful Act** constituting or relating to:
(a)   wrongful dismissal or discharge or termination of employment, whether actual or constructive;
(b)   employment-related misrepresentation;
(c)   violation of any federal, state, local, or foreign laws (whether common-law or statutory) concerning employment or discrimination in employment, including the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, or the Civil Rights Act of 1866;
(d)   employment-related sexual harassment or other unlawful harassment;
(e)   wrongful deprivation of career opportunity, failure to grant tenure, demotion, failure to advance to status of partner or equity partner, or failure to employ or promote;
(f)   wrongful discipline in employment;
(g)   employment-related retaliation;
(h)   negligent evaluation of employees;
(i)   failure to adopt adequate workplace or employment policies or procedures;
(j)   employment-related defamation, humiliation, or invasion of privacy;
(k)   negligent hiring, retention, training, or supervision, failure to provide or enforce adequate or consistent corporate policies or procedures, or violation of an individual's civil rights in connection with any of the **Wrongful Acts** described in paragraphs (a) through (j) above;
(l)   employment-related false imprisonment, false arrest, detention, or malicious prosecution; or
(m)   employment-related wrongful infliction of emotional distress,
provided that this exclusion only applies to **Claims** brought by or on behalf of an **Insured Person** or applicant for employment with an **Insured Entity**;

3.    **Discrimination or Harassment**

brought by or on behalf of any third party, and based upon or arising out of any actual or alleged:
(a)   violation of any federal, state, local, or foreign laws (whether common-law or statutory) concerning discrimination; or
(b)   sexual harassment or other unlawful harassment;

4.    **ERISA/COBRA**

for any actual or alleged violation of the responsibilities, obligations, or duties imposed upon fiduciaries by **ERISA, COBRA or any Similar Act** in connection with an **Insured Entity's** or an **Outside Entity's** pension, employee benefit, or welfare plans;

5.    **Illegal Profits/Deliberate Acts**

based upon or arising out of:
(a)   an **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** was not legally entitled, provided that this exclusion 5.(a) does not apply to **Loss** in a **Claim** alleging violations of Sections 11, 12, or 15 of the Securities Act of 1933, as amended; or
(b)   the committing of any deliberate criminal, or deliberate fraudulent act or omission, or any willful violation of law or regulation by an **Insured**,
established by a final non-appealable adjudication in the underlying action or proceeding other than a coverage action to determine the rights and responsibilities of any party to this Policy.

For purposes of determining the applicability of this exclusion:
i.    the conduct of an **Insured Person** will not be imputed to any other **Insured Person**; and
ii.   only the conduct of a **Responsible Person** will be imputed to the **Named Insured**;

6.    **Insured Entity vs. Insured**

© CNA  All Rights Reserved.

(a) brought or maintained by, or on behalf of, an **Insured Entity** against another **Insured Entity**; or

(b) brought or maintained by, or on behalf of, any:

   i.  **Insured Entity** against any **Insured Person**; or

   ii. **Outside Entity** against any **Outside Entity Executive**,

   provided that this exclusion 6.(b) does not apply to any:

   a. **Claim** which is a **Shareholder Derivative Suit**;

   b. **Claim** brought, or maintained, at the recommendation of independent counsel (such counsel approved in advance by the Insurer), and the failure to make such **Claim** would result in liability of an **Insured**;

   c. **Claim** brought or maintained by, or on behalf of:

      (i)  an **Insured Entity** or **Outside Entity** while in **Financial Insolvency**; or

      (ii) the **Named Insured** as a debtor in possession;

   d. **Claim** brought and maintained outside the United States or any common law jurisdiction;

   e. **Claim** that is in the form of a cross-claim, third party claim, or otherwise for contribution or indemnity that is not otherwise excluded;

   f. **Claim** brought or maintained by an **Insured Entity** in its capacity as a **Control Person**; or

   g. **Defense Costs** which constitute **Non-Indemnifiable Loss**.

This exclusion 6. also does not apply to any **Claim** brought or maintained by, or on behalf of, a **Fund** based upon or arising out of the rendering of, or failure to render, **Investment Activities** and the failure to make such **Claim** would result in liability of an **Insured**;

7. **Prior Notice**

based upon or arising out of any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event that has been the subject of any notice accepted under any policy of which this Policy is a direct or indirect renewal or replacement;

8. **Prior or Pending**

based upon, or arising out of, or attributable to the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions, or events underlying or alleged in any written demand, request, action, proceeding, claim, investigation, inquiry, or **Claim** commenced against any **Insured** on or prior to the Prior or Pending Date set forth in Item 8. of the Declarations;

9. **Bodily Injury/Property Damage**

for any actual or alleged bodily injury (including death), sickness, violation of any right of privacy, disease, emotional distress, mental anguish, libel, slander, or defamation of any person, or damage to or destruction of any tangible property, including loss of use, provided that this exclusion does not apply to:

(a) damage to, destruction of, or loss of use of the records of a client, investor, or **Portfolio Company** in the sole possession of an **Insured**; or

(b) **Non-Indemnifiable Loss**;

10. **Securities Broker or Dealer**

for any actual or alleged liability involving the activities of any **Insured** as a "broker" or "dealer" in securities, as defined in Section 2(11) of the Securities Act of 1933, as amended, and Sections 3(a)(4) and 3(a)(5), respectively of the Securities Exchange Act of 1934, as amended, provided that this exclusion 10. does not apply to the distribution, underwriting, or resale of securities purchased directly from a **Fund** by a distributor for resale to any broker or dealer;

11. **Publishing Liability**

© CNA  All Rights Reserved.

CNA

**PRIVATE EQUITY LIABILITY SOLUTIONS**

for any actual or alleged plagiarism, misappropriation, infringement, or violation of copyright, patent, trademark, trade secret, or any other intellectual property rights, provided that this exclusion 11. does not apply to any **Insured Person**;

12. **Public Offerings**

based upon or arising out of any actual or alleged public offer, sale, offer to sell, solicitation, or distribution of equity or debt securities issued by an **Insured Entity**, provided that this exclusion 12. does not apply to:
(a)    the extent a **Claim** is made as a result of any actual or proposed purchase or sale of equity or debt securities:
    i.     of a **Portfolio Company**; or
    ii.    that are not required to be registered under any federal, state, or local statute that regulates the offering, sale, or purchase of securities;
(b)    the preparation for any public offering, including any "road show" presentations or any other presentations made by an **Insured Entity** or any **Executive** in connection with such public offering, provided that such offering does not occur; or
(c)    a failed undertaking of, or failure to complete, an initial public offering.

## IV.    LIMIT OF LIABILITY/RETENTION/INDEMNIFICATION/ADVANCEMENT OF DEFENSE COSTS

1.    <u>**Aggregate Limit of Liability**</u>

The amount set forth in Item 6.a. of the Declarations as the Aggregate Limit of Liability is the maximum aggregate limit of the Insurer's liability for all **Loss** under this Policy arising from **Claims** first made against the **Insureds** or **Shareholder Derivative Demands** first received by the **Insured Entities** during the **Policy Period**.

2.    <u>**Shareholder Derivative Demand Investigation Costs Sublimit of Liability**</u>

The **Shareholder Derivative Demand Investigation Costs** Sublimit of Liability set forth in Item 6.b. of the Declarations is the aggregate limit of the Insurer's liability for all **Shareholder Derivative Demand Investigation Costs** arising from all **Shareholder Derivative Demands**, regardless of the number of **Shareholder Derivative Demands**. The **Shareholder Derivative Demand Investigation Costs** Sublimit of Liability is part of and not in addition to the Aggregate Limit of Liability set forth in Item 6.a. of the Declarations.

3.    <u>**Retention**</u>

(a)    The Insurer will only be liable for **Loss** that is in excess of the applicable Retention stated in Item 7. of the Declarations. Any applicable Retention will be uninsured and borne by an **Insured**.
(b)    A single Retention applies to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts**.
(c)    No Retention applies with respect to:
    i.     **Non-Indemnifiable Loss**;
    ii.    a **Shareholder Derivative Demand**; or
    iii.   **Claims** against an **Outside Entity Executive** serving in his/her capacity as such.

4.    <u>**Presumptive Indemnification and Advancement of Defense Costs**</u>

It is agreed that each **Insured Entity** will fulfill its indemnification obligations to each **Insured Person** to the fullest extent permitted by law.

The Insurer will advance **Defense Costs** on a current basis, but no later than ninety (90) days after receipt and review of the legal bills and any supporting documentation reasonably requested by the Insurer. In the event that an **Insured Person** makes a written request for indemnification from an **Insured Entity** and such **Insured Entity** fails to respond, or refuses to indemnify such **Insured Person** within sixty (60) days of such request, then the Insurer will advance **Defense Costs**. Such advancement will continue until such time that

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS**

such **Insured Entity** accepts such **Insured Person's** request for indemnification or the aggregate Limit of Liability set forth in the Declarations has been exhausted, whichever occurs first.

The Insurer reserves all rights to recoupment with respect to any advancement of **Defense Costs**. Any such advancement of **Defense Costs** will be repaid to the Insurer by the **Insureds**, severally according to their respective interests, if and to the extent it is determined that such **Defense Costs** are not insured under this Policy. The Insurer will not seek repayment from an **Insured** of advanced **Defense Costs** that are uninsured pursuant to Exclusion 5, Illegal Profits/Deliberate Acts, of Section III, Exclusions, unless established by a final non-appealable adjudication as specified therein.

Any advancement of **Defense Costs** by the Insurer will reduce the Limit of Liability set forth in the Declarations. If the Insurer recovers any such **Defense Costs** paid, the amount of such **Defense Costs**, less all costs incurred by the Insurer to obtain such recovery, will be applied to the Limit of Liability.

## V.    COOPERATION/CONSENT/DUTY TO DEFEND/ALLOCATION

1.    **Cooperation**

Each **Insured** will, as a condition precedent to obtaining coverage under this Policy, give the Insurer full cooperation, assistance, and information as the Insurer may reasonably request. The **Insureds** will do nothing that in any way increases the Insurer's liabilities or prejudices the Insurer's potential or actual rights of recovery. The failure of any **Insured Person** to give the Insurer cooperation, assistance, and information as required hereunder will not impair the rights of any other **Insured Person** under this Policy.

2.    **Insurer's Consent**

The **Insureds** will not agree to any settlement, make any offer of settlement, stipulate to any judgment, incur any **Defense Costs**, **Loss**, **Shareholder Derivative Investigative Costs**, **Extradition Costs**, **Facilitation Costs**, or any similar cost or expense, or admit any liability or assume any contractual obligation, without the Insurer's prior written consent, such consent not to be unreasonably withheld.

Notwithstanding the above:
(a)    the **Insureds** may incur up to fifty percent (50%) of the applicable Retention in **Defense Costs** without the Insurer's prior written consent, provided that any **Defense Costs** in excess of this amount will be subject to the Insurer's consent; and
(b)    if the **Insureds** are able to settle all **Claims**, including all **Claims** alleging **Interrelated Wrongful Acts**, for an aggregate amount, including **Defense Costs**, not exceeding the applicable Retention, the Insurer's consent will not be required for the settlement of such **Claims**.

3.    **Duty to Defend**

The **Insureds** have the duty to defend under this Policy. The Insurer is entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**, payment of any **Loss**, costs, or expenses that appear reasonably likely to exceed the applicable Retention.

4.    **Allocation**

The Insurer and the **Insureds** will use their best efforts to determine a fair and proper allocation between covered **Loss** and any amount that is not covered loss, based on the relative legal and financial exposures of the covered parties to the covered matters. Failure of the Insurer and an **Insured** to agree to an allocation determination will not preclude the Insurer from advancing **Defense Costs** in accordance with paragraph 4. of Section IV, Limit of Liability/Retention/Indemnification/Advancement of Defense Costs.

If the **Insureds** and the Insurer cannot, after exerting their best efforts, agree on an allocation of covered **Defense Costs** and uncovered defense costs, the Insurer then will advance the percentage of **Defense Costs** which the Insurer deems to be fair and proper until a different allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS**

Any allocation or advancement of **Defense Costs** will not apply to or create any presumption with respect to the allocation of other **Loss**.

## VI.     SUBROGATION

To the extent it pays any **Loss**, the Insurer will be subrogated to all the **Insureds**' rights of recovery, including any right to indemnification from any entity, insurer, or other source. If the Insurer recovers any such **Loss** paid, the amount of such **Loss**, less all costs incurred by the Insurer to obtain such recovery, will be applied to the Limit of Liability.  The **Insureds** will cooperate and assist in securing such rights of recovery and indemnification.

In no event will the Insurer exercise its right to subrogate against an **Insured**.

## VII.     NOTICE AND INTERRELATED CLAIMS

1.     __Notice of Claim__

The **Insureds** will, as a condition precedent to the obligations of the Insurer under this Policy, give written notice to the Insurer of each **Claim** as soon as practicable after a **Responsible Person** first becomes aware of such **Claim**, but in no event later than:
(a)     ninety (90) days after the termination or expiration of the **Policy Period**, provided that this Policy has not been renewed by the Insurer or extended by purchase of an **Extended Reporting Period**; or
(b)     the expiration of the **Extended Reporting Period**.

2.     __Notice of Circumstances__

Should a **Responsible Person** elect to provide notice of circumstances which may reasonably be expected to give rise to a **Claim**, such notice must be in writing and include the basis of the potential **Claim**, the alleged or potential **Wrongful Acts**, the remedy and potential damages sought, the parties involved, and when an **Insured** first became aware of such circumstances or allegations. Any **Claim** otherwise covered pursuant to this Policy that is subsequently made and that arises out of such notice of circumstances will be deemed to have been first made during the **Policy Period** in which such written notice was received by the Insurer.

3.     __Request for Specified Costs or Fees__

In the event that an **Insured** seeks coverage for **Shareholder Derivative Demand Investigative Costs**, such **Insured** must submit a written notice to the Insurer which provides the date the **Shareholder Derivative Demand** was first received and a copy of the demand, and if not contained within the demand, identification of the parties involved and the remedy sought.

Any **Claim** otherwise covered pursuant to this Policy that is subsequently made and that arises out of a noticed **Shareholder Derivative Demand** will be deemed to have been first made during the **Policy Period** in which such written notice was received by the Insurer.

4.     __Interrelatedness__

With respect to any **Claims** involving the same **Wrongful Act** or **Interrelated Wrongful Acts**, such **Claims** will be deemed one **Claim** which was first made on the earlier of:
(a)     the date on which the earliest such **Claim** was first made; or
(b)     the earliest date valid notice was given by an **Insured** to the Insurer under this Policy or under any prior policy of any **Wrongful Act** or any fact, circumstance, situation, event, or transaction that underlies any such **Claim**.

In no event will an individual lawsuit or proceeding constitute more than one **Claim**.

5.     __To Whom Notices are Sent__

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS**

The **Insureds** will give written notice to the Insurer by regular mail or email sent to the addresses specified in the Declarations. With proof of mailing, the date the written notice was sent will be deemed the effective date of notice.

**VIII.   EXTENDED REPORTING PERIOD**

1.    If this Policy is canceled, or terminates for any reason other than non-payment of premium, the **Named Insured** will have the right to purchase an **Extended Reporting Period** for the premium and time period stated in Item 5. of the Declarations.

2.    The right to an **Extended Reporting Period** will lapse unless written notice of election to purchase such **Extended Reporting Period**, together with payment of the specified premium, is received by the Insurer within sixty (60) days after the effective date of cancellation or termination of this Policy.

3.    In the event the **Named Insured** elects not to purchase an **Extended Reporting Period**, an **Insured Entity** (other than the **Named Insured**) or **Insured Persons** will have the right to purchase such **Extended Reporting Period**, provided written notice of election to purchase, together with payment of the specified premium, is received by the Insurer within thirty (30) days after the expiration date of the aforementioned sixty (60) day period. Any such **Extended Reporting Period** elected pursuant to this paragraph 3. will only apply to **Claims** made against such **Insured Entity** or **Insured Persons** who purchased the **Extended Reporting Period**.

4.    If any **Insured** elects to purchase an **Extended Reporting Period** as set forth in paragraphs 2. or 3. above, coverage otherwise afforded by this Policy will apply, subject to all terms and conditions, provided that such coverage will extend only to **Claims** that are: (a) first made during the **Extended Reporting Period**; (b) reported in accordance with paragraph 1. of Section VII, Notice and Interrelated Claims; and (c) for **Wrongful Acts** taking place before the effective date of such cancellation or termination.

5.    Any **Extended Reporting Period** purchased will become part of the **Policy Period** extending such **Policy Period** to the expiration of the time period stated in Item 5.a. of the Declarations.

6.    The premium for the **Extended Reporting Period** will be deemed fully earned at the inception of the **Extended Reporting Period**.

7.    There is no separate or additional Limit of Liability for any **Extended Reporting Period**.

**IX.   TERMINATION OR CANCELLATION**

This Policy will terminate at the earliest of the following events:
1.    expiration of the **Policy Period**;
2.    termination by the Insurer only for nonpayment of premium, in which case the Insurer will provide to the **Named Insured** written notice of such termination which will be effective twenty (20) days after receipt by the **Named Insured**; or
3.    cancellation by the **Named Insured** by providing notice to the Insurer stating when such cancellation will be effective.

Any return of premium will be computed on a pro rata basis.

**X.   REPRESENTATIONS AND SEVERABILITY OF THE APPLICATION**

The **Insureds** represent and acknowledge that the statements, representations, and information in the **Application** are true and accurate. This Policy is issued in reliance upon the truth and accuracy of such statements, representations, and information.

The **Application** is deemed a separate request for coverage by each **Insured**. As such, with respect to any statements, representations, and information in the **Application**, no knowledge possessed by any **Insured Person** will be imputed to any other **Insured Person**.

© CNA  All Rights Reserved.

In the event the statements, representations, or information in the **Application** contain any actual or knowing misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the Insurer under this Policy, there will be no coverage for any **Loss** on account of any **Claim** alleging, arising out of, or based upon any such misrepresentations or omissions:

1.    with respect to any **Insured Person** who knew of such misrepresentations or omissions. For purposes of this paragraph, the knowledge of any **Insured Person** will not be imputed to any other **Insured Person**;

2.    with respect to an **Insured Entity**, to the extent it indemnifies any **Insured Person** identified in paragraph 1. above as having knowledge of the such misrepresentations or omissions; and

3.    with respect to the **Named Insured**, if any **Responsible Person** knew of such misrepresentations or omissions.

The Insurer will not be entitled to rescind or void this Policy with respect to any **Insured**.

## XI.    CHANGE OF CONTROL OR STATUS OF INSUREDS

1.    __Subsidiaries__ or __Affiliates__

(a)    Acquisition or Creation of a Subsidiary

i.    Subject to paragraph ii. below, if before or during the **Policy Period** an **Insured Entity** acquires, creates, or obtains **Management Control** of another entity, such that the acquired or newly created entity becomes a **Subsidiary**, then such **Subsidiary** and the **Insured Persons** thereof, will be **Insureds** only with respect to **Wrongful Acts** occurring after such acquisition or creation.

ii    If a **Subsidiary** is acquired or created during the **Policy Period** pursuant to paragraph i. above and the total assets of such **Subsidiary** exceed twenty-five percent (25%) of the total assets of the **Named Insured** (as reflected in the most recent audited consolidated financial statements of such **Subsidiary** and the **Named Insured**, respectively, as of the date of such acquisition or creation), then the **Named Insured**, no later than ninety (90) days after the date of such acquisition or creation, will provide written notice of such acquisition or creation to the Insurer together with all information the Insurer may reasonably require. Coverage for any such acquired or created **Subsidiary** and its **Insured Persons** may be subject to additional or different terms and conditions and payment of additional premium.

If the **Named Insured** fails to give such notice and information in accordance with the foregoing, or refuses to accept additional or different terms and conditions, or payment of additional premium, coverage for such acquired or created **Subsidiary** and its **Insured Persons** will terminate with respect to **Claims** first made more than ninety (90) days after such acquisition or creation. Such coverage will not be eligible for any **Extended Reporting Period** purchase.

(b)    Control Over an Affiliate

If, during the **Policy Period**, an **Insured Entity** gains control over, or comes under common control or common co-control with, an entity such that the entity becomes an **Affiliate**, then such **Affiliate** and the **Insured Persons** thereof, will be **Insureds** only with respect to **Wrongful Acts** occurring after such **Insured Entity** gains control over, or comes under common control or common co-control, with such **Affiliate**.

© CNA  All Rights Reserved.

(c)    Cessation of a Subsidiary or Affiliate

If, during the **Policy Period**, an **Insured Entity** ceases to be a **Subsidiary** or an **Affiliate**, then with respect to such **Subsidiary** or **Affiliate** and their respective **Insured Persons**, coverage will continue for **Claims** for **Wrongful Acts** or **Interrelated Wrongful Acts** while such **Insured Entity** was a **Subsidiary** or an **Affiliate** until this Policy is terminated or canceled. The Insurer reserves the right to offer an extension of coverage subject to additional or different terms and conditions and payment of additional premium.

2.    **Funds**

(a)    Acquisition or Creation of a Fund

If a fund is acquired or created during the **Policy Period**, then the **Named Insured**, no later than ninety (90) days after the date of such acquisition or creation, must provide written notice of such acquisition or creation to the Insurer together with all information the Insurer may reasonably require.

If the investment objectives of such newly created or acquired fund as set forth in the offering document or the private placement memorandum:

i.    do not differ materially from the investment objectives of the previous **Funds**, then there will be automatic coverage for such newly acquired or created **Fund** and its **Insured Persons**; or

ii.    differ materially from the investment objectives of the previous **Funds**, then coverage for such newly acquired or created fund and its directors, officers, trustees, employees, or other affiliated natural persons who would otherwise become **Insured Persons** will be at the sole option of the Insurer and may be subject to additional or different terms and conditions and payment of additional premium.

(b)    Cessation, Dissolution, or Liquidation of a Fund

If, during the **Policy Period**, an **Insured Entity** ceases to be a **Fund**, then with respect to such **Fund** and its **Insured Persons**, coverage will continue for **Claims** for **Wrongful Acts** or **Interrelated Wrongful Acts** while such **Insured Entity** was a **Fund** (or until the final dissolution or liquidation of the **Fund**, whichever is later) until this Policy is terminated or canceled.  The Insurer reserves the right to offer an extension of coverage subject to additional or different terms and conditions and payment of additional premium.

3.    **Takeover**

In the event of a **Takeover** during the **Policy Period**, coverage under this Policy will continue until this Policy is otherwise terminated or canceled, but only with respect to **Claims** for **Wrongful Acts** occurring before the effective date of the **Takeover**, unless:

(a)    the Insurer is notified in writing of the **Takeover** prior to the **Takeover** effective date;
(b)    the Insurer agrees in writing to provide coverage for **Wrongful Acts** occurring on or after such effective date, subject to additional or different terms and conditions and payment of additional premium; and
(c)    the **Named Insured** accepts any additional or different terms and conditions and payment of additional premium required by the Insurer.

This Policy may not be canceled after the effective date of the **Takeover** and the entire premium for this Policy will be deemed earned as of such effective date.

**XII.    OTHER INSURANCE**

© CNA  All Rights Reserved.



**PRIVATE EQUITY LIABILITY SOLUTIONS**

1.  In the event **Loss** covered under this Policy is also covered under any other valid and collectible insurance policy, then this Policy will apply as excess of the applicable retention and limit of liability of such other policy, unless such other insurance is written specifically as excess insurance of the Limits of Liability provided by this Policy. Notwithstanding the foregoing, this Policy will apply as primary with respect to any personal umbrella or personal directorship liability insurance purchased by an **Insured Person**.

2.  Any coverage afforded by this Policy will apply specifically as excess of, and will not contribute with, any fiduciary, environmental, cyber, or employment practices liability policy.

3.  Any coverage afforded by this Policy for a **Claim** against an **Outside Entity Executive** will apply specifically as excess of any insurance and/or indemnification available to such **Outside Entity Executive** from an **Outside Entity**, after all reasonable efforts are made by such **Outside Entity Executive** to collect such insurance or indemnification.

    In the event that an **Outside Entity Executive** makes a written request for indemnification from an **Outside Entity** and such **Outside Entity** fails to respond, or refuses to indemnify such **Outside Entity Executive** within sixty (60) days of such request, then the Insurer will advance **Defense Costs** according to paragraph 4. of Section IV, Limit of Liability/Retention/Indemnification/ Advancement of Defense Costs.

**XIII.    ESTATES, LEGAL REPRESENTATIVES AND SPOUSES**

The estates, heirs, legal representatives, assigns, spouses, and any **Domestic Partner** of **Insured Persons** will be considered **Insureds** under this Policy; provided that coverage is afforded to such estates, heirs, legal representatives, assigns, spouses, and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse, or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly held property, or property transferred from an **Insured Person** to such **Insured Person's** spouse or **Domestic Partner**. No coverage is provided for any act, error, or omission of an estate, heir, legal representative, assign, spouse, or **Domestic Partner** of an **Insured Person**. All terms and conditions of this Policy, including without limitation the Retention, applicable to **Loss** incurred by an **Insured Person**, also applies to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses, and **Domestic Partners**.

**XIV.    BANKRUPTCY**

Bankruptcy or insolvency of any **Insured Entity** or any **Insured Person** does not relieve the Insurer of any of its obligations hereunder.

The **Insureds** agree not to oppose or object to any efforts by the Insurer or any other **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this Policy as a result of the commencement of any bankruptcy or insolvency proceeding.

**XV.    PRIORITY OF PAYMENTS**

Any coverage afforded by this Policy is principally intended to benefit the **Insured Persons**. In the event that **Non-Indemnifiable Loss** and any other **Loss** are concurrently due, then the **Non-Indemnifiable Loss** will be paid first. All other **Loss** will be paid as it becomes due in accordance with the terms and conditions of this Policy.

**XVI.    NO ACTION AGAINST INSURER**

1.  No action will be taken against the Insurer unless, as a condition precedent, there has been full compliance with all the provisions of this Policy.

2.  No person or entity has any right under this Policy to join the Insurer as a party to any **Claim** against an **Insured** to determine such **Insured's** liability, nor will the Insurer be impleaded by an **Insured** or their legal representatives in any such **Claim**.

**XVII.    CHANGES OR ASSIGNMENT**

Notice to, or knowledge possessed by, any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or prevent the Insurer from asserting any right under the provisions of

© CNA  All Rights Reserved.

**PRIVATE EQUITY LIABILITY SOLUTIONS**

this Policy. The provisions of this Policy cannot be waived or changed except by written endorsement issued to form a part of this Policy.

Further, any assignment of interest under this Policy will not bind the Insurer unless the Insurer's consent to such assignment is endorsed to this Policy.

## XVIII.  TERRITORY

Coverage will apply worldwide.

## XIX.  NAMED INSURED AUTHORIZATION AND NOTICE

The **Insureds** agree that the **Named Insured** will act on behalf of all **Insureds** with respect to giving of all notice to the Insurer (except notices provided under Section VII, Notice and Interrelated Claims and under paragraph 3. of Section VIII, Extended Reporting Period), the receipt of notices from the Insurer, the payment of the premiums (except payment of premiums under paragraph 3. of Section VIII, Extended Reporting Period), the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements.

Any notices to the **Named Insured** under this Policy will be provided to the **Named Insured** at the address provided in Item 1. of the Declarations. If properly mailed to the **Named Insured** at such address, the date of mailing will constitute the date such notice was given.

## XX.  ENTIRE AGREEMENT

The **Insureds** agree that this Policy, including the **Application**, constitute the entire contract existing between them and the Insurer or any of its agents relating to this insurance.

## XXI.  VALUATIONS

All premiums, limits, retentions, **Loss**, and other amounts under this Policy are expressed and payable in United States of America currency. If any judgment, settlement, or any part of **Loss** is expressed or calculated in any other currency, payment of such **Loss** due under this Policy will be made in the currency of the United States of America, at the rate of exchange published in The Wall Street Journal on the date the Insurer's obligation to pay such **Loss** is established, or, if not published on that date, on the date of next publication.

## XXII.  TRADE AND ECONOMIC SANCTIONS

This Policy does not provide coverage for an **Insured**, transaction, or that part of loss that is uninsurable under the laws or regulations of the United States concerning trade or economic sanctions.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be executed by its Chairman and Secretary, but this Policy will not be binding upon us unless completed by the attachment of the Declarations.

Chairman                                                    Secretary

_____                          _____

© CNA  All Rights Reserved.

**SERVICE OF SUIT ENDORSEMENT**

Wherever used in this endorsement Named Insured means the first person or entity named on the declarations page.

In consideration of the premium paid for this Policy, it is agreed that the following provision is added to the Policy:

**SERVICE OF SUIT**

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the below-named as the person to whom the said officer is authorized to mail such process or true copy thereof.

Service of process in such suit shall be made upon:

General Counsel
Columbia Casualty Company
151 North Franklin Street
Chicago, IL 60606

and in any suit instituted against such person upon this policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The General Counsel is authorized and directed to accept service of process on behalf of the Insurer in any such suit and, upon the request of the Named Insured, to give a written undertaking to the Named Insured that he will enter a general appearance upon the Insurer's behalf in the event such suit shall be instituted.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA74300XX (6-14)
Page 1

Policy No:    652290339
Endorsement No:   1
Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



### STATE AMENDATORY INCONSISTENCY ENDORSEMENT

It is understood and agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this policy and any term or condition of this policy, then, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory endorsement or the policy which are more favorable to the **Insured**.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA69560XX (1-13)                                              Policy No:      652290339
Page 1                                                        Endorsement No:  2
Columbia Casualty Company                                     Effective Date:  12/30/2022
Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.

**CNA**

## CRISIS EVENT EXPENSES EXTENSION ENDORSEMENT

In consideration of the premium, this Policy is amended as follows:

I.      The Declarations is amended as follows:

      A.      Item 6. of the Declarations is amended to add the following:

            • **Crisis Event Expenses** Sublimit of Liability (subject to the Aggregate Limit of Liability): $250,000

      B.      Item 7. is amended to add the following:

          **Crisis Event Expenses** Insuring Agreement: No Retention.

II.     Section I, Insuring Agreements is amended to add the following Insuring Agreement:

      **Crisis Event Expenses**

      The Insurer will reimburse the **Insured Entity** for **Crisis Event Expenses** resulting from any **Crisis Event** first occurring during the **Policy Period**.

III.    Section II, Definitions is amended as follows:

      A.      The definition of **Loss** is amended to add the following:

          **Loss** will also include **Crisis Event Expenses**.

      B.      The following definitions are added:

          **Crisis Event** means any one of the following events:
          1.    an **Insured Entity's** issuance of a public announcement stating that its audited financials from the immediate prior fiscal year will be restated;
          2.    the unexpected death, discharge, resignation, or termination of an **Executive** of the **Named Insured**;
          3.    the appointment of a receiver, conservator, liquidator, trustee, rehabilitator, or similar official or creditors' committee to take control of, supervise, manage, or liquidate an **Insured Entity**;
          4.    an unsolicited **Takeover** proposal received by the **Named Insured**, or the commencement of an unsolicited **Takeover** bid for the **Named Insured**; or
          5.    any criminal or fraudulent act committed or allegedly committed against an **Insured**,
          provided that:
          (a)   the events described in paragraphs 1. through 5. above must have the potential to cause an **Insured Entity** to incur reputational harm, adverse publicity, or business disruption; and
          (b)   none of the events described in paragraphs 1. through 5. above were planned or reasonably foreseeable by an **Executive** prior to the inception date of this Policy.

          **Crisis Event** does not include any cyber or cyber breach related events.

          A **Crisis Event** is deemed to have first occurred on the earliest date upon which the: (i) notice was received by the **Insured**; (ii) actual event occurred; or (iii) public announcement was made.

          **Crisis Event Expenses** mean reasonable and necessary fees and expenses incurred by an **Insured Entity** and consented to in advance by the Insurer (such consent not to be unreasonably withheld) for:
          1.    **Crisis Management Services** by a **Crisis Management Adviser**;
          2.    legal or accounting services, valuation opinions, or outside advisers or consultants;
          3.    issuing public or private communications; or
          4.    travel of an **Executive**,

---

CNA94406XX (2-19)                                      Policy No:   652290339
Page 1                                              Endorsement No:   3
                                                        Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.

provided that such fees and expenses are incurred: (a) to mitigate or minimize reputational harm, adverse publicity, or business disruption resulting from such **Crisis Event**; and (b) within twelve (12) months following the provision of written notice to the Insurer of a **Crisis Event**.

**Crisis Management Adviser** means any independent crisis management services firm, consulting firm, or public relations firm retained by the **Insured** and consented to by the Insurer (such consent will not be unreasonably withheld) to respond to a **Crisis Event**.

**Crisis Management Services** means services rendered by the **Crisis Management Advisor** to an **Insured Entity** or an **Executive** with respect to managing adverse media coverage, public perception, reputational harm, or business disruption resulting from a **Crisis Event**.

IV.   Section III. Exclusions is amended to add the following exclusion:

- The Insurer will not be liable for **Crisis Event Expenses** under this Policy in connection with any **Crisis Event** based upon or arising out of any matter, fact, circumstance, situation, transaction, or event that has been the subject of any notice accepted under any policy of which this Policy is a direct or indirect renewal or replacement;

V.   Section IV, Limit of Liability/Retention/Indemnification/Advancement of Defense Costs is amended as follows:

A.   Paragraph 1, Aggregate Limit of Liability is amended to add the following sentence:

The amount set forth in Item 6.a. of the Declarations as the Aggregate Limit of Liability also includes all **Loss** arising from **Crisis Events** first occurring during the **Policy Period**.

B.   Paragraph 3(c) of Retention is amended to add the following subparagraph:

- a **Crisis Event**.

C.   The following paragraph is added:

**Crisis Event Expenses Sublimit of Liability**

The **Crisis Event Expenses** Sublimit of Liability set forth in Item 6. of the Declarations is the aggregate limit of the Insurer's liability for all **Crisis Event Expenses** arising from all **Crisis Events**, regardless of the number of **Crisis Events**. The **Crisis Event Expenses** Sublimit of Liability is part of and not in addition to the Aggregate Limit of Liability set forth in Item 6.a. of the Declarations.

VI.   The first paragraph of paragraph 2, Insurer's Consent of Section V, Cooperation/Consent/Duty to Defend/Allocation is amended to add the following:

The **Insureds** will also not incur any **Crisis Event Expenses** without the Insurer's prior written consent, such consent not to be unreasonably withheld.

VII.   Paragraph 3, Request for Specified Costs or Fees in Section VII, Notice and Interrelated Claims is amended to add the following paragraphs:

In the event that an **Insured Entity** seeks coverage for **Crisis Event Expenses**, such **Insured Entity** must submit a written notice to the Insurer which provides the date the **Crisis Event** first occurred and the details involving the **Crisis Event**.

Any **Claim** otherwise covered pursuant to this Policy that is subsequently made and that arises out of a noticed **Crisis Event** will be deemed to have been first made during the **Policy Period** in which such written notice was received by the Insurer.

CNA94406XX (2-19)
Page 2

Policy No:   652290339
Endorsement No:   3
Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA94406XX (2-19)
Page 3

Policy No:        652290339
Endorsement No:   3
Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.

**PORTFOLIO COMPANY SUCCESSOR LIABILITY EXTENSION ENDORSEMENT**

In consideration of the premium, this Policy is amended as follows:

I.      The Declarations is amended as follows:

    A.      Item 6. of the Declarations is amended to add the following:

- **Portfolio Company Successor Claim Defense Costs** Sublimit of Liability (subject to the Aggregate Limit of Liability): $250,000

    B.      Item 7. is amended to add the following:

        **Portfolio Company Successor Liability** Insuring Agreement: No Retention.

II.     Section I, Insuring Agreements is amended to add the following Insuring Agreement:

    <u>**Portfolio Company Successor Liability**</u>

    The Insurer will pay **Defense Costs** on behalf of an **Insured Entity** resulting from any **Portfolio Company Successor Claim** first made against such **Insured Entity** during the **Policy Period**.

III.    Section II, Definitions is amended as follows:

    A.      The definition of **Defense Costs** is amended to add the following:

    Solely with respect to a **Portfolio Company Successor Claim**, **Defense Costs** mean reasonable and necessary fees, costs, and expenses consented to by the Insurer (such consent not to be unreasonably withheld) and incurred by an **Insured Entity** in the investigation, adjustment, defense, or appeal of any covered **Portfolio Company Successor Claim**.

    B.      The following definitions are added:

    **Portfolio Company Successor Claim** means a lawsuit in which an **Insured Entity** is named as a defendant on account of any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by:
1.      an entity, prior to such entity becoming a **Portfolio Company**; or
2.      a natural person employed by such entity, and
the **Insured Entity** is named solely in the capacity as a **Control Person** of such **Portfolio Company**.

    A **Portfolio Company Successor Claim** will be deemed first made on the earliest of the date on which the **Portfolio Company Successor Claim** is first served upon or first received by an **Insured Entity**.

IV.     Section III, Exclusions is amended to add the following exclusion:

- The Insurer will not be liable for **Defense Costs** under this Policy in connection with any **Portfolio Company Successor Claim** based upon or arising out of any matter, fact, circumstance, situation, transaction, or event that has been the subject of any notice accepted under any policy of which this Policy is a direct or indirect renewal or replacement;

V.      Section IV, Limit of Liability/Retention/Indemnification/Advancement of Defense Costs is amended as follows:

    A.      Paragraph 1, Aggregate Limit of Liability is amended to add the following sentence:

    The amount set forth in Item 6.a. of the Declarations as the Aggregate Limit of Liability also includes all **Loss** arising from **Portfolio Company Successor Claims** first made against the **Insured Entities** during the **Policy Period**.

Policy No:   652290339
Endorsement No:   4
Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



B.    Paragraph 3(c) of Retention is amended to add the following subparagraph:

- a **Portfolio Company Successor Claim**.

C.    The following paragraph is added:

**Portfolio Company Successor Claim Defense Costs Sublimit of Liability**

The **Portfolio Company Successor Claim Defense Costs** Sublimit of Liability set forth in Item 6. of the Declarations is the aggregate limit of the Insurer's liability for all **Defense Costs** arising from all **Portfolio Company Successor Claims**, regardless of the number of **Portfolio Company Successor Claims**. The **Portfolio Company Successor Claim Defense Costs** Sublimit of Liability is part of and not in addition to the Aggregate Limit of Liability set forth in Item 6.a. of the Declarations.

VI.    Paragraph 3, Request for Specified Costs or Fees in Section VII, Notice and Interrelated Claims is amended to add the following paragraphs:

In the event that an **Insured Entity** seeks coverage for **Defense Costs** for a **Portfolio Company Successor Claim**, such **Insured Entity** must submit written notice to the Insurer of such **Portfolio Company Successor Claim** as soon as practicable after a **Responsible Person** first becomes aware of such **Portfolio Company Successor Claim**, but in no event later than ninety (90) days after the termination or expiration of the **Policy Period**.

Any **Claim** otherwise covered pursuant to this Policy that is subsequently made and that arises out of a noticed **Portfolio Company Successor Claim** will be deemed to have been first made during the **Policy Period** in which such written notice was received by the Insurer.

All other terms and conditions of the Policy remain unchanged.

> This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA94348XX (2-19)
Page 2

Policy No:    652290339
Endorsement No:    4
Effective Date:    12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



## EMPLOYED LAWYERS ENDORSEMENT

In consideration of the premium, the Policy is amended as follows:

I.      Section II, Definitions is amended as follows:

    A.      The definition of **Insured Person** is amended to add the following:

        **Insured Person** also includes an **Employed Lawyer**.

    B.      Solely with respect to an **Employed Lawyer**, paragraph 8 of the definition of **Investment Activities** is deleted and replaced with the following:

        8.      any legal, compliance, or regulatory services performed by an **Insured** in connection with any of the services described in paragraphs 1. through 7. above.

    C.      Solely with respect to an **Employed Lawyer**, the definition of **Wrongful Act** is deleted and replaced with the following:

        **Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an **Employed Lawyer**, in the rendering of, or failure to render professional legal services for an **Insured Entity** or a **Portfolio Company**, but solely in his/her capacity as an **Employed Lawyer**.

    D.      The following definition is added:

        **Employed Lawyer** means any natural person who is or was at the time of the **Wrongful Act** employed as a lawyer full-time and salaried by an **Insured Entity**, and admitted to the practice of law.

II.     Solely with respect to **Employed Lawyers**, Section III, Exclusions is amended to add the following exclusion:

    The Insurer will not be liable for **Loss** under this Policy in connection with any **Claim**:

    **Employed Lawyers**

    based upon or arising out of an **Employed Lawyer's** actual or alleged performance of, or failure to perform, any legal services other than those legal services provided to or for the benefit of an **Insured Entity** or a **Portfolio Company** within the scope of the **Employed Lawyer's** employment.

III.    Solely with respect to **Employed Lawyers**, Section XII, Other Insurance is amended to add the following paragraph:

    Any coverage afforded by this Policy to any **Employed Lawyer** will apply specifically as excess of the applicable retention and limit of liability to any other valid and collectible insurance, including any lawyers' professional insurance, legal malpractice, or errors and omissions insurance, and any excess insurance available thereto.

IV.     It is understood and agreed that the coverage afforded by this endorsement will not be construed to reduce or negate coverage otherwise available to an **Employed Lawyer** who is also an **Executive**.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA94393XX (2-19)
Page 1

Policy No:      652290339
Endorsement No:      5
Effective Date:      12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.

**CNA**

**EMPLOYMENT PRACTICES LIABILITY INSURING AGREEMENT ENDORSEMENT**
**(Discrimination in Third Party Wrongful Employment Practices Wrongful Act)**

In consideration of the premium, the Policy is amended as follows:

I.      The Declarations is amended as follows:

      A.      Item 6. is amended to add the following:

            •      **Employment Claim** Sublimit of Liability (Inclusive of **Defense Costs** and subject to the Aggregate Limit of Liability): $5,000,000

      B.      Item 7. is amended to add the following:

        Employment Practices Liability Insuring Agreement: each **Employment Claim** $1,000,000

II.     Section I, Insuring Agreements is amended to add the following Insuring Agreement:

      **Employment Practices Liability**

      The Insurer will pay **Loss** on behalf of the **Insureds** resulting from any **Employment Claim** first made against such **Insureds** during the **Policy Period.**

III.    Solely with respect to the coverage afforded by this endorsement, Section II, Definitions is amended as follows:

      A.      The following definitions are deleted and replaced with the following:

      **Domestic Partner** means any person qualifying as such under any federal, state, or local laws or under the **Insured Entity's** employee benefit plans or human resources policies.

      **Employee** means:
      1.      any past, present, or future full-time, part-time, seasonal or temporary employee, intern, or any volunteer of an **Insured Entity**, including any employees leased or loaned to the **Insured Entity**; or
      2.      any natural person who is contracted to perform work for the **Insured Entity** as an independent contractor, provided that:
         (a)     such independent contractor has a written contract with the **Insured Entity**, entered into prior to the alleged **Employment Practices Wrongful Act**, designating him/her as an independent contractor, and under which the **Insured Entity** is obligated to provide employment practices liability insurance or to indemnify for any **Employment Practices Wrongful Act**; or
         (b)     the **Insured Entity** is obligated pursuant to any applicable law or regulation to provide indemnification to such independent contractor for **Employment Practices Wrongful Act**.

      **Insured Person** means an **Executive** or **Employee**.

      **Loss** means:
      1.      those amounts that an **Insured** is legally obligated to pay as a result of any **Employment Claim**, including awards, settlements, damages (including back pay and front pay), judgments, pre-judgment and post-judgment interest, and claimant's attorney fees and costs attributable to the covered portion of a settlement or imposed as a result of a covered judgment;
      2.      **Defense Costs**;
      3.      punitive, exemplary, and multiplied damages if such punitive or exemplary damages are insurable in the jurisdiction which is most favorable to an **Insured**, provided that such jurisdiction has a

© CNA  All Rights Reserved.



substantial relationship to the relevant **Insureds**, to the Insurer, or to the **Employment Claim** giving rise to such damages; and

4.    liquidated damages awarded pursuant to the Age Discrimination in Employment Act, the Family Medical Leave Act, or the Equal Pay Act.

Provided, **Loss** does not include:

(a)    civil or criminal fines, penalties, taxes, sanctions, or forfeitures imposed on an **Insured** whether pursuant to law, statute, regulation, or court rule;

(b)    compensation earned by the claimant in the course of employment but unpaid by the **Insured**, including salary, wages, commissions, severance, bonus, or incentive compensation;

(c)    any amounts, other than **Defense Costs**, for which an **Insured** is liable due to an act or omission in violation of any written contract of employment;

(d)    amounts, other than **Defense Costs**, representing medical or insurance premiums or benefit claim payments;

(e)    except as provided in paragraphs 3. and 4. above with respect to punitive, exemplary, the multiple portion of any multiplied damages, or liquidated damages, matters which may be deemed uninsurable under the law pursuant to which this Policy will be construed;

(f)    future salary, wages, or commissions of a claimant who is hired, promoted, or reinstated to employment pursuant to a settlement of, order in, or other resolution of any **Employment Claim**; or

(g)    **Employment Related Benefits**.

B.    Any reference to **Claim** will mean **Employment Claim**.

C.    Any reference to **Wrongful Act** will mean **Employment Practices Wrongful Act**.

D.    The following definitions are added:

**EEOC Proceeding** means an investigative proceeding before the Equal Employment Opportunity Commission or an adjudicatory or investigative proceeding before any similar federal, state, or local government body whose purpose is to address any **Employment Practices Wrongful Act**.

**Employment Claim** means:

1.    a written demand (excluding a subpoena) for monetary, non-monetary, injunctive, or declaratory relief;

2.    a written request for arbitration, mediation, or other alternative dispute resolution;

3.    a written request to toll or waive a statute of limitations;

4.    a civil, administrative, or regulatory proceeding (including an **EEOC Proceeding**),

against an **Insured** by an **Employee** or **Executive** for an **Employment Practices Wrongful Act** or by a third party for a **Third Party Employment Practices Wrongful Act**, including any appeal therefrom.

**Employment Claim** does not include any:

(a)    criminal proceeding, criminal administrative or criminal regulatory proceeding, or criminal investigation;

(b)    labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement; or

(c)    audit conducted by the Office of Federal Contract Compliance Programs, unless a Notice of Violation or Order to Show Cause or written demand for monetary relief or injunctive relief has been issued.

Unless specifically articulated otherwise herein, an **Employment Claim** is deemed first made on the earliest of the date on which the **Employment Claim** is first served upon or first received by any **Insured**, or the applicable notice or order is filed or entered.

**Employment Practices Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or

CNA94351XX (2-19)
Page 2

Policy No:    652290339
Endorsement No:  6
Effective Date:  12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



attempted, by the **Insured Persons** in their capacity as such or by the **Insured Entity** constituting or related to:

1.    wrongful dismissal or discharge or termination of employment, whether actual or constructive;
2.    employment-related misrepresentation;
3.    violation of any federal, state, local, or foreign laws (whether common-law or statutory) concerning employment or discrimination in employment, including the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, or the Civil Rights Act of 1866;
4.    employment-related sexual harassment or other unlawful harassment;
5.    wrongful deprivation of career opportunity, failure to grant tenure, demotion, failure to advance to status of partner or equity partner, or failure to employ or promote;
6.    wrongful discipline in employment;
7.    employment-related retaliation;
8.    negligent evaluation of employees;
9.    failure to adopt adequate workplace or employment policies or procedures;
10.   employment-related defamation, humiliation, or invasion of privacy;
11.   negligent hiring, retention, training, or supervision, failure to provide or enforce adequate or consistent corporate policies or procedures, or violation of an individual's civil rights in connection with any of the **Employment Practices Wrongful Acts** described in paragraphs 1. through 10. above;
12.   employment-related false imprisonment, false arrest, detention, or malicious prosecution; or
13.   employment-related wrongful infliction of emotional distress.

**Employment Related Benefits** means perquisites, fringe benefits, deferred compensation, or payments (including insurance premiums) in connection with an employee benefit plan, **Stock Benefits** and any other payment to or for the benefit of an **Employee** arising out of the employment relationship. **Employment Related Benefits** does not include salary, wages, commissions, or non-deferred cash incentive compensation.

**Property Damage** means:

1.    physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or
2.    loss of use of tangible property that is not physically damaged.

**Stock Benefits** means:

1.    any offering, plan, or agreement between the **Named Insured** and any **Employee** which grants stock, stock warrants, or stock options of the **Named Insured** to any such **Employee**, including grants of stock options, restricted stock, stock warrants, performance stock shares, or any other compensation or incentive granted in the form of securities of the **Named Insured**; or
2.    any payment or instrument in the amount or value of which is derived from the value of securities of the **Named Insured**, including stock appreciation rights or phantom stock plans or arrangements.

**Stock Benefits** does not include employee stock ownership plans or employee stock purchase plans.

**Third Party Employment Practices Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by the **Insured Persons** in his/her capacity as such or by the **Insured Entity** constituting or relating to:

1.    sexual harassment or other unlawful harassment, or violation of any federal, state, or local harassment laws (whether common law or statutory); or
2.    discrimination, or violation of any federal, state, local, or foreign discrimination laws (whether common law or statutory).

IV.    Solely with respect to the coverage afforded by this endorsement, Section III, Exclusions is amended as follows:

---

CNA94351XX (2-19)                                                    Policy No:      652290339
Page 3                                                    Endorsement No:    6
                                                    Effective Date:    12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.

A.  Exclusions 1, Contractual Liability, 2, Employment Related, and 3, Discrimination or Harassment are deleted.

B.  Exclusion 4, ERISA/COBRA is deleted and replaced with the following:

**ERISA/COBRA**

for any actual or alleged violation of the responsibilities, obligations, or duties imposed upon fiduciaries by **ERISA, COBRA or any Similar Act**;

C.  Exclusion 9, Bodily Injury/Property Damage is deleted and replaced with the following:

**Bodily Injury/Property Damage**

for any actual or alleged bodily injury (including death), sickness, disease of any person, or **Property Damage**, provided that this exclusion does not apply to allegations of emotional distress, humiliation, mental anguish, or loss of reputation;

D.  The following exclusions are added:

The Insurer will not be liable for **Loss** under this Policy in connection with any **Employment Claim**:

**Pollutants**

based upon or arising out of:
1.  any nuclear reaction, radiation or contamination, or any actual, alleged or threatened discharge, release, escape, or disposal of, or exposure to, **Pollutants**;
2.  any request, direction, or order that any of the **Insureds** test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effect of **Pollutants** or nuclear reaction, radiation, or contamination, or any voluntary decision to do so; or
3.  any actual or alleged **Property Damage**, bodily injury, sickness, disease or death of any person, or financial loss resulting from any of the matters referenced in paragraphs 1.and 2. above,
provided that this exclusion does not apply to any **Employment Claim** alleging retaliation (including any **Employment Claim** alleging retaliation in violation of Section 510 of ERISA), or wrongful dismissal, discharge, or termination of employment whether actual or constructive, because of a claimant's actual or threatened disclosure of the matters referenced above in this exclusion;

**Violation of Law**

1.  for any actual or alleged violation of:
    a.  any law governing workers' compensation, unemployment insurance, social security, disability benefits, or any other similar federal, state, or local statutory or regulatory law or common law anywhere in the world;
    b.  the Occupational Safety and Health Act of 1970 (OSHA), as amended, or any other federal, state, or local statutory or regulatory law or common law anywhere in the world governing workplace safety and health;
    c.  the Workers' Adjustment and Retraining Notification Act, Public Law 100-379 (1988), as amended, or any other federal, state, or local statutory or regulatory law or common law anywhere in the world governing an employer's obligation to notify or bargain with others in advance of any facility closing or mass layoff; or
    d.  the National Labor Relations Act, as amended, or any other federal, state, or local statutory or regulatory law or common law anywhere in the world governing employees' rights and the employers duties with respect to unions, bargaining, strikes, boycotts, picketing, lockouts, or collective activities; or

CNA94351XX (2-19)
Page 4

Policy No:      652290339
Endorsement No:  6
Effective Date:  12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



2.      based upon or arising out of any actual or alleged violation of the Fair Labor Standards Act (except the Equal Pay Act), as amended, or any other federal, state, or local statutory law or common law anywhere in the world governing wage, hour, and payroll policies;

provided that this exclusion does not apply to any **Employment Claim** alleging retaliation (including any **Employment Claim** alleging retaliation in violation of Section 510 of ERISA) or wrongful dismissal, discharge, or termination of employment, whether actual or constructive, with respect to a claimant's exercise of a right pursuant to any such laws;

**Assumed Liability**

based upon or arising out of an **Insured's** assumption of the liability of others in any oral or written contract or agreement, unless such liability would have attached to an **Insured** in the absence of such agreement.

E.      The following exclusions applicable to **Loss**, other than **Defense Costs**, are added:

The Insurer will not be liable for **Loss**, other than **Defense Costs**, under this Policy in connection with any **Employment Claim**:

**Contractual Liability**

for an **Insured's** actual or alleged liability pursuant to any written employment contract or employment agreement, including any written agreement concerning severance payments;

**Cost of Accommodations**

for the costs associated with providing any reasonable accommodations required by, made as a result of, or to conform with the requirements of the Americans With Disabilities Act and any amendments thereto or any similar federal, state, or local statute, regulation, or common laws;

**Non-monetary Relief**

for the cost of any non-monetary relief, including without limitation any costs associated with compliance with any injunctive relief of any kind or nature imposed by any judgment or settlement;

V.      Solely with respect to the coverage afforded by this endorsement Section IV, Limit of Liability/Retention/Indemnification/Advancement of Defense Costs is amended as follows:

A.      The following paragraph is added:

**Employment Claim Sublimit of Liability**

The **Employment Claim** Sublimit of Liability set forth in Item 6. of the Declarations is the aggregate limit of the Insurer's liability for all **Loss** arising from all **Employment Claims**, regardless of the number of **Employment Claims**. The **Employment Claim** Sublimit of Liability is part of and not in addition to the Aggregate Limit of Liability set forth in Item 6.a. of the Declarations.

B.      Paragraph 3, Retention is amended to add the following subparagraph:

•       In the event that more than one Retention applies to **Loss** arising from an **Employment Claim**, the higher Retention will apply.

VI.      Solely with respect to the coverage afforded by this endorsement, paragraph 2 of Section XII, Other Insurance is deleted and replaced with the following:

2.      Any coverage afforded by this Policy will apply specifically as excess of, and will not contribute with, any fiduciary, environmental, or cyber liability policy.



VII.     Solely with respect to the coverage afforded by this endorsement, the following section is added:

### COORDINATION OF COVERAGE PROVISION

Any **Loss** otherwise covered by both this Policy and any employment practices liability policy or coverage part issued by the Insurer, any affiliate of the Insurer, or any other insurance company ("EPL Coverage") first will be covered as provided in, and will be subject to the limit of liability, retention and coinsurance percentage applicable to such EPL Coverage. Any remaining **Loss** otherwise covered by this Policy that is not paid under such EPL Coverage will be covered as provided in, and will be subject to the Limit of Liability and Retention applicable to this Policy, provided that the Retention applicable to such **Loss** under this Policy will be reduced by the amount of **Loss** otherwise covered by this Policy that is paid by an **Insured** as the retention under such EPL Coverage.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA94351XX (2-19)                                                                                                     Policy No:      652290339
Page 6                                                                                                                    Endorsement No:  6
                                                                                                                              Effective Date:  12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



**BIOMETRICS EXCLUSION ENDORSEMENT**
**(EMPLOYMENT PRACTICES LIABILITY COVERAGE)**

In consideration of the premium, solely with respect to the Employment Practices Liability Insuring Agreement added to this Policy via any Employment Practices Liability Endorsement attached thereto, Section III, Exclusions of the Policy is amended to add the following exclusion:

The Insurer will not be liable for **Loss** under this Policy in connection with any **Employment Claim**:

**Biometrics**

based upon, arising from, or in any way related to the actual or alleged violation of any federal, state, or local statutory biometric privacy law or any such similar common law anywhere in the world, that govern or relate to the collection, use, safeguarding, handling, storage, retention, or destruction of biometric identifiers, biometric data, or biometric information, provided that this exclusion does not apply to any **Employment Claim** alleging retaliation (including an **Employment Claim** alleging retaliation in violation of Section 510 of ERISA) or wrongful dismissal, discharge, or termination of employment, whether actual or constructive, with respect to a claimant's exercise of a right pursuant to any such laws.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA97933XX (9-20)                                          Policy No:      652290339
Page 1                                                     Endorsement No:  7
Columbia Casualty Company                                  Effective Date:  12/30/2022
Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



**MOCK REGULATORY COMPLIANCE EXAMINATION CONTRIBUTION ENDORSEMENT**
**(Approved Compliance Consulting Firms)**

In consideration of the premium, the Policy is amended to include the following section:

**MOCK REGULATORY COMPLIANCE EXAMINATION CONTRIBUTION**

1.　　Subject to paragraph 2. below, the Insurer will reimburse the **Named Insured** for the cost of mock regulatory compliance examinations of the **Named Insured** conducted during the **Policy Period**, by any of the following Approved Compliance Consulting Firms:

　　　(a)　　ACA Compliance Group;
　　　(b)　　NRS National Regulatory Services;
　　　(c)　　Duff & Phelps;
　　　(d)　　Vigilant Compliance;
　　　(e)　　Constellation Advisors;
　　　(f)　　SEC Compliance Consultants ("SEC3");
　　　(g)　　Greyline Partners

　　　Any such examination will not be conducted without the prior written consent of the Insurer.

2.　　The Insurer's maximum reimbursement payment for each mock regulatory compliance examination will be fifty percent (50%) of the cost of such examination or ten percent (10%) of the annual premium charged for this Policy, whichever is less. The Insurer's maximum reimbursement payment total for all mock regulatory examinations in the aggregate will be $25,000.

3.　　The provisions of this Section will apply to one (1) mock regulatory compliance examination per twelve (12) month period.

4.　　This Section will not apply to any **Extended Reporting Period**.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

Policy No:　　652290339
Endorsement No:　　8
Effective Date:　　12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



**Vivo Capital, LLC**
**AMEND ILLEGAL PROFITS/DELIBERATE ACTS EXCLUSION ENDORSEMENT**
**(Add Personal Qualifier and Foreign Jurisdiction)**

In consideration of the premium, Exclusion 5, Illegal Profits/Deliberate Acts set forth in Section III, Exclusions of the Policy is deleted and replaced with the following:

**Illegal Profits/Deliberate Acts**

based upon or arising out of:

(a)     an **Insured** gaining any personal profit, remuneration, or financial advantage to which such **Insured** was not legally entitled, provided that this exclusion 5.(a) does not apply to **Loss** in a **Claim** alleging violations of Sections 11, 12, or 15 of the Securities Act of 1933, as amended; or

(b)     the committing of any deliberate criminal, or deliberate fraudulent act or omission, or any willful violation of law or regulation by an **Insured**,

established by a final non-appealable adjudication in the underlying action or proceeding other than a coverage action to determine the rights and responsibilities of any party to this Policy.

Solely with respect to paragraph (b) above, any act or omission that is treated as a criminal violation in a **Foreign Jurisdiction** but that is not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act or omission occurred.

For purposes of determining the applicability of this exclusion the conduct of an **Insured** will not be imputed to any other **Insured**.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

© CNA  All Rights Reserved.



**Vivo Capital, LLC**
**AMEND REPRESENTATIONS AND SEVERABILITY OF THE APPLICATION SECTION ENDORSEMENT**

In consideration of the premium, Section X, Representations and Severability of the Application of the Policy is deleted and replaced with the following:

### REPRESENTATIONS AND SEVERABILITY OF THE APPLICATION

The **Insureds** represent and acknowledge that, as of the Inception Date of this Policy, to the best of his, her or its knowledge and belief, the statements, representations, and information in the **Application** are true and accurate in all material respects. This Policy is issued in reliance upon the truth and accuracy of such statements, representations, and information.

The **Application** is deemed a separate request for coverage by each **Insured**. As such, with respect to any statements, representations, and information in the **Application**, no knowledge possessed by any **Insured Person** will be imputed to any other **Insured**.

The Insurer will not be entitled to rescind or void this Policy with respect to any **Insured**.


All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA102362XX (10-21)                                    Policy No:        652290339
Page 1                                              Endorsement No:  10
                                                    Effective Date:    12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



**Vivo Capital, LLC**
**AMENDATORY ENDORSEMENT**

In consideration of the premium, the Policy is amended as follows:

I.    Item 5. Extended Reporting Period of the Declarations is deleted and replaced with the following:

        Item 5.    **Extended Reporting Period:**

                Option 1:
                a.    Period: 1 year
                b.    Premium: 150% of Policy Premium

                Option 2:
                a.    Period: 3 years
                b.    Premium: 200% of Policy Premium

                Option 3:
                a.    Period: 6 years
                b.    Premium: 250% of Policy Premium

II.    Section II, Definitions is amended as follows:

    A.    The definition of **Application** is deleted and replaced with the following:

        **Application** means the applications, and any materials submitted therewith in connection with the underwriting of this Policy by the Insurer for the policy period listed on the Declarations. If the **Application** uses terms, conditions or phrases that differ from terms, conditions or phrases in this Policy or where any other inconsistency exists, the terms, conditions and phrases of this Policy will prevail.

    B.    The definition of **Claim** is amended to add the following:

        **Claim** also includes an **Informal Investigation**.

    C.    The definition of **Control Person** is deleted and replaced with the following:

        **Control Person** means any **Insured** who controls, or is alleged to control, directly or indirectly, any persons or entities within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20(a) of the Securities Exchange Act of 1934, as amended, or within the meaning of any applicable statute, rule, regulation, or law (whether common law or statutory), or any foreign equivalent of any of the foregoing or any under any theory of liability.

    D.    The definition of **Defense Costs** is deleted and replaced with the following:

        **Defense Costs** mean reasonable fees (at non-discounted hourly rates), costs, and expenses, incurred by an **Insured** in the investigation, defense, or appeal of any covered **Claim**, including the premium for appeal, attachment, or similar bonds arising out of a covered judgment. **Defense Costs** will also include all reasonable fees and expenses incurred by defense counsel selected by the Insureds in providing reports, updates or other information to the Insurer. **Defense Costs** do not include **Shareholder Derivative Demand Investigation Costs**, or salaries, wages, fees, overhead, or benefit expenses associated with any **Insured Person**.

        Notwithstanding anything to the contrary in this Policy, **Defense Costs** also include **Pre-Claim Expenses**, provided that any payment of **Pre-Claim Expenses** is conditioned upon the following:
        1.    a **Responsible Person** provides written notice of circumstances pursuant to Section VII, Notice and Interrelated Claims, paragraph 2, Notice of Circumstances, which the Insurer has accepted (the "Noticed Matter");

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



2.     an **Insured** provides written notice of a **Claim**, which arises subsequent to the Noticed Matter, and arises from, is based upon, or directly results from the same or similar facts, transactions, or events described in the Noticed Matter (the "Subsequent Claim");

3.     the Insurer has accepted such notice of the Subsequent Claim;

4.     the **Insureds** are in compliance with all other terms and conditions of the Policy;

5.     any **Pre-Claim Expenses** will first be applied towards the applicable Retention for the Subsequent Claim; and

6.     the Insurer has the sole discretion with respect to determining the reasonableness, necessity, and allocation of the **Pre-Claim Expenses** (including the right to apply any exclusions applicable to the Subsequent Claim to the determination and allocation of **Pre-Claim Expenses**).

E.     The definition of **Employee** is deleted and replaced with the following:

    **Employee** means any past, present, or future full-time, part-time, seasonal or temporary employee, seconded employee, intern, or any volunteer of an **Insured Entity**. **Employee** does not include any **Executive**.

F.     The definition of **Executive** is deleted and replaced with the following:

    **Executive** means any:

1.     natural person who is past, present, or future duly elected or appointed director (including alternative or shadow directors), officer, principal, shadow director, alternative director, trustee, governor of a corporation, entrepreneur-in-residence, board observer, management committee member, member of the board of managers or limited liability company, managing partner or managing member, member of a joint venture (or holder of a functionally equivalent position) of an **Insured Entity**;

2.     natural person who is a past, present or future Chief Executive Officer, In-House General Counsel, Chief Operating Officer, Chief Compliance Officer, or Risk Manager (or holder of a functionally equivalent position) of the **Insured Entity**;

3.     natural person who is a past, present, or future **General Partner**; or

4.     **Outside Entity Executive**.

**Executive** does not include any **Employee**.

G.     The definition of **Financial Insolvency** is deleted and replaced with the following:

    **Financial Insolvency** means the appointment of a receiver, conservator, liquidator, trustee, rehabilitator, or similar official or creditors' committee to take control of, supervise, manage, or liquidate an **Insured Entity** or an **Outside Entity** or when the **Insured Entity** or **Outside Entity** can affirmatively establish that they are unable at the present time or in the future pay its debts in the ordinary course of business.

H.     The definition of **Fund** is deleted and replaced with the following:

    **Fund** means any pooled investment vehicle (including but not limited to those forms as an onshore or offshore corporation, general partnership, limited partnership, limited liability company, trust or any foreign equivalent) or **Separately Managed Account** created, sponsored, controlled, advised, or managed by an Insured Entity:

1.     on or before the effective date of this Policy; or

2.     after the effective date of this Policy by reason of being acquired or created by an **Insured Entity**, subject to paragraph 2.(a) of Section XI, Change of Control or Status of Insureds.

I.     The definition of **General Partner** is deleted and replaced with the following:

    **General Partner** means any natural person or entity designated as such in an Organizational Document of an Insured Entity (including, but not limited to, any administrative general partner, managing general partner, or other sponsor or manager of such limited partnership) or the functional or foreign equivalent of the foregoing.

Policy No:   652290339
Endorsement No:   11
Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



J.    The definition of **Insured Entity** is deleted and replaced with the following:

**Insured Entity** means:
1.    the **Named Insured**, any **Affiliate**, or any **Subsidiary**;
2.    any **Fund**;
3.    any entity **General Partner**;
4.    any entity managing member or entity management company identified in an **Organizational Document**;
5.    any **Investment Holding Company**;
6.    any **Investment Manager**;
7.    any other entity specifically included as an **Insured Entity** by endorsement to this Policy;
8.    any advisory board, advisory committee, or similar committees formed pursuant to an **Organizational Document**;
9.    any entity advisor, consultant, or independent contractor, but only if and to the extent such advisor, consultant, or independent contractor is:
       (a)    providing **Investment Activities** at the specific request or direction of another **Insured Entity**; and
       (b)    indemnified by such other **Insured Entity**; or
10.   any such entity referenced in paragraphs 1. through 9. above as a debtor in possession under United States bankruptcy law or any similar state, local, or foreign law.
**Insured Entity** does not include any **Outside Entity**.

K.    The definition of **Investment Activities** is deleted and replaced with the following:

**Investment Activities** mean:
1.    any management, consulting, monitoring, investment, administrative, economic, valuation consulting, research, financial, advisory, due diligence or other services performed by an **Insured**, directly or indirectly, to, or on behalf of, or for the benefit of any past, present or prospective **Insured Entity** or **Portfolio Company**, including services performed by an **Insured** in the capacity as a **Control Person** of a **Portfolio Company**;
2.    the formation, organization, capitalization, dissolution, recapitalization, structural reorganization (including any divestiture of an **Insured Entity**) or reorganization of any interests of an **Insured Entity** (or prospective **Insured Entity**), or the purchase or sale of, or offer or solicitation for the purchase or sale of any interest in, or the calling of committed capital to, an **Insured Entity** (or prospective **Insured Entity**), or disposition of any assets (including an in-case or in-kind distribution) of an **Insured Entity** (or prospective **Insured Entity**), or any functional equivalent transaction;
3.    the acquisition, disposition, purchase or sale of, or offer or solicitation for the purchase or sale of any direct or indirect interest in or assets of a **Portfolio Company**, or any actual or proposed merger, acquisition, consolidation, recapitalization, restructure, or other business combination transaction of a **Portfolio Company**, including but not limited to the service by an **Insured** on a stockholder committee of a **Portfolio Company** in connection with the sale of such **Portfolio Company**;
4.    the payment of any dividend or distribution, the repurchase of shares, or the registration of any securities of a **Portfolio Company** by an **Insured**;
5.    the providing, funding, structuring, arranging, negotiating, syndicating, securitizing, signing, closing, or monitoring of, or any actual or proposed transaction involving:
       a.    any equity, debt, convertible or other securities, or any interest in any entity or any obligations or financing by or on behalf of, or for the benefit of an **Insured Entity** or **Portfolio Company**; or
       b.    any assets, securities, or other interests owned by, on behalf of, or for the benefit of an **Insured Entity** or any **Portfolio Company**;
6.    any services performed by an **Insured** solely in the capacity as a **Shareholder Representative**;
7.    any services performed by an **Insured** for a **Portfolio Company** arising from the extension or grant, or refusal to grant, of a loan or credit, or any similar transaction, or functional equivalent of a loan, or the declaring an event of default, accelerating any obligation, foreclosing on any assets or

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.

security, or otherwise exercising any remedy with respect to such loan, extension of credit, or obligation;

8.    any services performed or advice given by an **Insured** for, or on behalf of, an **Insured Entity** or **Portfolio Company** relating to or in connection with any actual or proposed transaction involving fixed income, equity, convertible, public, or private security, asset, liability, debt, bond, note, commodity, currency, futures contract, warrant, swap, single stock swap, index swaps, total rate of return swaps, credit default swaps, basket swap, contracts for differences (CFD), currency contract, or other derivative instrument or contract, or functional equivalent of any of the foregoing, or any private placement of, an entity, mutual fund, exchange traded fund, hedge fund, private equity fund, fund of funds, or real property;

9.    the selection and oversight of outside service providers by an **Insured** for or on behalf of a **Fund** or **Portfolio Company**; and

10.   any legal, compliance or regulatory services performed by an **Insured** in connection with any of the services described in paragraphs 1. through 9 above.

L.    The definition of **Investment Manager** is deleted and replaced with the following:

**Investment Manager** means any entity formed and controlled by one or more **Insureds** that performed **Investment Activities** to, for or on behalf of a **Fund** (including but not limited to any managing member, managing shareholder, or other sponsor of such **Fund**).

M.    The definition of **Loss** is amended as follows:

Paragraph 2 of the definition of **Loss** is deleted and replaced with the following:

2.    solely with respect to an **Insured Person**, penalties assessed pursuant to the Foreign Corrupt Practices Act, 15 U.S.C. Section 78dd-2(g)(2)(B), as amended, or the Bribery Act 2010 (UK Bribery Act), as amended;

Paragraph (e) is deleted in its entirety.

Paragraph (h) is deleted and replaced with the following:

(h)    amounts, awards, settlements, or judgments that represent or are substantially equivalent to the price or consideration differential in connection with a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of any of the ownership interest in or assets of an entity is inadequate, provided however this will not apply to **Non-Indemnifiable Loss**;

N.    The definition of **Non-Indemnifiable Loss** is deleted and replaced with the following:

**Non-Indemnifiable Loss** means any **Loss** incurred by an **Insured Person** that an **Insured Entity** fails or refuses to pay, advance, or indemnify:
1.    due to **Financial Insolvency**; or
2.    because such indemnification is not permitted pursuant to law or an **Organizational Document**.

O.    The definition of **Outside Entity Executive** is amended to include "(including **Employees**)" after "natural person".

P.    The definition of **Portfolio Company** is deleted and replaced with the following:

**Portfolio Company** means any entity or **Outside Fund** in which a **Fund** has, had, or proposes to have directly or indirectly (separately or in combination with another **Fund** or through an **Investment Holding Company**) an outstanding economic interest, securities, debentures, or voting rights, or any combination thereof, before or during the **Policy Period**, provided that such entity is not an **Insured Entity**.

Q.    The definition of **Regulatory Body** is amended to delete "of which the **Insured** is a member".

Policy No:   652290339
Endorsement No:  11
Effective Date:  12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



R.    The definition of **Responsible Person** is deleted and replaced with the following:

**Responsible Person** means the General Counsel or Chief Financial Officer of the **Named Insured**.

S.    The following definitions are added:

**Informal Investigation** means any informal administrative or regulatory investigation of an **Insured** by a **Regulatory Body**, commenced by the **Insured's** receipt of:
1.    a verifiable notice to produce documents that relate to the **Insured Entity's** business activities; or
2.    a request for testimony or a request for an interview issued by a **Regulatory Body** directed to an **Insured Person** in his/her capacity as such.
**Informal Investigation** does not include any routine examination, routine inspection, "sweep" examination, general request for information, or any other similar review, inquiry, or investigation.

**Outside Fund** means any entity or non-entity pooled or single investor investment vehicle, managed account, custody account, or function equivalent thereof:
1.    that is not a **Fund**; and
2.    in which one or more **Funds** has, had or proposes to have directly or indirectly (separately or in combination with another **Fund** or through an **Investment Holding Company**) separately or in combination, previously had, currently has, proposes to have an ownership interest or ownership rights in such entity or non-entity pooled or single investment vehicle, managed account, custody account, or functional equivalent thereof.

**Pre-Claim Expenses** mean reasonable fees, costs, and expenses (other than salaries, wages, fees, overhead, or benefit expenses of any **Insured Person**) that have been:
1.    consented to by the Insurer, such consent not to be unreasonably withheld; and
2.    incurred by an **Insured** in the defense of the Noticed Matter, on or after the date the notice of circumstances has been accepted and prior to, or on, the date the Noticed Matter became a **Claim**.

**Pre-Claim Expenses** do not include any fees, costs, or expenses incurred by the **Insured**: (a) in connection with any routine examinations, routine inspections, "sweep" examinations, general requests for information, or any other similar reviews, inquiries, or investigations; or (b) as a result of any Foreign Corrupt Practices Act investigation, examination, or request. The Insurer has the sole discretion with respect to determining the reasonableness, necessity, and allocation of the **Pre-Claim Expenses** (including the right to apply any Subsequent Claim exclusions to the determination and allocation of **Pre-Claim Expenses**).

**Separately Managed Account** means any third party client account managed by an **Insured Entity** pursuant to a written advisory agreement.

III.    Section III, Exclusions is amended as follows:

A.    The preamble is deleted and replaced with the following:

The Insurer shall not be liable for that portion of **Loss** under this Policy in connection with any **Claim**:

B.    Exclusion 1, Contractual Liability is deleted and replaced with the following:

**Contractual Liability**

for:
(a)    an **Insured's** actual or alleged liability under any written contract or written agreement, including express warranties or guarantees; or
(b)    the actual or alleged liability of others an **Insured** assumes under any written contract or written agreement,
provided that this exclusion does not apply to:
i.    an **Insured's** liability that exists in the absence of such contract or agreement;

Policy No:    652290339
Endorsement No:    11
Effective Date:    12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



ii.    any **Claim** arising out of the rendering of, or failure to render, **Investment Activities**;

iii.   any **Claim** based upon, arising out of, or relating to any actual or alleged breach of any **Organizational Document**;

iv.    **Defense Costs**; or

v.     **Non-Indemnifiable Loss**;

C.    Exclusion 4, ERISA/COBRA is deleted and replaced with the following:

**ERISA/COBRA**

for any actual or alleged violation of the responsibilities, obligations, or duties imposed upon fiduciaries by **ERISA, COBRA or any Similar Act** in connection with an **Insured Entity's** pension, employee benefit, or welfare plans;

D.    Exclusion 6. Insured Entity vs. Insured is amended by deleting Paragraph (b).ii. in its entirety.

E.    Exclusion 7, Prior Notice is amended by deleting "based upon or arising out of" and replacing it with "for".

F.    Exclusion 8, Prior and Pending is deleted and replaced with the following:

**Prior and Pending**

for the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events underlying or alleged in any written demand, request, action, proceeding, claim, investigation, inquiry or **Claim** commenced against any **Insured** for which the Insurer had notice on or prior to the Prior or Pending Date set forth in Item. 8 of the Declarations;

G.    Exclusion 9, Bodily Injury/Property Damage is deleted and replaced with the following:

**Bodily Injury/Property Damage**

for any actual or alleged bodily injury (including death), sickness, violation of any right of privacy, disease, of any person, or damage to or destruction of any tangible property, including loss of use, provided that this exclusion does not apply to:

(a)    damage to, destruction of, or loss of use of the records of a client, investor, or **Portfolio Company** in the sole possession of an **Insured**; or

(b)    **Non-Indemnifiable Loss**;

H.    Exclusion 10, Securities Broker or Dealer is deleted in its entirety.

I.    Exclusion 11, Publishing Liability is deleted in its entirety.

IV.    Paragraph 4, Presumptive Indemnification and Advancement of Defense Costs of Section IV, Limit of Liability/Retention/Indemnification/Advancement of Defense Costs is amended as follows:

A.    The first sentence of the first paragraph is deleted and replaced with the following:

It is agreed that each **Insured Entity** will fulfill its indemnification obligations to each **Insured Person** to the fullest extent permitted by an **Organizational Document**.

B.    The first sentence of the second paragraph is deleted and replaced with the following:

The Insurer will advance **Defense Costs** on a current basis, but no later than sixty (60) days after receipt and review of the legal bills and any supporting documentation reasonably requested by the Insurer.

V.    Section V, Cooperation/Consent/Duty to Defend/Allocation is amended as follows:

CNA102360XX (11-21)
Page 6

Policy No:       652290339
Endorsement No:  11
Effective Date:  12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



A.    Paragraph 1, Cooperation is deleted and replaced with the following:

**Cooperation**

Each **Insured** will, as a condition precedent to obtaining coverage under this Policy, give the Insurer full cooperation, assistance, and information as the Insurer may reasonably request. While the **Insureds** will not be required to waive any privilege, including attorney-client privilege or work product privilege, or reveal any confidential information, the **Insureds** will use their best efforts to provide to the Insurer any requested information the Insurer deems pertinent to the investigation and handling of the **Claim** or **Shareholder Derivative Demand**. Provided, the **Insureds'** inability or failure to provide such privileged or confidential information to the Insurer will not constitute a failure to comply with this paragraph 1.

The **Insureds** will do nothing that in any way increases the Insurer's liabilities or prejudices the Insurer's potential or actual rights of recovery. The failure of any **Insured Person** to give the Insurer cooperation, assistance, and information as required hereunder will not impair the rights of any other **Insured Person** under this Policy.

B.    Paragraph 4, Allocation is amended to add the following at the end of the second paragraph:

Notwithstanding the foregoing, the Insurer will advance one hundred percent (100%) of **Defense Costs** incurred by **Insured Persons** which constitute **Non-Indemnifiable Loss**.

VI.    Paragraph 1, Notice of Claim of Section VII, Notice and Interrelated Claims is deleted and replaced with the following:

**Notice of Claim**

The **Insureds** will, as a condition precedent to the obligations of the Insurer under this Policy, give written notice to the Insurer of each **Claim** as soon as practicable after a the **Named Insured's** Chief Financial Officer first receives written notice of such **Claim** in writing, but in no event later than:
(a)    ninety (90) days after the termination or expiration of the **Policy Period**, provided that this Policy has not been renewed by the Insurer or extended by purchase of an **Extended Reporting Period**; or
(b)    the expiration of the **Extended Reporting Period**,
provided that failure to give timely notice as described above will not invalidate coverage of such **Claim** unless the Insurer demonstrates that such failure to provide timely notice has materially prejudiced the Insurer.

This notice requirement will apply only if the **Insureds** reasonably believe that the total **Loss** including **Defense Costs**, resulting from such **Claim** will, or is reasonably likely to, exceed 50% of the Retention applicable to such **Claim**.

VII.    Paragraph 4.(b), Interrelatedness of Section VII, Notice and Interrelated Claims is amended to include "and accepted" after the word "given".

VIII.    Section XV, Priority of Payments is deleted and replaced with the following:

**PRIORITY OF PAYMENTS**

Any coverage afforded by this Policy is principally intended to benefit the **Insured Persons**. In the event that **Non-Indemnifiable Loss** :and any other **Loss** are concurrently due, then **Loss** will be paid in the following order:

1.    the Insurer will pay first any **Non-Indemnifiable Loss** due under Insuring Agreement A. of this Policy up to the remaining Limit of Liability available under the Policy; then
2.    only after payment of **Non-Indemnifiable Loss** has been made pursuant to Paragraph 1. above, with respect to whatever remaining amount of the Limit of Liability is available after such payment,



the Insurer will pay the amount of **Loss** due under Insuring Agreement B. for all **Insured Persons**, up to the remaining Limit of Liability under this Policy; then

3.  only after payment in accordance with Paragraphs 1 and 2 above, the Insurer will pay **Loss** on behalf of an **Insured Entity** due under Insuring Agreement C., up to the remaining Limit of Liability available under the Policy.

The Insurer's liability with respect to any such delayed **Loss** payment will not be increased, and will not include any interest, on account of such delay.

IX.  Unless otherwise provided within the Policy, this endorsement will not afford coverage for any pre-tender or pre-notice **Defense Costs**.

All other terms and conditions of the Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

CNA102360XX (11-21)
Page 8

Policy No:        652290339
Endorsement No:  11
Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.



## SCHEDULE OF FUNDS ENDORSEMENT

In consideration of the premium, the definition of **Fund** set forth in Section II, Definitions of the Policy is amended to add the following:

**Fund** also means the following entities set forth in the Schedule of Funds below:

Schedule of Funds:

- Vivo Capital Fund IX, L.P.
- Vivo Capital Fund IX (Cayman), L.P.
- Vivo Capital Fund VIII, L.P.
- Vivo Capital Surplus Fund VIII, L.P.
- Vivo Innovation Fund II, L.P.
- Vivo Opportunity Co-Invest (W), L.P.
- Vivo Opportunity Co-Invest, L.P.
- Vivo Opportunity Fund, L.P.
- Vivo Panda Fund, L.P.
- Vivo Super VIII Limited
- Vivo Ventures Fund Cayman VII, L.P.
- Vivo Ventures Fund V, L.P.
- Vivo Ventures Fund VI, L.P.
- Vivo Ventures Fund VII, L.P.
- Vivo Ventures V Affiliates Fund, L.P.
- Vivo Ventures VI Affiliates Fund, L.P.
- Vivo Ventures VII Affiliates Fund, L.P.
- Vivo Asia Opportunity Fund
- Vivo Capital Fund X, L.P.
- Vivo Capital RMB Fund
- Vivo Innovation Fund II Holdings, L.P.
- Vivo Opportunity Fund Holdings, L.P.
- Vivo Asia Opportunity Fund Holdings, L.P.
  Vivo Capital Public Equity Fund GP, LLC

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

Policy No:        652290339
Endorsement No:   12
Effective Date:   12/30/2022

Insured Name: Vivo Capital, LLC

© CNA  All Rights Reserved.