# EXHIBIT C

Case Number :ANUHCV2025/0200

```
FILED
HIGH COURT
ANTIGUA AND BARBUDA
```

Amended Statement of Claim under CPR Rule 20.1(1) dated 17 June 2025

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200

Submitted Date:17/06/2025 12:32

Filed Date:17/06/2025 12:34

Fees Paid:2.00

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

BETWEEN:

(1) SINOVAC BIOTECH LTD.
(a company registered in Antigua and Barbuda)
(2) ORBIMED PARTNERS MASTER FUND LIMITED
(a company registered in Bermuda)
(3) 1GLOBE CAPITAL, LLC
(a company registered in Delaware, United States of America)

Claimants

and

(1) VIVO CAPITAL LLC
(a company registered in ~~Delaware~~ California, United States of America)
(2) VIVO CAPITAL FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(4) VIVO CAPITAL FUND IX, L.P.
(a limited partnership registered in Delaware, United States of America)
(5) PRIME SUCCESS, L.P.
(a limited partnership registered in the Cayman Islands)
(6) CEDE & CO
(a partnership registered in New York, United States of America)

Defendants

---

## AMENDED STATEMENT OF CLAIM

---

A.    **The Company**

1.    Sinovac Biotech Ltd. (the **"Company"**) is a company registered in Antigua and Barbuda.

2.    The Company was incorporated on 1 March 1999 under the International Business Corporations Act 1982 (**"IBCA 1982"**) with the name "Net Force Systems Inc." and with company number

011949. By special resolution dated 8 October 2003, the Company changed its name to its present name, "Sinovac Biotech Ltd.".

3.  The registered office of the Company is situated at c/o APN Corporate and Management Services Limited, Winter Medical Centre, Fort Road, Antigua.

4.  The Company is a biopharmaceutical company that focuses on research, development, production and commercialisation of vaccines that protect against human infectious diseases. Its business is based in The People's Republic of China ("**the PRC**"). The Company is listed on NASDAQ, but trading in the Company's shares has been halted since February 2019.

5.  The Company has two classes of shares, common shares with a nominal value of US$ 0.001 each ("**common shares**") and preferred shares with a nominal value of US$ 0.001 each ("**preferred shares**"). The Company is authorised under its Articles of Incorporation to issue up to 100 million common shares and (purportedly) up to 50 million preferred shares.[1]

6.  Pursuant to section 30 of IBCA 1982, subject to the articles, the by-laws, any unanimous shareholder agreement and section 35 of IBCA 1982, shares may be issued at such times and to such persons and for such consideration as the directors may determine.

7.  The by-laws of the Company have at all material times included the following provision under by-law 1.1:

    *"The issue or allotment of shares shall be under the control of the Board which may issue the whole or any portion thereof with such preferred, deferred, special or limited rights as it may think fit."*

8.  In relation to the Company, the directors of the Company, and any persons purporting to exercise any power conferred upon the directors of the Company as if they were such a director even though they do not validly hold such office (a **"purported director"**), stand in a fiduciary capacity to the Company.

9.  Further, the directors and any purported directors of the Company from time to time owe the Company the following duties, amongst others, under IBCA 1982:

---

[1] The Former Incumbent Directors (as defined below) purported to amend the Company's by-laws in February 2019 to create the preferred shares. As addressed below, the Former Incumbent Directors had ceased to be directors of the Company on 6 February 2018, and, consequently, did not have any authority to amend the Company's by-laws, and their attempt to do so was invalid.

9.1.    Under section 95(1)(a) of IBCA 1982, a duty to act honestly and in good faith with a view to the best interests of the Company.

9.2.    Under section 95(1)(b) of IBCA 1982, a duty to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

9.3.    Under section 95(2) of IBCA 1982, a duty to comply with IBCA 1982 and the regulations as well as with the Company's articles and by-laws.

10.    Accordingly:

10.1.    The directors and any purported directors of the Company from time to time are obliged as fiduciaries to exercise the power to allot shares in the Company under by-law 1.1 of the Company's by-laws and section 30 of IBCA for the purposes for which that power was conferred, and not for any improper or collateral purpose.

10.2.    Further or in the alternative, it is an implied term of the directors' power to allot and issue shares under by-law 1.1 of the Company's by-laws that that power must only be exercised (i) for the purpose for which that power was conferred, and not for any improper or collateral purpose, and (ii) honestly and in good faith with a view to the best interests of the Company.

## B.    The other Claimants

11.    The Second Claimant, OrbiMed Partners Master Fund Limited ("**OrbiMed**"), is an exempted company registered in Bermuda.

12.    OrbiMed is the registered owner of 1,000,000 common shares in the Company. OrbiMed is the beneficial owner of a further 642,814 common shares in the Company, which are registered in the name of Cede & Co (as nominee of The Depositary Trust Company). OrbiMed has been a shareholder of the Company since 2013.

13.    The Third Claimant, 1 Globe Capital, LLC ("**1Globe**"), is a limited liability company registered in Delaware.

14.    1Globe is the registered owner of 6,812,855 common shares in the Company. 1Globe has been a shareholder of the Company since 2010.

**C.**    **The Defendants**

15.    The First Defendant, Vivo Capital LLC ("**Vivo Capital**"), is a limited liability company registered in ~~Delaware~~ California with its registered office at ~~c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801~~ 192 Lytton Avenue, Palo Alto, California 94301, United States of America.

16.    The Fifth Defendant, Prime Success, L.P. ("**Prime Success**"), is a limited partnership registered in the Cayman Islands with its registered office at c/o Walkers Corporate Limited 190 Elgin Avenue, George Town, Grand Cayman KY1-9001. The general partner of Prime Success is Green Vision Partners Limited. The shareholder of Green Vision Partners Limited is Advantech Capital Partners Ltd ("**Advantech**").

17.    Prime Success and Vivo Capital each acquired 5,900,000 common shares (the "**Prime Success Shares**" and the "**Vivo Capital Shares**", and together the "**PIPE Shares**") pursuant to a purported private placement of shares in the Company that was announced on 3 July 2018 (the "**PIPE**").

18.    The PIPE Shares were purportedly issued pursuant to a Securities Purchase Agreement dated 2 July 2018 that the Company purportedly entered into with Vivo Capital and Prime Success (the "**SPA**").

19.    Subsequently, Vivo Capital purported to assign its rights under the SPA, and to transfer the Vivo Capital Shares, to the Second Defendant, Vivo Capital Fund VIII, L.P. ("**Vivo Capital Fund VIII**"), the Third Defendant, Vivo Capital Surplus Fund VIII, L.P. ("**Vivo Capital Surplus Fund VIII**") and the Fourth Defendant, Vivo Capital Fund IX, L.P. ("**Vivo Capital Fund IX**").

20.    Each of Vivo Capital Fund VIII, Vivo Capital Surplus Fund VIII and Vivo Capital Fund IX (together "**the Vivo Funds**") is a limited partnership registered in Delaware with its registered office at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801, United States of America. The Vivo Funds are ultimately controlled by Vivo Capital. Further or alternatively, the Vivo Funds and Vivo Capital are controlled by the same person or persons.

21.    The Vivo Capital Shares purportedly acquired by Vivo Capital under the PIPE are now registered as follows:

21.1.    Vivo Capital Fund VIII is purportedly the holder of 1,195,465 common shares;

21.2.    Vivo Capital Surplus Fund VIII is purportedly the holder of 165,079 common shares; and

21.3.    Vivo Capital Fund IX is purportedly the holder of 4,539,456 common shares.

22.    The Sixth Defendant is Cede & Co, a  partnership with an address at 570 Washington Boulevard, Jersey City, NJ 07310, United States of America. Cede & Co is the nominee of The Depositary Trust Company, which in turn is a central securities depositary and serves as a clearing house, including for the Company's common shares admitted to trading on NASDAQ.

23.    Following Prime Success's purported acquisition of the Prime Success Shares, those shares were subsequently transferred into the name of Cede & Co, albeit a single share was transferred back into Prime Success's name on or around 15 April 2025. Prime Success purports to continue to be the beneficial owner of 5,851,423 common shares (out of the 5,900,000 common shares purportedly issued to it under the PIPE). Cede & Co has been joined as a Defendant so that it is bound by any order made in these proceedings in relation to the 5,851,422 common shares which are registered in its name and purportedly beneficially owned by Prime Success.

D.    **Events leading up to the Company's AGM on 6 February 2018**

24.    From early 2016, a competition emerged between two rival consortia seeking to acquire ownership and control of the Company. As to this:

24.1.    The first consortium (the "**Management Consortium**") was led by Vivo Capital. Apart from Vivo Capital, the Management Consortium included Advantech, SAIF Partners IV, LP ("**SAIF**") as well as the Company's directors at the time, namely Weidong Yin ("**Mr Yin**"), Kenneth Lee, Simon Anderson, Yuk Lam Lo and Mei Meng (together, the "**Former Incumbent Directors**").

24.2.    The other consortium (the "**Sinobioway Consortium**") included Sinobioway Biomedicine Co. Ltd. ("**Sinobioway**"), which was a minority shareholder in one of the Company's major operating subsidiaries.

25.   On 1 February 2016, the Company announced that it had received a non-binding privatisation acquisition offer for the Company from the Management Consortium at US$6.18 per common share.

26.   On 4 February 2016, the Sinobioway Consortium made a competing offer for the Company at US$7 per common share. The Former Incumbent Directors rejected this superior bid.

27.   On 28 March 2016, the Former Incumbent Directors purported to adopt a rights agreement which professed to "*guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain control of the Company*" (the "**Rights Agreement**"). The Rights Agreement was a 'poison pill' device (purportedly) allowing the Former Incumbent Directors to dilute the shareholdings of any bidder consortium holding at least 15% of the issued common shares by allotting new shares to the remaining shareholders.

28.   On 26 June 2017, the Company announced that the Former Incumbent Directors had decided to sell the Company to the Management Consortium at US$7 per common share. That decision was taken without having engaged in any negotiations with the Sinobioway Consortium since their 4 February 2016 offer.

29.   Also on 26 June 2017, in order to implement the Management Consortium's privatisation acquisition offer, the Former Incumbent Directors caused the Company to enter into an amalgamation agreement (the "**Amalgamation Agreement**"):

   29.1.   Pursuant to the Amalgamation Agreement, the Company would merge with Sinovac Amalgamation Sub Limited, with the Company continuing as the surviving corporation and as a wholly owned subsidiary of Sinovac (Cayman) Limited. Both Sinovac Amalgamation Sub Limited and Sinovac (Cayman) Limited were newly incorporated for the purpose of implementing the proposed amalgamation.

   29.2.   Immediately following the implementation of the transactions contemplated by the Amalgamation Agreement, Sinovac (Cayman) Limited would be beneficially owned by the Management Consortium.

   29.3.   The shares in the Company owned by shareholders not party to the Management Consortium would be cancelled in consideration for the right to receive US$7 in cash per share.

30.   Under IBCA 1982, the proposed amalgamation pursuant to the Amalgamation Agreement required the prior approval by a resolution passed by shareholders of the Company representing at least two-thirds of the shares voted. As at 26 June 2017, the members of the Management Consortium beneficially owned in aggregate c. 29.5% of the issued common shares.

31.   On 28 June 2017, the Sinobioway Consortium increased its proposed offer for the Company to US$8 per common share. The Former Incumbent Directors again rejected the superior bid of the Sinobioway Consortium.

32.   On or around 2 July 2017, the Former Incumbent Directors queried whether the Sinobioway Consortium had sufficient funds in US$ for the acquisition. In response to that query, the Sinobioway Consortium furnished the Former Incumbent Directors with a certificate of deposit from the CITIC Group, evidencing US$2.5 billion of cash.

33.   The Former Incumbent Directors did not publicly disclose the existence of the Sinobioway Consortium's increased bid of US$8 per common share until publication of the Company's annual report for 2016 (filed in Form 20-F with the Securities and Exchange Commission (the "**SEC**") on 22 November 2017).

E.    **The AGM**

34.   On 28 December 2017, the Company gave formal notice of its Annual General Meeting to be held in Beijing on 6 February 2018 (the "**AGM**"). By-law 8.1 of the Company's by-laws provided (and provides) for the Company's directors to hold office until the next annual general meeting. One of the three items of business for the AGM included the re-election of the Former Incumbent Directors.

35.   On 31 January 2018, Sinobioway published, by an online press release addressed to all shareholders in the Company, a recommendation that shareholders should attend the AGM and vote against the re-election of the Former Incumbent Directors.

36.   At the AGM, James Chang (a DLA Piper partner) acting as the proxy of JPMorgan in respect of shares beneficially owned by OrbiMed proposed motions, including to (i) amend the ballot paper provided by the Company to include an "*Against All*" option to vote against the election of the Former Incumbent Directors; (ii) remove all Former Incumbent Directors except Yuk Lam Lo; and (iii) nominate an alternative slate of directors, comprising Yuk Lam Lo and four new

directors, namely Wang Guowei, Qiu Haifeng, Cao Jianzeng and Li Pengfei (such alternative slate being defined herein as the "**New Directors**").

37.     As at the record date for the AGM, the Company's issued share capital comprised 57,269,861 common shares. Shareholders holding 47,267,302 shares (constituting 82.53% of the issued share capital) voted at the AGM either in person or by proxy. The votes were cast as follows:

    37.1.     21,194,518 of those shares (constituting 44.84% of the shares voted) were voted by way of proxy forms issued by the Company and lodged in advance of the AGM, and of these between 98.24% and 98.87% (varying on a director-by-director basis) were voted in favour of the re-election of the Former Incumbent Directors. Approximately, 85% of those shares were owned by members of the Management Consortium.

    37.2.     Shareholders (or their legal proxies) holding 26,072,784 shares (constituting 55.16% of the shares voted) attended and voted on the alternative ballots at the AGM against the re-election of the Former Incumbent Directors and for the election of the New Directors.

38.     10,0002,559 shares, constituting 17.47% of the Company's total issued shares, were not voted.

39.     At the AGM, a tabulation of the votes cast showed that the resolution for the appointment of the New Directors had obtained a majority of the votes. However, the AGM concluded without a declaration of the results of the election by the scrutineer, who stated that she needed to confirm the validity of the votes cast on the alternative ballots with the Company's Antiguan counsel.

40.     On 5 March 2018, the Former Incumbent Directors caused the Company to publish, and file with the SEC, an announcement that the Former Incumbent Directors had been re-elected at the AGM. The announcement stated that:

> "… At the AGM, all five of the Company's incumbent directors – Weidong Yin, Yuk Lam Lo, Simon Anderson Kenneth Lee and Meng Mei – were re-elected by a majority of the votes validly cast. The Company determined, after consultation with its Antigua legal counsel, that a ballot proposed by the dissident group without prior notice at the AGM was invalid. …"

**F.     The Delaware proceedings**

41.   On 5 March 2018, the Former Incumbent Directors caused the Company to file a lawsuit in the Delaware Court of Chancery against OrbiMed, 1Globe, and various individuals, who voted against the re-election of the Former Incumbent Directors at the AGM, seeking declaratory and injunctive relief regarding the Rights Agreement (the "**Delaware Proceedings**").

42.   In the Delaware Proceedings, the Company sought a declaration that the defendants in those proceedings became "Acquiring Persons" under the terms of the Rights Agreement and caused a "Trigger Event" by reason of their having submitted the alternative ballots at the AGM, voting against the re-election of the Former Incumbent Directors and for the election of the New Directors to the Company's board of directors.

43.   The Delaware Proceedings were largely stayed during the pendency of the Antiguan Proceedings described directly below, and were dismissed with prejudice on 7 April 2025 (following the final determination of the Antiguan Proceedings).

G.    <u>The Antiguan proceedings and the Privy Council's decision</u>

44.   On 13 March 2018, 1Globe, which had voted at the AGM for the election of the New Directors to the Company's board of directors (but which was not part of either the Management Consortium or the Sinobioway Consortium), filed a claim in the High Court of Antigua and Barbuda, seeking declarations and orders under section 122 of IBCA 1982 in relation to the AGM (the "**Antiguan Proceedings**"), including as follows:

44.1.   That the New Directors had been duly elected at the AGM;

44.2.   That the New Directors be installed as the Company's Board of Directors; and

44.3.   That the Former Incumbent Directors were no longer the directors of the Company and any actions taken on behalf of the Company at their direction after the AGM were null and void.

45.   On 19 December 2018, Smith J in the High Court of Antigua and Barbuda dismissed 1Globe's claims.

46.   On 9 December 2021, the Court of Appeal dismissed 1Globe's appeal.

47.   On 16 January 2025, the Judicial Committee of the Privy Council handed down judgment, allowing 1Globe's appeal. The Privy Council found, and for the purposes of these proceedings it is averred, that:

   47.1.   On 6 February 2018, the Former Incumbent Directors (save for Yuk Lam Lo) had ceased to hold office as directors of the Company and had been "*imposters*" ever since.

   47.2.   On 6 February 2018, the New Directors (including Yuk Lam Lo) were duly elected at the AGM, and have ever since been the lawfully appointed directors of the Company.

   47.3.   The Rights Agreement purportedly adopted by the Former Incumbent Directors of the Company was, and has always been, void.

48.   The Privy Council's Order is dated 5 February 2025.

49.   Between the AGM on 6 February 2018 and the Privy Council's judgment, the Former Incumbent Directors had remained in *de facto* control of the Company.

**H.      Events following the AGM**

50.   In the light of the events at the AGM, it was apparent that the Management Consortium would not be able to secure the necessary two-thirds majority of shareholders' votes required for its privatisation offer. Accordingly, the Former Incumbent Directors pursued a new strategy to consolidate the Management Consortium's control of the Company, as described below.

51.   Shortly following the AGM, on the Former Incumbent Directors' instructions, the Company's management produced a business plan which showed a (purported) need for raising c. US$110 million.

52.   At around the same time, the Former Incumbent Directors instructed Latham & Watkins and Houlihan Lokey to advise in relation to a potential private placement of shares by the Company. Such a private placement of shares was considered during a number of conference calls between the Former Incumbent Directors, including on 19 March 2018, 22 May 2018, 5 June 2018 and on 2 and 3 July 2018.

53.   The Former Incumbent Directors invited members of the Management Consortium, including Vivo Capital and Advantech, to participate in a private placement of shares. The Former

Incumbent Directors' intention was that those participating in the placement would be required to sign up to obligations to vote the shares (i) for all Board-nominated director candidates and (ii) consistently with the Board's recommendations (other than in connection with a change of control transaction).

54.    The Former Incumbent Directors did not offer the Company's existing shareholders the opportunity to participate in the proposed private placement.

55.    On 3 July 2018, the Former Incumbent Directors purported to pass the following resolutions as directors of the Company:

55.1.    A resolution approving the Company's entry into the SPA with Vivo Capital and Prime Success and into related transaction documents.

55.2.    A resolution to issue the PIPE Shares to Vivo Capital and Prime Success (purportedly) pursuant to the SPA.

55.3.    A resolution to appoint Vivo Capital's nominee, Mr Shan Fu, as an additional director of the Company.

55.4.    A resolution to amend the Rights Agreement to permit the execution of the SPA and issue of the PIPE Shares without causing a "Trigger Event".

55.5.    A resolution to terminate the Amalgamation Agreement.

56.    The SPA was signed by Mr Yin, purportedly on behalf of the Company, by Wong Kok Wai (a director of the general partner of Prime Success) on behalf of Prime Success and by Albert Cha (a managing member of Vivo Capital) on behalf of Vivo Capital.

57.    Under the terms of the SPA, Vivo Capital and Prime Success agreed to purchase the PIPE Shares for US$86,730,000, with each of Vivo Capital and Prime Success agreeing to purchase 5,900,000 common shares for US$43,365,000, being a price of US$7.35 per share.

58.    On or around 3 July 2018, the Company (purportedly) issued the Prime Success Shares as fully-paid up to Prime Success and the Vivo Capital Shares as fully-paid up to Vivo Capital, reflected by corresponding entries in the Company's register of shareholders maintained by its transfer agent.

59. The shareholdings of the Management Consortium immediately prior to and after the issue of the PIPE Shares are set out in the following table:

| Pre-PIPE | | | Post-PIPE | | |
|---|---|---|---|---|---|
| Shareholder | Shares | % | Shareholder | Shares | % |
| Former Incumbent Directors[2] | 7,536,847 | 12.7% | Former Incumbent Directors[3] | 7,536,847 | 10.59% |
| SAIF | 10,780,820 | 18.17% | SAIF | 10,780,820 | 15.16% |
| Vivo Capital | 0 | 0 | Vivo Capital | 5,900,000 | 8.3% |
| Prime Success/ Advantech | 0 | 0 | Prime Success / Advantech | 5,900,000 | 8.3% |
| Total | 18,317,667 | 30.87% | | 30,117,667 | 42.35% |

60. On 3 July 2018, the Company (still under the *de facto* control of the Former Incumbent Directors) issued a press release (also filed with the SEC) announcing the purported PIPE.

61. Prime Success is an affiliate of Advantech, which was not named as a party to the SPA. Prime Success is ultimately controlled by Advantech. Further or alternatively, Prime Success and Advantech are controlled by the same person or persons. In particular:

61.1. Advantech is the sole shareholder as well as a director of Green Vision Partners Limited, which is Prime Success's general partner.

61.2. In connection with the SPA, Advantech Master Investment Limited (which, it is reasonably to be inferred, is an entity controlled by Advantech) signed an equity commitment letter dated 2 July 2018 confirming that it would contribute, as equity

---

[2] together with the Company's executive officers
[3] Ibid.

capital, US$43,365,000 for the purpose of funding Prime Success's payment obligations.

62. The Disclosure Schedule to the SPA contained the following statements:

*SECTION 3.2(A): AUTHORIZED SHARES*

*Board Election Matter*

*On March 5, 2018, the Company announced the re-election of the members of its board of directors (the "Board")—Mr. Weidong Yin, Mr. Yuk Lam Lo, Mr. Simon Anderson, Mr. Kenneth Lee, and Mr. Meng Mei—at the 2018 annual general meeting of shareholders (the "2018 AGM") held on February 6, 2018. The Company also announced that it had determined, after consultation with its Antigua legal counsel, that an alternative, pre-printed ballot not made available to all the Company's shareholders, and purportedly submitted at the 2018 AGM by 1Globe Capital LLC ("1Globe"), The Chiang Li Family, OrbiMed Advisors LLC ("OrbiMed") and other shareholders of the Company, was invalid. Certain of those shareholders have challenged these determinations in litigation against the Company, which is more particularly described in Section 5.4 of this Company Disclosure Schedule. If it is ultimately determined that the candidates nominated by 1Globe, OrbiMed, the Chiang Li Family and the other shareholders of the Company at the 2018 AGM were validly elected, such determination could create uncertainty as to whether the Board had the power and authority to approve the Securities Purchase Agreement and the transactions contemplated therein and whether the Securities Purchase Agreement constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms. This could create further uncertainty as to the validity of the capitalization of the Company, whether the Company's entry into the Securities Purchase Agreement and consummation of the transactions conflicted with applicable Law and whether the Shares were validly issued by the Company.*

*SECTION 5.4: PENDING LITIGATION*

*On March 13, 2018, 1Globe filed a complaint against the Company in the Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda (the "Antigua Court"). The complaint seeks a declaration that five persons purportedly*

proposed on a non-public ballot at the 2018 AGM were elected as directors of the Company at that meeting, an order of the Antigua Court that those five persons be installed as the Company's board of directors, and a declaration that any actions taken on behalf of the Company at the direction of the board of directors since the 2018 AGM are null and void. On April 10, 2018, 1Globe filed a notice of application in the Antigua Court seeking urgent relief, including an order declaring the result of the disputed election, an urgent order restraining the Company's board of directors from acting, pending determination of the dispute, including acting to initiate or continue litigation against 1Globe, and other related relief. On May 9, 2018, the Antigua Court stayed Sinovac's application for an extension of time to serve its defence, pending resolution of 1Globe's application for urgent relief. The Antigua Court held a hearing of 1Globe's application for urgent relief on June 12, 2018, at which time 1Globe requested an adjournment of two weeks. As of the date of this Company Disclosure Schedule, the adjourned hearing has been set for July 6, 2018. The Company is vigorously defending this lawsuit

63.    Further, clause 6.13 of the SPA, headed "*Remedies in Event of Rescission Event; Indemnification*", which will be referred to at trial for its full terms and effect, provided, in summary, that:

63.1.    If a court of competent jurisdiction determined that the SPA was not duly authorised by the Company's board of directors and/or that the PIPE Shares were not validly issued (such a determination being defined in the SPA as a "*Rescission Order*"), then the investors, Prime Success and Vivo Capital, would each be entitled to rescind the SPA and, in return for forfeiting the Prime Success Shares and/or the Vivo Capital Shares (as the case may be), would be entitled to the refund of "*the Rescission Amount*", as defined in the SPA; and

63.2.    If a Rescission Order (as so defined) became final and unappealable and where one or other of Prime Success or Vivo Capital had not previously elected to rescind the SPA, then the SPA and the issue of the PIPE Shares would be deemed to be automatically rescinded, and Prime Success and Vivo Capital would be required to forfeit the PIPE Shares and the Company would be required to repay them the Rescission Amount.

64.   In connection with the SPA, and as a condition of closing, Vivo Capital, Prime Success and the Company purportedly entered into a Shareholders Agreement (the "**Shareholders Agreement**") and a Registration Rights Agreement also dated 2 July 2018.

65.   Clause 3.1 of the Shareholders Agreement provides as follows:

> "*Voting*. *Until the Sunset Date, at any meeting of shareholders of the Company at which any matter is submitted to a vote of the shareholders of the Company (or if action is taken by written consent of shareholders of the Company in lieu of a meeting), the Investor Parties shall vote, or cause to be voted (including, if applicable, by written consent), all Voting Securities Beneficially Owned by the Investor Entities (a) affirmatively in favor of the election of all of the director designees nominated to serve as a Director (including the Investor Designee nominated in accordance with this Agreement) and (b) consistent with the recommendations of the majority of the Board as to all other matters; provided, that, each Investor Entity shall be permitted to vote its Voting Securities in its discretion with respect to any Acquisition (and any other related matter the approval of which is required to consummate such Acquisition)."*

66.   The Shareholders Agreement defines "*Sunset Date*" as meaning "*the earliest date on which (a) the aggregate Percentage Interest of the Investor Entities is less than ten percent (10%) or (b) a Change of Control shall have been consummated or have occurred*".

67.   Clause 4 of the Shareholders Agreement contains restrictions on share transfers by Vivo Capital and Prime Success, including an initial lock-up period of 9 months.

I.    **Purported Assignments by Vivo Capital**

68.   Vivo Capital (as seller) and Vivo Capital Fund VIII and Vivo Capital Surplus Funds VIII (as buyers) entered into a securities purchase agreement dated 16 July 2018 pursuant to which 1,360,544 of the Vivo Capital Shares were (purportedly) sold to Vivo Capital Fund VIII, LP (1,195,465 shares) and Vivo Capital Surplus Funds VIII, LP (165,079 shares) for US$10,000,000. Albert Cha (a managing member/director of the general partners of the Vivo Funds) signed the agreement on behalf of Vivo Capital Fund VIII and Vivo Capital Surplus Funds VIII.

69.   Vivo Capital (as seller) and Vivo Capital Fund IX (as buyer) entered into a securities purchase agreement dated 24 August 2018 pursuant to which 4,539,456 of the Vivo Capital Shares (i.e.

the remainder of those shares after the previous transfers to Vivo Capital Fund VIII and Vivo Capital Surplus Funds VIII) were (purportedly) sold to Vivo Capital Fund IX for US$33,365,001.60. Albert Cha (a managing member/director of the general partners of the Vivo Funds) signed the agreement on behalf of Vivo Capital Fund IX.

70.    The transfers of the Vivo Capital Shares contemplated by the two agreements were subsequently recorded in the Company's register of shareholders maintained by its transfer agent.

## J.    Subsequent Events

71.    On or around 18 February 2019, the Former Incumbent Directors purported to pass the following board resolutions:

71.1.    A resolution determining that 1Globe Capital, OrbiMed and all other shareholders who voted against the re-election of the Former Incumbent Directors (and for the election of the New Directors) at the AGM became *"Acquiring Persons"* within the meaning of the Rights Agreement *"at or prior to"* the AGM.

71.2.    A resolution noting that, as a result, a *"Trigger Event"* occurred under the Rights Agreement, such that those *"Acquiring Persons"* lost any preferred share purchase rights under the Rights Agreement.

71.3.    A resolution approving an exchange of all valid, remaining preferred share purchase rights under the Rights Agreement *"as of the close of trading in the United States on February 22, 2019"* for common shares and preferred shares in the Company (referred to as the "**Exchange Shares**").

71.4.    A resolution allotting and approving the issue of the Exchange Shares, being 27,777,341 common shares and 14,630,813 preferred shares, to a trustee for the benefit of, and subsequent transfer to, the Company's shareholders as of 22 February 2019 (apart from the *"Acquiring Persons"*). For this purpose, the Former Incumbent Directors treated the PIPE Shares as having been validly issued, so as purportedly to entitle the holders thereof to Exchange Shares in respect of them.

72.  In late February and in early March 2019, 1Globe obtained interim relief from the Delaware Court of Chancery in the Delaware Proceedings and from the Court of Appeal in the Antiguan Proceedings preventing the Company from enforcing the terms of the Rights Agreement.

73.  If the Rights Agreement had been implemented in accordance with the Former Incumbent Directors' (purported) resolutions, the shareholdings of the shareholders who voted against the Former Incumbent Directors would have been diluted and the proportionate shareholdings of the Management Consortium, including by virtue of the PIPE Shares, would have increased from c. 42.35% to c. 52.36% of the Company's total share capital.

74.  In the circumstances, it is to be inferred, and so the Claimants allege, that the Former Incumbent Directors' decision to delay the (purported) declaration of a "*Trigger Event*" and the (purported) issue of the Exchange Shares under the Rights Agreement until after the purported issue of the PIPE Shares was deliberate and designed to maximise the shareholdings of the Management Consortium.

**K.     The SPA is invalid given the Former Incumbent Directors' lack of authority**

75.  In circumstances where, as the Privy Council found, the Former Incumbent Directors had ceased to be directors of the Company on 6 February 2018, the Former Incumbent Directors did not have any authority (i) to approve the Company's entry into, or to cause the Company to enter into, the SPA, the Shareholders Agreement (or any of the related agreements) or (ii) to allot or issue the PIPE Shares.

76.  Accordingly:

76.1.  There was in fact no resolution by the board of directors of the Company (i) that the Company enter into the SPA, the Shareholders Agreement or any of the related agreements or (ii) that the Company allot or issue the PIPE Shares.

76.2.  Mr Yin, who purported to sign the SPA and the Shareholders Agreement (as well as the related agreements) on behalf of the Company, in fact had no authority to do so.

76.3.  Any instructions given to the Company's transfer agent purportedly on behalf of the Company to record the allotment and issue of the PIPE Shares to Prime Success and Vivo Capital in the Company's register of shareholders were in fact unauthorised.

77.   Each of Prime Success and Vivo Capital as well as the Vivo Funds knew, or ought to have known, or, alternatively they knew that there was, at least, a significant risk, that on 6 February 2018 the Former Incumbent Directors had ceased to be directors of the Company and the New Directors had been elected as directors, and they each also knew or ought to have known that a finding and declaration to this effect might in due course be the outcome of the Antiguan Proceedings. In support of that contention, reliance is placed on the following:

77.1.   The Former Incumbent Directors, and on their instructions, the Company's management, discussed with Advantech and Vivo Capital (i) the AGM, (ii) the Antiguan Proceedings and (iii) the possibility that, in due course, the outcome of those proceedings might be a declaration to the effect that, at the AGM, the Former Incumbent Directors had ceased to be directors of the Company and the New Directors had been elected as directors of the Company.

77.2.   Advantech and Vivo Capital investigated this possibility as part of their due diligence preceding the SPA. On two occasions, in April 2018 and in early June 2018, as a result of Advantech's and Vivo Capital's concerns about the impact of the Antiguan Proceedings, negotiations in relation to a potential private placement of shares in the Company were put on hold.

77.3.   Prime Success and the Vivo Funds are affiliates of Advantech and Vivo Capital, respectively, and paragraphs 20 and 61 above are repeated.

77.4.   Further, at all material times:

77.4.1.The same individuals acted on behalf of Prime Success and Advantech, including Wong Kok Wai (who was at all material times a director of Advantech and a director of the general partner of Prime Success) and Yan Yang (who was at all material times a director of the general partner of Prime Success and an authorised signatory of Advantech and Prime Success).

77.4.2.The same individual(s) acted on behalf of Vivo Capital and the Vivo Funds, including Albert Cha (who was at all material times a managing member of Vivo Capital and a managing member/director of the general partners of the Vivo Funds).

77.5.    The Disclosure Schedule to the SPA contains extensive disclosure in relation to the AGM and the Antiguan Proceedings. Paragraph 62 above is repeated.

77.6.    Clause 6.13 of the SPA purports to cater for the eventuality that the outcome of the Antiguan Proceedings (or any other proceedings) would be a declaration that, at the AGM, the Former Incumbent Directors had ceased to be directors of the Company and the New Directors had been elected as directors of the Company, and that the Former Incumbent Directors had no authority to cause the Company to enter into the SPA or to allot or issue the PIPE Shares. Paragraph 63 above is repeated.

78.    In the circumstances, each of Prime Success and Vivo Capital, in (purportedly) entering into the SPA, the Shareholders Agreement (and related agreements) and in (purportedly) purchasing and subscribing for the PIPE Shares, as well as the Vivo Funds, in (purportedly) purchasing the Vivo Capital Shares, knowingly assumed the risk that (i) the Former Incumbent Directors did not have authority to approve the Company's entry into, and Mr Yin did not have authority to sign on behalf of the Company, the SPA, the Shareholders Agreement (or any related agreements) and that (ii) the Former Incumbent Directors did not have authority to allot or issue the PIPE Shares, and that such purported corporate acts would later be found to be invalid or ineffective.

79.    The Former Incumbent Directors further did not have any authority to appoint Mr Shan Fu as an additional director of the Company.

**L.    The SPA is invalid by reason of the Former Incumbent Directors' breaches of duty**

80.    In (purportedly) causing the Company to enter into the SPA and to issue the PIPE Shares to Prime Success and Vivo Capital, the Former Incumbent Directors acted for the purpose, or substantially for the purpose, of increasing the number of shares held by members of the Management Consortium (or their affiliates) so as to consolidate the Management Consortium's control of the Company and, ultimately, with a view to defeating any future resolution for the removal of the Former Incumbent Directors and/or to improve the chances of successfully implementing a future privatisation acquisition offer by the Management Consortium (the **"Improper Purpose"**)

81.    In support of the contention that the (purported) entry into the SPA and the (purported) issue of the PIPE Shares were carried out for the Improper Purpose, the following matters in particular are relied upon:

81.1.    The PIPE was procured by the Former Incumbent Directors forming part of the Management Consortium.

81.2.    Vivo Capital and Prime Success were members of the Management Consortium (or, alternatively, affiliates of members of the Management Consortium).

81.3.    Preparations for the PIPE began almost immediately after the AGM on 6 February 2018, where a clear majority of shareholders had voted to remove the Former Incumbent Directors and appoint the New Directors instead.

81.4.    At that stage, it had also become apparent that the Management Consortium lacked support among the general body of shareholders and would not achieve the necessary two-thirds majority to pursue the proposed amalgamation under the Amalgamation Agreement. The Company's announcement of the purported PIPE on 3 July 2018 specifically included a quote by Mr Yin that the PIPE transaction was concluded as a result of recognising that "*the going-private transaction may not complete*".

81.5.    The offer of shares pursuant to the PIPE was made only in favour of Vivo Capital and Prime Success / Advantech, without any of the other existing shareholders outside of the Management Consortium being offered the opportunity to participate.

81.6.    The price of US$7.35 per common share paid by Vivo Capital and Prime Success did not reflect market value or the best price reasonably obtainable by the Company. In support of that contention, reliance is placed on the following:

81.6.1. The Sinobioway Consortium had offered to pay US$8 per common share.

81.6.2. On 29 June 2018, the Company's closing trading price was US$7.46 per common share, and its 30-day, 60-day and 90-day volume weighted average prices were US$7.95, US$7.79 and US$7.95, respectively.

81.6.3. Accordingly, the price of US$7.35 per common share implies a discount to the 29 June 2018 closing stock price, and the 30-day, 60-day and 90-day volume weighted average prices of 1.5%, 7.6%, 5.7% and 7.5%, respectively, and was significantly below the recent high of US$8.66 per common share on 8 June 2018.

81.6.4. The Company's trading price was artificially suppressed by the Former Incumbent Directors' failure to announce, or properly to announce, the positive outcome of the phase III trial of the Company's new polio vaccine. Preliminary result of the phase III trial had been available to the Former Incumbent Directors since April 2018.

81.7.  The effect of the purported issue of the PIPE shares was to increase the proportion of the Company's total issued share capital controlled by the Management Consortium from 30.87% to 42.35%, effectively ensuring (if the PIPE was valid) that the Former Incumbent Directors would be able to defeat any future resolution for their removal (or to secure their reappointment).

81.8.  Vivo Capital and Prime Success (purportedly) participated in the PIPE on terms of the SPA, under which both gave undertakings regarding the way in which each would vote on any resolution for the appointment of directors nominated by the Board of Directors of the Company. Paragraphs 65 and 66 above are repeated.

81.9.  The (purported) entry into the SPA and issue of the Prime Success Shares and the Vivo Capital Shares was not warranted by any genuine need on the part of the Company to raise capital, or, alternatively any genuine need to raise capital to the extent of the US$86,730,000 raised under the SPA. In support of the contention that the Company did not have a genuine need to raise capital, reliance is placed on the following:

81.9.1. As of 30 June 2018, the Company and its group had US$88.1 million of cash and cash equivalents. In its unaudited financial results for the six months ended 30 June 2018, the Company reported that it expected its current cash position would be able to support its operations for at least the next 12 months.

81.9.2. As of 31 December 2018, the Company and its group had US$158.2 million of cash and cash equivalents (excluding short-term investments of US$18.9 million) according to the Company's audited financial results for the financial year ended 31 December 2018.

81.9.3. In the period from June 2018 until the financial year ended 31 December 2021, the Company and its group were profitable and generated positive cash flow through its product sales.

81.9.4. At no point during the period when the Former Incumbent Directors remained in *de facto* control of the Company were the proceeds of the PIPE utilised or deployed in any way in furtherance of any business or financing needs of the Company.

82.     By acting for the Improper Purpose, the Former Incumbent Directors, as purported directors of the Company, breached their fiduciary duty to exercise the power to allot shares in the Company under by-law 1.1 for the purpose for which the power in question was conferred, and instead exercised that power for an improper and/or collateral purpose.

83.     Further, or in the alternative, by procuring the allotment of the PIPE Shares to Prime Success and Vivo Capital and in (purportedly) causing the Company to enter into the SPA, the Former Incumbent Directors, as purported directors of the Company, breached their fiduciary duty to act honestly and in good faith with a view to the best interests of the Company. In support of that contention, the following matters in particular are relied upon:

83.1.   Paragraph 81 above is repeated.

83.2.   The (purported) transaction with Advantech / Prime Success and Vivo Capital was not an arm's length transaction, given their and the Former Incumbent Directors' relationship as members of the Management Consortium, and as illustrated by the favourable price paid by Vivo Capital and Prime Success (as to which paragraph 81.6 above is repeated).

83.3.   In particular, in so acting, the Former Incumbent Directors failed to act fairly as between the different members of the Company:

83.3.1. The effect of the issue of the PIPE Shares, which was only made in favour of Prime Success and Vivo Capital, was to dilute the shareholdings of the existing shareholders, none of whom was offered the opportunity to participate.

83.3.2. The effect of the issue of the PIPE Shares was to frustrate the purpose of the members of the Company that had voted against the re-election of the Former

Incumbent Directors and for the election of the New Directors by seeking to ensure that any attempt in the future to pass similar resolutions would be defeated.

84.     Further, in the premises, the Former Incumbent Directors purported to exercise the power to allot and issue shares under by-law 1.1 of the Company's by-laws in breach of the implied term set out in paragraph 10.2 above.

85.     In the premises, by reason of the aforesaid breaches of fiduciary duty and/or the breach of the implied term set out in paragraph 10.2 above:

85.1.   Mr Yin, who purported to sign the SPA and the Shareholders Agreement (as well as the related agreements) on behalf of the Company, in fact had no authority to do so.

85.2.   Any instructions given to the Company's transfer agent purportedly on behalf of the Company to record the allotment and issue of the PIPE Shares to Prime Success and Vivo Capital in the Company's register of shareholders were in fact unauthorised.

**M.    Conclusion on sections K and L above**

86.     In the premises, by reason of the facts and matters set out in section K above; further or alternatively, by reason of the facts and matters set out in section L above:

86.1.   Each of the SPA and the Shareholders Agreement (as well as the related agreements) is, and always has been, invalid, never having been entered into by the Company.

86.2.   Further or alternatively, each of the SPA and the Shareholders Agreement (as well as the related agreements) is void, having been purportedly entered into by the Former Incumbent Directors in breach of their fiduciary duties as purported directors.

86.3.   The purported allotment and issue of the PIPE Shares was, and the continuing purported existence of those shares is in breach of OrbiMed's and 1Globe's rights as shareholders of the Company.

86.4.   The purported allotment and issue of the PIPE Shares to Prime Success and Vivo Capital was invalid and/or should be set aside.

86.5.    The register of shareholders of the Company should be rectified under section 207 of IBCA 1982 by:

86.5.1. The deletion of any entries in respect of the purported allotment and transfers of the Vivo Capital Shares; and

86.5.2. The deletion of any entries in respect of the purported allotment and transfers of the Prime Success Shares (save for the 48,577 Prime Success Shares which are no longer beneficially owned by Prime Success or its affiliates).

86.6.    The purported appointment of Mr Shan Fu as an additional director of the Company on or around 3 July 2018 was ineffective and invalid.

## N.    The SLS convertible loans

87.    At all material times, until on or around 7 December 2020, Sinovac Life Sciences Co., Ltd. ("**SLS**") was an indirect wholly-owned subsidiary of the Company. The Company's interest in SLS was, and continues to be, held via Sinovac Biotech (Hong Kong) Limited ("**Sinovac Hong Kong**"), a direct wholly-owned subsidiary of the Company registered in Hong Kong. In 2024, Sinovac Holding Group Co., Ltd., a direct wholly-owned subsidiary of Sinovac Hong Kong registered under the laws of the PRC, was inserted as an intermediate holding company above SLS Ltd.

88.    SLS (formerly named "Sinovac Research and Development Co., Ltd.") is a limited liability company incorporated under the laws of the PRC.  At all material times, until on or around 7 December 2020, Mr Yin was the sole director of SLS. SLS's business includes human vaccine research as well as the development, manufacturing  and sales of human vaccines. It is a key operating subsidiary of the Company,  having, among other matters,  developed, marketed and sold "CoronaVac", a vaccine against Covid-19.

89.    On or around 18 May 2020, SLS entered into (i) a loan agreement with Prime Success and (ii) a loan agreement with Vivo Capital Fund IX (together the "**Convertible Loan Agreements**"). Pursuant to the Convertible Loan Agreements:

89.1.    Each of Prime Success and Vivo Capital Fund IX made a convertible loan to SLS in the principal amount of US$7.5 million.

89.2.    Each loan under the Convertible Loan Agreements bore simple interest at a rate of 8% per annum.

89.3.    Each loan under the Convertible Loan Agreements had a maturity date of 24 months (capable of a 12-month extension by mutual agreement).

89.4.    On the maturity date, each loan under the Convertible Loan Agreements could be converted into 7.5% of the total equity interest in SLS at Prime Success's and Vivo Capital Fund IX's election, respectively.

90.    In connection with the Convertible Loan Agreements, the Former Incumbent Directors purported to cause the Company to enter into a guarantee agreement with each of Prime Success and Vivo Capital Fund IX, guaranteeing the punctual performance by SLS of its obligations under the Convertible Loan Agreements (the "**Purported Guarantees**").

91.    On 22 May 2020, the Former Incumbent Directors caused the Company to issue a press release announcing that Advantech Capital and Vivo Capital invested US$15 million into SLS purportedly so as "*to further the development of ... CoronoaVac*". The press release noted that:

> "*Sinovac has made significant process in the development of CoronaVac. Preclinical results regarding CoronaVac were recently published in the peer-reviewed academic journal Science in an article noting that the vaccine candidate is safe and provides protection to rhesus macaques (monkeys) through an animal challenge study.*
>
> *Sinovac received approval from governmental authorities to conduct both Phase I and Phase II human clinical trials in China. The Phase I clinical trial, which evaluates the safety, tolerance, and preliminary immunogenicity of CoronaVac, commenced in April. After preliminary observation of the safety profile of CoronaVac in the Phase I study, the Phase II clinical trial commenced in May. ... Sinovac is constructing a commercial vaccine production plant that is expected to manufacture up to 100 million doses of CoronaVac annually.*"

92.    At the beginning of the Covid-19 pandemic, the Company and/or SLS were selected by the government of the PRC as the preferred contractor for supplying a vaccine against Covid-19. The government of the PRC provided financial as well as regulatory support for the rapid development of a vaccine against Covid-19. Throughout 2020, the Former Incumbent Directors caused the Company to issue a number of further press releases also announcing positive outcomes in the clinical trials relating to CoronaVac, indicating that the Company (and SLS) remained optimistic that CoronaVac was on track for approval. In June 2020, CoronaVac

became the first vaccine approved for emergency use in the PRC. On 5 February 2021, CoronaVac received conditional marketing authorisation in the PRC.

93. On or around 7 December 2020, Sino Biopharmaceutical Limited, a company listed on the Hong Kong Stock Exchange, via its Hong-Kong registered subsidiary, Talent Forward Limited, invested c. US$515 million in SLS in exchange for 15.03% of the total equity interest in SLS.

94. According to a press release that the Former Incumbent Directors caused the Company to issue on 7 December 2020, Sino Biopharmaceutical Limited's investment was intended to fund the further development, capacity expansion and manufacturing of CoronaVac as well as other development and operational activities.

95. Prior to Sino Biopharmaceutical Limited's investment (through Talent Forward Limited) in SLS, each of Prime Success's and Vivo Capital Fund IX's loan under the Convertible Loan Agreements was converted into 7.5% of the total equity interest in SLS.

96. Since December 2020, following the conversion of the loans under the Convertible Loan Agreements into equity in SLS, Sino Biopharmaceutical Limited's investment in SLS and the issue of further shares by SLS to Keding Investment (Hong Kong) Limited ("**Keding**") in connection with SLS's employee share ownership plan, the equity in SLS was held as follows:

96.1. Sino Biopharmaceutical Limited (via Talent Forward Limited) held 15.03% of the total equity interest in SLS.

96.2. An associate of Sino Biopharmaceutical Limited, who invested together with Sino Biopharmaceutical Limited, held 0.35% of the total equity interest in SLS.

96.3. Keding held 12.69% of the total equity interest in SLS.

96.4. Vivo Capital Fund IX held 6.345% of the total equity interest in SLS.

96.5. Prime Success held 6.345% of the total equity interest in SLS.

96.6. Sinovac Hong Kong (the Company's wholly-owned subsidiary) held 59.24% of the total equity interest in SLS.

97.   Pending further disclosure, it is averred that between December 2020 and June 2024, SLS paid dividends totalling c. US$6.7 billion to its shareholders, of which c. US$850 million was paid to Vivo Capital Fund IX and Prime Success / Advantech (the "**SLS Dividends**").

O.   **The Former Incumbent Directors' lack of authority**

98.   It is to be inferred, and so the Claimants do positively allege, that at all material times, the Former Incumbent Directors had effective control of SLS and its board of directors, or, alternatively, had the ability to exert such control. In support of that contention, the following matters in particular are relied upon:

98.1.   Until on or around 7 December 2020, SLS was a wholly-owned subsidiary of the Company.

98.2.   The Former Incumbent Directors remained in *de facto* control of the Company until the Privy Council's judgment in the Antiguan Proceedings.

98.3.   At all material times until on or around 7 December 2020, Mr Yin was the sole director of SLS.

98.4.   Until the Privy Council's judgment in the Antiguan Proceedings, Mr Yin, as sole director of SLS, treated the Former Incumbent Directors as if they remained the duly appointed directors of the Company.

98.5.   Between 2008 and March 2025, two of the Former Incumbent Directors, namely Mr Yin and Yuk Lam Lo, were the directors of Sinovac Hong Kong together with Nan Wang Nan (who was also the CFO of the Company).

99.   It is further to be inferred, and so the Claimants do positively allege, that the Former Incumbent Directors procured, caused and/or allowed SLS to enter into the Convertible Loan Agreements and to subsequently pay the SLS Dividends. In support of that contention, the following matters in particular are relied upon:

99.1.   The facts and matters set out in paragraph 98 above.

99.2.   The fact that the Former Incumbent Directors purported to approve the Company's provision of the Purported Guarantees in connection with the Convertible Loan Agreements.

99.3.   The Company's press releases in relation to the Convertible Loan Agreements, including press releases dated 22 May 2020 and 7 December 2020.

100.   In circumstances where, as the Privy Council found, the Former Incumbent Directors had ceased to be directors of the Company on 6 February 2018, the Former Incumbent Directors did not have any authority to (i) approve the Company's entry into, or to cause the Company to enter into, the Purported Guarantees or (ii) to procure, cause and/or allow SLS, (purportedly) as directors of, and on behalf of, the Company, to enter into the Convertible Loan Agreements or to pay the SLS Dividends.

101.   Accordingly, the person who purported to sign the Purported Guarantees on behalf of the Company in fact had no authority to do so.

102.   Each of Prime Success and Vivo Capital Fund IX knew or ought to have known, or, alternatively they knew that there was, at least, a significant risk, that on 6 February 2018 the Former Incumbent Directors had ceased to be directors of the Company and the New Directors had been elected as directors, and they each also knew or ought to have known that a finding and declaration to this effect might in due course be the outcome of the Antiguan Proceedings. Paragraph 77 above is repeated.

103.   In the circumstances, each of Prime Success and Vivo Capital Fund IX, in (purportedly) accepting the Purported Guarantees knowingly assumed the risk that the Former Incumbent Directors did not have authority to approve the Company's entry into, and the person who signed the Purported Guarantees did not have authority to sign on behalf of the Company, the Purported Guarantees, and that such purported corporate acts would later be found to be invalid or ineffective.

**P.    The Former Incumbent Directors' breaches of duty**

104.   In (purportedly) causing the Company to enter into the Purported Guarantees and in procuring, causing and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends, the Former Incumbent Directors as purported directors of the Company, breached (i) their fiduciary duty to act honestly and in good faith with a view to the best interests of the Company under section 95(1)(a) of IBCA 1982 and (ii) their duty to exercise reasonable care, diligence and skill under section 95(1)(b) of IBCA 1982. In support of that contention, the following matters in particular are relied upon:

104.1.    The valuation of SLS at US$100 million, which underpinned the Convertible Loan Agreements, significantly undervalued SLS. The valuation of SLS will be a matter for expert evidence at trial, but pending the production of such expert evidence the Claimants contend as follows:

104.1.1. The valuation failed to give adequate weight to the real prospect of SLS obtaining approval for CoronaVac shortly, and the revenues which SLS would be able to generate by CoronaVac sales in due course. Paragraph 92 above is repeated.

104.1.2. A valuation of SLS at US$100 million failed to give adequate weight to or reflect the fact that valuations of other companies in the business of developing vaccines against Covid-19 had dramatically increased in the first half of 2020. The mean and the median increase of the enterprise values of BioNTech, Moderna, Novavax and CanSino Biologics between 31 December 2019 and 18 May 2020 was US$9,144.5 million and US$5,237.8 million, respectively.

104.1.3. Less than 7 months later, Sino Biopharmaceutical Limited invested US$515 million for a 15.03% stake in SLS, i.e. Sino Biopharmaceutical Limited's investment proceeded on the basis of a valuation of SLS at US$3.426 billion.

104.2.    The effect of the Convertible Loan Agreements, and the subsequent conversion of the loans into 15% of the total equity interest in SLS pursuant to them, was to unfairly dilute the shareholding of Sinovac Hong Kong and, consequently, the interest of the Company, in SLS.

104.3.    The entry into the Convertible Loan Agreements was not warranted by any genuine need on the part of SLS to raise capital from Prime Success or Vivo Capital Fund IX. In support of the contention that SLS did not have a genuine need to raise capital from outside the Company's group, reliance is placed on the following:

104.3.1. As at 31 March 2020, the Company and its group had cash and cash equivalents of US$165.3 million (excluding short-term investments of US$21.2 million).

104.3.2. As at 30 June 2020, the Company and its group had cash and cash equivalents of US$141.3 million (excluding short-term investments of US$35.4 million).

104.3.3. Excluding the net proceeds of Prime Success's and Vivo Capital Fund IX's loans totalling US$15 million advanced pursuant to the Convertible Loan Agreements, the Company and its group had cash and cash equivalents of US$126.6 million as at 30 June 2020 (excluding short-term investments of US$35.4 million).

104.3.4. In the period from June 2018 until the financial year ended 31 December 2021, the Company (and its group) were profitable and generated positive cash flow through product sales. The Company's and its group's cash flow was positive throughout the third and fourth quarter of 2020 even when discounting the net proceeds of the loans received pursuant to the Convertible Loan Agreements of US$15 million and Sino Biopharmaceutical Limited's US$515 million investment.

## Q.    Conclusion on sections O and P above

105.    In the premises, by reason of the facts and matters set out in section O above; further or alternatively, by reason of the facts and matters set out in section P above:

105.1.    The Purported Guarantees are, and always have been, invalid, never having been entered into by the Company.

105.2.    Further or alternatively, the Purported Guarantees are void, having been purportedly approved by the Former Incumbent Directors in breach of their fiduciary duties as purported directors.

105.3.    The Former Incumbent Directors had no authority to procure, cause and/or allow SLS, purportedly as directors of, and on behalf of, the Company to enter into the Convertible Loan Agreements or to pay the SLS Dividends.

105.4.    The Former Incumbent Directors, as purported directors of the Company, acted in breach of their duty under section 95(1)(a) and (b) of IBCA 1982 in procuring, causing

and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends.

**R.    Amendments and further claims**

106.    The Claimants fully reserve their rights to amend this Statement of Claim, including by adding new claims against the Defendants, whether as a result of the New Directors' further investigations into the Company's affairs and the Former Incumbent Directors' actions or otherwise.

**AND THE CLAIMANTS CLAIM:**

(1)    A declaration that each of the SPA, the Shareholders' Agreement (and any related agreements) is, and always has been, invalid and/or void.

(2)    A declaration that the issue of the PIPE Shares should be set aside.

(3)    Rectification of the Company's register of shareholders to delete any entries in respect of the purported allotments and transfers of the PIPE Shares (save for the 48,577 Prime Success Shares which are no longer beneficially owned by Prime Success or its affiliates).

(4)    A declaration that the purported appointment of Mr Shan Fu as an additional director of the Company on or around 3 July 2018 was ineffective and invalid.

(5)    A declaration that the Purported Guarantees are, and always have been, invalid and/or void.

(6)    A declaration that the Former Incumbent Directors had no authority to procure, cause and/or allow SLS to enter into the Convertible Loan Agreements or to pay the SLS Dividends, acting as purported directors of, and (purportedly) on behalf of, the Company.

(7)    A declaration that the Former Incumbent Directors, as purported directors of the Company, acted in breach of their duties under section 95(1)(a) and (b) of IBCA 1982 in procuring, causing and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends.

(8)  Such other relief as to the Court seems fit.

(9)  Costs.

Dated the 17th day of June, 2025

.........................................
CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEY-AT-LAW
FOR THE CLAIMANTS

## CERTIFICATE OF TRUTH

I, **CRAIG L. JACAS**, Attorney-at-Law for the Claimants certify that:

(a) the Claimants believe that the facts stated in this Amended Statement of Claim are true; and

(b) this Certificate is given on the Claimant's instructions.

The Claimants cannot give the Certificate because they are outside the jurisdiction and not available to sign this Amended Statement of Claim.

Dated the 17th day of June, 2025

.........................................
CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEY-AT-LAW
FOR THE CLAIMANTS

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200


IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL
BUSINESS CORPORATIONS ACT 1982

BETWEEN:

(1) SINOVAC BIOTECH LTD.
(2) ORBIMED PARTNERS MASTER FUND LIMITED
(3) 1GLOBE CAPITAL, LLC

Claimants

AND

(1) VIVO CAPITAL LLC
(2) VIVO CAPITAL FUND VIII, L.P.
(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.
(4) VIVO CAPITAL FUND IX, L.P.
(5) PRIME SUCCESS, L.P.
(6) CEDE & CO

Defendants

---

**AMENDED STATEMENT OF CLAIM**

---


CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEY AT LAW
FOR THE CLAIMANTS

Form 1: Authorization Code –
[Rule 13(4)

## THE EASTERN CARIBBEAN SUPREME COURT
## IN THE HIGH COURT OF JUSTICE

**ANTIGUA AND BARBUDA**
**CLAIM NO: ANUHCV2025/0200**
### IN THE MATTER OF SINOVAC BIOTECH LTD.
### AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

**BETWEEN:**

**(1) SINOVAC BIOTECH LTD.**
**(a company registered in Antigua and Barbuda)**
**(2) ORBIMED PARTNERS MASTER FUND LIMITED**
**(a company registered in Bermuda)**
**(3) 1GLOBE CAPITAL, LLC**
**(a company registered in Delaware, United States of America)**

**Claimants**

**and**

**(1) VIVO CAPITAL LLC**
**(a company registered in California, United States of America)**
**(2) VIVO CAPTIAL FUND VIII, L.P.**
**(a limited partnership registered in Delaware, United States of America)**
**(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.**
**(a limited partnership registered in Delaware, United States of America)**
**(4) VIVO CAPITAL FUND IX, L.P.**
**(a limited partnership registered in Delaware, United States of America)**
**(5) PRIME SUCCESS, L.P.**
**(a limited partnership registered in Cayman Islands)**
**(6) CEDE & CO**
**(a limited partnership registered in New York, United States of America)**

**Defendants**

**TAKE NOTICE** that the Claimant has filed the attached proceedings on The Eastern Caribbean Supreme Court Electronic Litigation Portal. The authorization code for **VIVO CAPITAL LLC (a company registered in California, United States of America)** to assess these proceedings is **Pdq2Xk**

These proceedings can only be accessed through the Electronic Litigation Portal. If you do not have an attorney-at-law and need assistance in accessing the Electronic Litigation Portal please contact the Service Bureau at the High Court office.

**Dated the 17th June, 2025**

The Court Office is at Parliament Drive, St. John's Antigua Telephone number 1(268) 462-0409/ 462 3744, The office is open between 8:30a.m. and 4:30 p.m. Monday to Thursday and 8:30am to 3:00pm Fridays except public holidays and court holidays.

STAPLETON CHAMBERS, Attorneys-at-Law, **Stapleton House, Suite #2, Stapleton Lane, P. O. Box 2891,** St. John's Antigua Telephone No. 1(268) 562-7185 Fax 1 268 562-7967 email: craig.lacas@stapletonchambers.com Attorneys for the above named Claimants whose address for service is the same

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO: ANUHCV2025/0200

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS
CORPORATIONS ACT 1982

BETWEEN:

(1)  SINOVAC BIOTECH LTD.
(a company registered in Antigua and Barbuda)
(2)  ORBIMED PARTNERS MASTER FUND LIMITED
(a company registered in Bermuda)
(3)  1GLOBE CAPITAL, LLC
(a company registered in Delaware, United States of America)
Claimants

and

(1)  VIVO CAPITAL LLC
(a company registered in California, United States of America)
(2)  VIVO CAPTIAL FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of
America)
(3)  VIVO CAPITAL SURPLUS FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(4)  VIVO CAPITAL FUND IX, L.P.
(a limited partnership registered in Delaware, United States of America)
(5)  PRIME SUCCESS, L.P.
(a limited partnership registered in Cayman Islands)
(6)  CEDE & CO
(a limited partnership registered in New York, United States of America)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### FORM 1; AUTHOIZATION CODE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEY AT LAW
FOR THE CLAIMANTS

**Case Number :ANUHCV2025/0200**

FILED
HIGH COURT
ANTIGUA AND BARBUDA

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/

**Submitted Date:06/05/2025 15:48**

**Filed Date:06/05/2025 15:48**

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

BETWEEN:

**(1) SINOVAC BIOTECH LTD.**
(a company registered in Antigua and Barbuda)
**(2) ORBIMED PARTNERS MASTER FUND LIMITED**
(a company registered in Bermuda)
**(3) 1GLOBE CAPITAL, LLC**
(a company registered in Delaware, United States of America)

Claimants

AND

**(1) VIVO CAPITAL LLC**
(a company registered in Delaware, United States of America)
**(2) VIVO CAPITAL FUND VIII, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(4) VIVO CAPITAL FUND IX, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(5) PRIME SUCCESS, L.P.**
(a limited partnership registered in the Cayman Islands)
**(6) CEDE & CO**
(a partnership registered in New York, United States of America)

Defendants

---

**STATEMENT OF CLAIM**

---

A.     <u>The Company</u>

1.    Sinovac Biotech Ltd. (the "**Company**") is a company registered in Antigua and Barbuda.

2.    The Company was incorporated on 1 March 1999 under the International Business Corporations Act 1982 ("**IBCA 1982**") with the name "Net Force Systems Inc." and with company number

1

011949. By special resolution dated 8 October 2003, the Company changed its name to its present name, "Sinovac Biotech Ltd.".

3. The registered office of the Company is situated at c/o APN Corporate and Management Services Limited, Winter Medical Centre, Fort Road, Antigua.

4. The Company is a biopharmaceutical company that focuses on research, development, production and commercialisation of vaccines that protect against human infectious diseases. Its business is based in The People's Republic of China ("**the PRC**"). The Company is listed on NASDAQ, but trading in the Company's shares has been halted since February 2019.

5. The Company has two classes of shares, common shares with a nominal value of US$ 0.001 each ("**common shares**") and preferred shares with a nominal value of US$ 0.001 each ("**preferred shares**"). The Company is authorised under its Articles of Incorporation to issue up to 100 million common shares and (purportedly) up to 50 million preferred shares.[1]

6. Pursuant to section 30 of IBCA 1982, subject to the articles, the by-laws, any unanimous shareholder agreement and section 35 of IBCA 1982, shares may be issued at such times and to such persons and for such consideration as the directors may determine.

7. The by-laws of the Company have at all material times included the following provision under by-law 1.1:

> *"The issue or allotment of shares shall be under the control of the Board which may issue the whole or any portion thereof with such preferred, deferred, special or limited rights as it may think fit."*

8. In relation to the Company, the directors of the Company, and any persons purporting to exercise any power conferred upon the directors of the Company as if they were such a director even though they do not validly hold such office (a **"purported director"**), stand in a fiduciary capacity to the Company.

---

[1] The Former Incumbent Directors (as defined below) purported to amend the Company's by-laws in February 2019 to create the preferred shares. As addressed below, the Former Incumbent Directors had ceased to be directors of the Company on 6 February 2018, and, consequently, did not have any authority to amend the Company's by-laws, and their attempt to do so was invalid.

2

9. Further, the directors and any purported directors of the Company from time to time owe the Company the following duties, amongst others, under IBCA 1982:

9.1. Under section 95(1)(a) of IBCA 1982, a duty to act honestly and in good faith with a view to the best interests of the Company.

9.2. Under section 95(1)(b) of IBCA 1982, a duty to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

9.3. Under section 95(2) of IBCA 1982, a duty to comply with IBCA 1982 and the regulations as well as with the Company's articles and by-laws.

10. Accordingly:

10.1. The directors and any purported directors of the Company from time to time are obliged as fiduciaries to exercise the power to allot shares in the Company under by-law 1.1 of the Company's by-laws and section 30 of IBCA for the purposes for which that power was conferred, and not for any improper or collateral purpose.

10.2. Further or in the alternative, it is an implied term of the directors' power to allot and issue shares under by-law 1.1 of the Company's by-laws that that power must only be exercised (i) for the purpose for which that power was conferred, and not for any improper or collateral purpose, and (ii) honestly and in good faith with a view to the best interests of the Company.

## B.    The other Claimants

11. The Second Claimant, OrbiMed Partners Master Fund Limited ("**OrbiMed**"), is an exempted company registered in Bermuda.

12. OrbiMed is the registered owner of 1,000,000 common shares in the Company. OrbiMed is the beneficial owner of a further 642,814 common shares in the Company, which are registered in the name of Cede & Co (as nominee of The Depositary Trust Company). OrbiMed has been a shareholder of the Company since 2013.

13. The Third Claimant, 1 Globe Capital, LLC ("**1Globe**"), is a limited liability company registered in Delaware.

3

14.    1Globe is the registered owner of 6,812,855 common shares in the Company. 1Globe has been a shareholder of the Company since 2010.

## C.    The Defendants

15.    The First Defendant, Vivo Capital LLC ("**Vivo Capital**"), is a limited liability company registered in Delaware with its registered office at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801, United States of America.

16.    The Fifth Defendant, Prime Success, L.P. ("**Prime Success**"), is a limited partnership registered in the Cayman Islands with its registered office at c/o Walkers Corporate Limited 190 Elgin Avenue, George Town, Grand Cayman KY1-9001. The general partner of Prime Success is Green Vision Partners Limited. The shareholder of Green Vision Partners Limited is Advantech Capital Partners Ltd ("**Advantech**").

17.    Prime Success and Vivo Capital each acquired 5,900,000 common shares (the "**Prime Success Shares**" and the "**Vivo Capital Shares**", and together the "**PIPE Shares**") pursuant to a purported private placement of shares in the Company that was announced on 3 July 2018 (the "**PIPE**").

18.    The PIPE Shares were purportedly issued pursuant to a Securities Purchase Agreement dated 2 July 2018 that the Company purportedly entered into with Vivo Capital and Prime Success (the "**SPA**").

19.    Subsequently, Vivo Capital purported to assign its rights under the SPA, and to transfer the Vivo Capital Shares, to the Second Defendant, Vivo Capital Fund VIII, L.P. ("**Vivo Capital Fund VIII**"), the Third Defendant, Vivo Capital Surplus Fund VIII, L.P. ("**Vivo Capital Surplus Fund VIII**") and the Fourth Defendant, Vivo Capital Fund IX, L.P. ("**Vivo Capital Fund IX**").

20.    Each of Vivo Capital Fund VIII, Vivo Capital Surplus Fund VIII and Vivo Capital Fund IX (together "**the Vivo Funds**") is a limited partnership registered in Delaware with its registered office at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801, United States of America. The Vivo Funds are ultimately controlled by Vivo Capital. Further or alternatively, the Vivo Funds and Vivo Capital are controlled by the same person or persons.

21.    The Vivo Capital Shares purportedly acquired by Vivo Capital under the PIPE are now registered as follows:

4

21.1.    Vivo Capital Fund VIII is purportedly the holder of 1,195,465 common shares;

21.2.    Vivo Capital Surplus Fund VIII is purportedly the holder of 165,079 common shares; and

21.3.    Vivo Capital Fund IX is purportedly the holder of 4,539,456 common shares.

22.    The Sixth Defendant is Cede & Co, a partnership with an address at 570 Washington Boulevard, Jersey City, NJ 07310, United States of America. Cede & Co is the nominee of The Depositary Trust Company, which in turn is a central securities depositary and serves as a clearing house, including for the Company's common shares admitted to trading on NASDAQ.

23.    Following Prime Success's purported acquisition of the Prime Success Shares, those shares were subsequently transferred into the name of Cede & Co, albeit a single share was transferred back into Prime Success's name on or around 15 April 2025. Prime Success purports to continue to be the beneficial owner of 5,851,423 common shares (out of the 5,900,000 common shares purportedly issued to it under the PIPE). Cede & Co has been joined as a Defendant so that it is bound by any order made in these proceedings in relation to the 5,851,422 common shares which are registered in its name and purportedly beneficially owned by Prime Success.

D.    **Events leading up to the Company's AGM on 6 February 2018**

24.    From early 2016, a competition emerged between two rival consortia seeking to acquire ownership and control of the Company. As to this:

24.1.    The first consortium (the "**Management Consortium**") was led by Vivo Capital. Apart from Vivo Capital, the Management Consortium included Advantech, SAIF Partners IV, LP ("**SAIF**") as well as the Company's directors at the time, namely Weidong Yin ("**Mr Yin**"), Kenneth Lee, Simon Anderson, Yuk Lam Lo and Mei Meng (together, the "**Former Incumbent Directors**").

24.2.    The other consortium (the "**Sinobioway Consortium**") included Sinobioway Biomedicine Co. Ltd. ("**Sinobioway**"), which was a minority shareholder in one of the Company's major operating subsidiaries.

25.    On 1 February 2016, the Company announced that it had received a non-binding privatisation acquisition offer for the Company from the Management Consortium at US$6.18 per common share.

26.   On 4 February 2016, the Sinobioway Consortium made a competing offer for the Company at US$7 per common share. The Former Incumbent Directors rejected this superior bid.

27.   On 28 March 2016, the Former Incumbent Directors purported to adopt a rights agreement which professed to "*guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain control of the Company*" (the "**Rights Agreement**"). The Rights Agreement was a 'poison pill' device (purportedly) allowing the Former Incumbent Directors to dilute the shareholdings of any bidder consortium holding at least 15% of the issued common shares by allotting new shares to the remaining shareholders.

28.   On 26 June 2017, the Company announced that the Former Incumbent Directors had decided to sell the Company to the Management Consortium at US$7 per common share. That decision was taken without having engaged in any negotiations with the Sinobioway Consortium since their 4 February 2016 offer.

29.   Also on 26 June 2017, in order to implement the Management Consortium's privatisation acquisition offer, the Former Incumbent Directors caused the Company to enter into an amalgamation agreement (the "**Amalgamation Agreement**"):

   29.1.   Pursuant to the Amalgamation Agreement, the Company would merge with Sinovac Amalgamation Sub Limited, with the Company continuing as the surviving corporation and as a wholly owned subsidiary of Sinovac (Cayman) Limited. Both Sinovac Amalgamation Sub Limited and Sinovac (Cayman) Limited were newly incorporated for the purpose of implementing the proposed amalgamation.

   29.2.   Immediately following the implementation of the transactions contemplated by the Amalgamation Agreement, Sinovac (Cayman) Limited would be beneficially owned by the Management Consortium.

   29.3.   The shares in the Company owned by shareholders not party to the Management Consortium would be cancelled in consideration for the right to receive US$7 in cash per share.

30.   Under IBCA 1982, the proposed amalgamation pursuant to the Amalgamation Agreement required the prior approval by a resolution passed by shareholders of the Company representing at least two-thirds of the shares voted. As at 26 June 2017, the members of the Management Consortium beneficially owned in aggregate c. 29.5% of the issued common shares.

6

31.    On 28 June 2017, the Sinobioway Consortium increased its proposed offer for the Company to US$8 per common share. The Former Incumbent Directors again rejected the superior bid of the Sinobioway Consortium.

32.    On or around 2 July 2017, the Former Incumbent Directors queried whether the Sinobioway Consortium had sufficient funds in US$ for the acquisition. In response to that query, the Sinobioway Consortium furnished the Former Incumbent Directors with a certificate of deposit from the CITIC Group, evidencing US$2.5 billion of cash.

33.    The Former Incumbent Directors did not publicly disclose the existence of the Sinobioway Consortium's increased bid of US$8 per common share until publication of the Company's annual report for 2016 (filed in Form 20-F with the Securities and Exchange Commission (the "**SEC**") on 22 November 2017).

E.    **The AGM**

34.    On 28 December 2017, the Company gave formal notice of its Annual General Meeting to be held in Beijing on 6 February 2018 (the "**AGM**"). By-law 8.1 of the Company's by-laws provided (and provides) for the Company's directors to hold office until the next annual general meeting. One of the three items of business for the AGM included the re-election of the Former Incumbent Directors.

35.    On 31 January 2018, Sinobioway published, by an online press release addressed to all shareholders in the Company, a recommendation that shareholders should attend the AGM and vote against the re-election of the Former Incumbent Directors.

36.    At the AGM, James Chang (a DLA Piper partner) acting as the proxy of JPMorgan in respect of shares beneficially owned by OrbiMed proposed motions, including to (i) amend the ballot paper provided by the Company to include an "*Against All*" option to vote against the election of the Former Incumbent Directors; (ii) remove all Former Incumbent Directors except Yuk Lam Lo; and (iii) nominate an alternative slate of directors, comprising Yuk Lam Lo and four new directors, namely Wang Guowei, Qiu Haifeng, Cao Jianzeng and Li Pengfei (such alternative slate being defined herein as the "**New Directors**").

37.    As at the record date for the AGM, the Company's issued share capital comprised 57,269,861 common shares. Shareholders holding 47,267,302 shares (constituting 82.53% of the issued share capital) voted at the AGM either in person or by proxy. The votes were cast as follows:

37.1.    21,194,518 of those shares (constituting 44.84% of the shares voted) were voted by way of proxy forms issued by the Company and lodged in advance of the AGM, and of these between 98.24% and 98.87% (varying on a director-by-director basis) were voted in favour of the re-election of the Former Incumbent Directors. Approximately, 85% of those shares were owned by members of the Management Consortium.

37.2.    Shareholders (or their legal proxies) holding 26,072,784 shares (constituting 55.16% of the shares voted) attended and voted on the alternative ballots at the AGM against the re-election of the Former Incumbent Directors and for the election of the New Directors.

38.    10,0002,559 shares, constituting 17.47% of the Company's total issued shares, were not voted.

39.    At the AGM, a tabulation of the votes cast showed that the resolution for the appointment of the New Directors had obtained a majority of the votes. However, the AGM concluded without a declaration of the results of the election by the scrutineer, who stated that she needed to confirm the validity of the votes cast on the alternative ballots with the Company's Antiguan counsel.

40.    On 5 March 2018, the Former Incumbent Directors caused the Company to publish, and file with the SEC, an announcement that the Former Incumbent Directors had been re-elected at the AGM. The announcement stated that:

> "… At the AGM, all five of the Company's incumbent directors – Weidong Yin, Yuk Lam Lo, Simon Anderson Kenneth Lee and Meng Mei – were re-elected by a majority of the votes validly cast. The Company determined, after consultation with its Antigua legal counsel, that a ballot proposed by the dissident group without prior notice at the AGM was invalid. …"

## F.    The Delaware proceedings

41.    On 5 March 2018, the Former Incumbent Directors caused the Company to file a lawsuit in the Delaware Court of Chancery against OrbiMed, 1Globe, and various individuals, who voted against the re-election of the Former Incumbent Directors at the AGM, seeking declaratory and injunctive relief regarding the Rights Agreement (the "**Delaware Proceedings**").

42.    In the Delaware Proceedings, the Company sought a declaration that the defendants in those proceedings became "Acquiring Persons" under the terms of the Rights Agreement and caused a "Trigger Event" by reason of their having submitted the alternative ballots at the AGM, voting

against the re-election of the Former Incumbent Directors and for the election of the New Directors to the Company's board of directors.

43.    The Delaware Proceedings were largely stayed during the pendency of the Antiguan Proceedings described directly below, and were dismissed with prejudice on 7 April 2025 (following the final determination of the Antiguan Proceedings).

**G.    The Antiguan proceedings and the Privy Council's decision**

44.    On 13 March 2018, 1Globe, which had voted at the AGM for the election of the New Directors to the Company's board of directors (but which was not part of either the Management Consortium or the Sinobioway Consortium), filed a claim in the High Court of Antigua and Barbuda, seeking declarations and orders under section 122 of IBCA 1982 in relation to the AGM (the "**Antiguan Proceedings**"), including as follows:

44.1.    That the New Directors had been duly elected at the AGM;

44.2.    That the New Directors be installed as the Company's Board of Directors; and

44.3.    That the Former Incumbent Directors were no longer the directors of the Company and any actions taken on behalf of the Company at their direction after the AGM were null and void.

45.    On 19 December 2018, Smith J in the High Court of Antigua and Barbuda dismissed 1Globe's claims.

46.    On 9 December 2021, the Court of Appeal dismissed 1Globe's appeal.

47.    On 16 January 2025, the Judicial Committee of the Privy Council handed down judgment, allowing 1Globe's appeal. The Privy Council found, and for the purposes of these proceedings it is averred, that:

47.1.    On 6 February 2018, the Former Incumbent Directors (save for Yuk Lam Lo) had ceased to hold office as directors of the Company and had been "*imposters*" ever since.

47.2.    On 6 February 2018, the New Directors (including Yuk Lam Lo) were duly elected at the AGM, and have ever since been the lawfully appointed directors of the Company.

47.3.   The Rights Agreement purportedly adopted by the Former Incumbent Directors of the Company was, and has always been, void.

48.   The Privy Council's Order is dated 5 February 2025.

49.   Between the AGM on 6 February 2018 and the Privy Council's judgment, the Former Incumbent Directors had remained in *de facto* control of the Company.

## H.   Events following the AGM

50.   In the light of the events at the AGM, it was apparent that the Management Consortium would not be able to secure the necessary two-thirds majority of shareholders' votes required for its privatisation offer. Accordingly, the Former Incumbent Directors pursued a new strategy to consolidate the Management Consortium's control of the Company, as described below.

51.   Shortly following the AGM, on the Former Incumbent Directors' instructions, the Company's management produced a business plan which showed a (purported) need for raising c. US$110 million.

52.   At around the same time, the Former Incumbent Directors instructed Latham & Watkins and Houlihan Lokey to advise in relation to a potential private placement of shares by the Company. Such a private placement of shares was considered during a number of conference calls between the Former Incumbent Directors, including on 19 March 2018, 22 May 2018, 5 June 2018 and on 2 and 3 July 2018.

53.   The Former Incumbent Directors invited members of the Management Consortium, including Vivo Capital and Advantech, to participate in a private placement of shares. The Former Incumbent Directors' intention was that those participating in the placement would be required to sign up to obligations to vote the shares (i) for all Board-nominated director candidates and (ii) consistently with the Board's recommendations (other than in connection with a change of control transaction).

54.   The Former Incumbent Directors did not offer the Company's existing shareholders the opportunity to participate in the proposed private placement.

55.   On 3 July 2018, the Former Incumbent Directors purported to pass the following resolutions as directors of the Company:

10

55.1.    A resolution approving the Company's entry into the SPA with Vivo Capital and Prime Success and into related transaction documents.

55.2.    A resolution to issue the PIPE Shares to Vivo Capital and Prime Success (purportedly) pursuant to the SPA.

55.3.    A resolution to appoint Vivo Capital's nominee, Mr Shan Fu, as an additional director of the Company.

55.4.    A resolution to amend the Rights Agreement to permit the execution of the SPA and issue of the PIPE Shares without causing a "Trigger Event".

55.5.    A resolution to terminate the Amalgamation Agreement.

56.    The SPA was signed by Mr Yin, purportedly on behalf of the Company, by Wong Kok Wai (a director of the general partner of Prime Success) on behalf of Prime Success and by Albert Cha (a managing member of Vivo Capital) on behalf of Vivo Capital.

57.    Under the terms of the SPA, Vivo Capital and Prime Success agreed to purchase the PIPE Shares for US$86,730,000, with each of Vivo Capital and Prime Success agreeing to purchase 5,900,000 common shares for US$43,365,000, being a price of US$7.35 per share.

58.    On or around 3 July 2018, the Company (purportedly) issued the Prime Success Shares as fully-paid up to Prime Success and the Vivo Capital Shares as fully-paid up to Vivo Capital, reflected by corresponding entries in the Company's register of shareholders maintained by its transfer agent.

59.    The shareholdings of the Management Consortium immediately prior to and after the issue of the PIPE Shares are set out in the following table:

| Pre-PIPE | | | Post-PIPE | | |
|---|---|---|---|---|---|
| Shareholder | Shares | % | Shareholder | Shares | % |

11

| Former Incumbent Directors[2] | 7,536,847 | 12.7% | Former Incumbent Directors[3] | 7,536,847 | 10.59% |
|---|---|---|---|---|---|
| SAIF | 10,780,820 | 18.17% | SAIF | 10,780,820 | 15.16% |
| Vivo Capital | 0 | 0 | Vivo Capital | 5,900,000 | 8.3% |
| Prime Success/ Advantech | 0 | 0 | Prime Success / Advantech | 5,900,000 | 8.3% |
| **Total** | 18,317,667 | 30.87% | | 30,117,667 | 42.35% |

60. On 3 July 2018, the Company (still under the *de facto* control of the Former Incumbent Directors) issued a press release (also filed with the SEC) announcing the purported PIPE.

61. Prime Success is an affiliate of Advantech, which was not named as a party to the SPA. Prime Success is ultimately controlled by Advantech. Further or alternatively, Prime Success and Advantech are controlled by the same person or persons. In particular:

    61.1. Advantech is the sole shareholder as well as a director of Green Vision Partners Limited, which is Prime Success's general partner.

    61.2. In connection with the SPA, Advantech Master Investment Limited (which, it is reasonably to be inferred, is an entity controlled by Advantech) signed an equity commitment letter dated 2 July 2018 confirming that it would contribute, as equity capital, US$43,365,000 for the purpose of funding Prime Success's payment obligations.

62. The Disclosure Schedule to the SPA contained the following statements:

    *SECTION 3.2(A): AUTHORIZED SHARES*

    *Board Election Matter*

---

[2] together with the Company's executive officers
[3] Ibid.

On March 5, 2018, the Company announced the re-election of the members of its board of directors (the "Board")—Mr. Weidong Yin, Mr. Yuk Lam Lo, Mr. Simon Anderson, Mr. Kenneth Lee, and Mr. Meng Mei—at the 2018 annual general meeting of shareholders (the "2018 AGM") held on February 6, 2018. The Company also announced that it had determined, after consultation with its Antigua legal counsel, that an alternative, pre-printed ballot not made available to all the Company's shareholders, and purportedly submitted at the 2018 AGM by 1Globe Capital LLC ("1Globe"), The Chiang Li Family, OrbiMed Advisors LLC ("OrbiMed") and other shareholders of the Company, was invalid. Certain of those shareholders have challenged these determinations in litigation against the Company, which is more particularly described in Section 5.4 of this Company Disclosure Schedule. If it is ultimately determined that the candidates nominated by 1Globe, OrbiMed, the Chiang Li Family and the other shareholders of the Company at the 2018 AGM were validly elected, such determination could create uncertainty as to whether the Board had the power and authority to approve the Securities Purchase Agreement and the transactions contemplated therein and whether the Securities Purchase Agreement constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms. This could create further uncertainty as to the validity of the capitalization of the Company, whether the Company's entry into the Securities Purchase Agreement and consummation of the transactions conflicted with applicable Law and whether the Shares were validly issued by the Company.

SECTION 5.4: PENDING LITIGATION

On March 13, 2018, 1Globe filed a complaint against the Company in the Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda (the "Antigua Court"). The complaint seeks a declaration that five persons purportedly proposed on a non-public ballot at the 2018 AGM were elected as directors of the Company at that meeting, an order of the Antigua Court that those five persons be installed as the Company's board of directors, and a declaration that any actions taken on behalf of the Company at the direction of the board of directors since the 2018 AGM are null and void. On April 10, 2018, 1Globe filed a notice of application in the Antigua Court seeking urgent relief, including an order declaring the result of the disputed election, an urgent order restraining the Company's board of directors from acting,

13

*pending determination of the dispute, including acting to initiate or continue litigation against 1Globe, and other related relief. On May 9, 2018, the Antigua Court stayed Sinovac's application for an extension of time to serve its defence, pending resolution of 1Globe's application for urgent relief. The Antigua Court held a hearing of 1Globe's application for urgent relief on June 12, 2018, at which time 1Globe requested an adjournment of two weeks. As of the date of this Company Disclosure Schedule, the adjourned hearing has been set for July 6, 2018. The Company is vigorously defending this lawsuit*

63.    Further, clause 6.13 of the SPA, headed "*Remedies in Event of Rescission Event; Indemnification*", which will be referred to at trial for its full terms and effect, provided, in summary, that:

63.1.    If a court of competent jurisdiction determined that the SPA was not duly authorised by the Company's board of directors and/or that the PIPE Shares were not validly issued (such a determination being defined in the SPA as a "*Rescission Order*"), then the investors, Prime Success and Vivo Capital, would each be entitled to rescind the SPA and, in return for forfeiting the Prime Success Shares and/or the Vivo Capital Shares (as the case may be), would be entitled to the refund of "*the Rescission Amount*", as defined in the SPA; and

63.2.    If a Rescission Order (as so defined) became final and unappealable and where one or other of Prime Success or Vivo Capital had not previously elected to rescind the SPA, then the SPA and the issue of the PIPE Shares would be deemed to be automatically rescinded, and Prime Success and Vivo Capital would be required to forfeit the PIPE Shares and the Company would be required to repay them the Rescission Amount.

64.    In connection with the SPA, and as a condition of closing, Vivo Capital, Prime Success and the Company purportedly entered into a Shareholders Agreement (the "**Shareholders Agreement**") and a Registration Rights Agreement also dated 2 July 2018.

65.    Clause 3.1 of the Shareholders Agreement provides as follows:

"*Voting. Until the Sunset Date, at any meeting of shareholders of the Company at which any matter is submitted to a vote of the shareholders of the Company (or if action is taken by written consent of shareholders of the Company in lieu of a meeting), the*

> *Investor Parties shall vote, or cause to be voted (including, if applicable, by written consent), all Voting Securities Beneficially Owned by the Investor Entities (a) affirmatively in favor of the election of all of the director designees nominated to serve as a Director (including the Investor Designee nominated in accordance with this Agreement) and (b) consistent with the recommendations of the majority of the Board as to all other matters; provided, that, each Investor Entity shall be permitted to vote its Voting Securities in its discretion with respect to any Acquisition (and any other related matter the approval of which is required to consummate such Acquisition)."*

66.    The Shareholders Agreement defines "*Sunset Date*" as meaning "*the earliest date on which (a) the aggregate Percentage Interest of the Investor Entities is less than ten percent (10%) or (b) a Change of Control shall have been consummated or have occurred*".

67.    Clause 4 of the Shareholders Agreement contains restrictions on share transfers by Vivo Capital and Prime Success, including an initial lock-up period of 9 months.

**I.    Purported Assignments by Vivo Capital**

68.    Vivo Capital (as seller) and Vivo Capital Fund VIII and Vivo Capital Surplus Funds VIII (as buyers) entered into a securities purchase agreement dated 16 July 2018 pursuant to which 1,360,544 of the Vivo Capital Shares were (purportedly) sold to Vivo Capital Fund VIII, LP (1,195,465 shares) and Vivo Capital Surplus Funds VIII, LP (165,079 shares) for US$10,000,000. Albert Cha (a managing member/director of the general partners of the Vivo Funds) signed the agreement on behalf of Vivo Capital Fund VIII and Vivo Capital Surplus Funds VIII.

69.    Vivo Capital (as seller) and Vivo Capital Fund IX (as buyer) entered into a securities purchase agreement dated 24 August 2018 pursuant to which 4,539,456 of the Vivo Capital Shares (i.e. the remainder of those shares after the previous transfers to Vivo Capital Fund VIII and Vivo Capital Surplus Funds VIII) were (purportedly) sold to Vivo Capital Fund IX for US$33,365,001.60. Albert Cha (a managing member/director of the general partners of the Vivo Funds) signed the agreement on behalf of Vivo Capital Fund IX.

70.    The transfers of the Vivo Capital Shares contemplated by the two agreements were subsequently recorded in the Company's register of shareholders maintained by its transfer agent.

**J.    Subsequent Events**

71. On or around 18 February 2019, the Former Incumbent Directors purported to pass the following board resolutions:

71.1. A resolution determining that 1Globe Capital, OrbiMed and all other shareholders who voted against the re-election of the Former Incumbent Directors (and for the election of the New Directors) at the AGM became "*Acquiring Persons*" within the meaning of the Rights Agreement "*at or prior to*" the AGM.

71.2. A resolution noting that, as a result, a "*Trigger Event*" occurred under the Rights Agreement, such that those "*Acquiring Persons*" lost any preferred share purchase rights under the Rights Agreement.

71.3. A resolution approving an exchange of all valid, remaining preferred share purchase rights under the Rights Agreement "*as of the close of trading in the United States on February 22, 2019*" for common shares and preferred shares in the Company (referred to as the "**Exchange Shares**").

71.4. A resolution allotting and approving the issue of the Exchange Shares, being 27,777,341 common shares and 14,630,813 preferred shares, to a trustee for the benefit of, and subsequent transfer to, the Company's shareholders as of 22 February 2019 (apart from the "*Acquiring Persons*"). For this purpose, the Former Incumbent Directors treated the PIPE Shares as having been validly issued, so as purportedly to entitle the holders thereof to Exchange Shares in respect of them.

72. In late February and in early March 2019, 1Globe obtained interim relief from the Delaware Court of Chancery in the Delaware Proceedings and from the Court of Appeal in the Antiguan Proceedings preventing the Company from enforcing the terms of the Rights Agreement.

73. If the Rights Agreement had been implemented in accordance with the Former Incumbent Directors' (purported) resolutions, the shareholdings of the shareholders who voted against the Former Incumbent Directors would have been diluted and the proportionate shareholdings of the Management Consortium, including by virtue of the PIPE Shares, would have increased from c. 42.35% to c. 52.36% of the Company's total share capital.

74. In the circumstances, it is to be inferred, and so the Claimants allege, that the Former Incumbent Directors' decision to delay the (purported) declaration of a "*Trigger Event*" and the (purported) issue of the Exchange Shares under the Rights Agreement until after the purported issue of the

16

PIPE Shares was deliberate and designed to maximise the shareholdings of the Management Consortium.

**K.    The SPA is invalid given the Former Incumbent Directors' lack of authority**

75.    In circumstances where, as the Privy Council found, the Former Incumbent Directors had ceased to be directors of the Company on 6 February 2018, the Former Incumbent Directors did not have any authority (i) to approve the Company's entry into, or to cause the Company to enter into, the SPA, the Shareholders Agreement (or any of the related agreements) or (ii) to allot or issue the PIPE Shares.

76.    Accordingly:

76.1.    There was in fact no resolution by the board of directors of the Company (i) that the Company enter into the SPA, the Shareholders Agreement or any of the related agreements or (ii) that the Company allot or issue the PIPE Shares.

76.2.    Mr Yin, who purported to sign the SPA and the Shareholders Agreement (as well as the related agreements) on behalf of the Company, in fact had no authority to do so.

76.3.    Any instructions given to the Company's transfer agent purportedly on behalf of the Company to record the allotment and issue of the PIPE Shares to Prime Success and Vivo Capital in the Company's register of shareholders were in fact unauthorised.

77.    Each of Prime Success and Vivo Capital as well as the Vivo Funds knew, or ought to have known, or, alternatively they knew that there was, at least, a significant risk, that on 6 February 2018 the Former Incumbent Directors had ceased to be directors of the Company and the New Directors had been elected as directors, and they each also knew or ought to have known that a finding and declaration to this effect might in due course be the outcome of the Antiguan Proceedings. In support of that contention, reliance is placed on the following:

77.1.    The Former Incumbent Directors, and on their instructions, the Company's management, discussed with Advantech and Vivo Capital (i) the AGM, (ii) the Antiguan Proceedings and (iii) the possibility that, in due course, the outcome of those proceedings might be a declaration to the effect that, at the AGM, the Former Incumbent Directors had ceased to be directors and the New Directors had been elected as directors of the Company.

77.2.   Advantech and Vivo Capital investigated this possibility as part of their due diligence preceding the SPA. On two occasions, in April 2018 and in early June 2018, as a result of Advantech's and Vivo Capital's concerns about the impact of the Antiguan Proceedings, negotiations in relation to a potential private placement of shares in the Company were put on hold.

77.3.   Prime Success and the Vivo Funds are affiliates of Advantech and Vivo Capital, respectively, and paragraphs 20 and 61 above are repeated.

77.4.   Further, at all material times:

77.4.1. The same individuals acted on behalf of Prime Success and Advantech, including Wong Kok Wai (who was at all material times a director of Advantech and a director of the general partner of Prime Success) and Yan Yang (who was at all material times a director of the general partner of Prime Success and an authorised signatory of Advantech and Prime Success).

77.4.2. The same individual(s) acted on behalf of Vivo Capital and the Vivo Funds, including Albert Cha (who was at all material times a managing member of Vivo Capital and a managing member/director of the general partners of the Vivo Funds).

77.5.   The Disclosure Schedule to the SPA contains extensive disclosure in relation to the AGM and the Antiguan Proceedings. Paragraph 62 above is repeated.

77.6.   Clause 6.13 of the SPA purports to cater for the eventuality that the outcome of the Antiguan Proceedings (or any other proceedings) would be a declaration that, at the AGM, the Former Incumbent Directors had ceased to be directors of the Company and the New Directors had been elected as directors of the Company, and that the Former Incumbent Directors had no authority to cause the Company to enter into the SPA or to allot or issue the PIPE Shares. Paragraph 63 above is repeated.

78.   In the circumstances, each of Prime Success and Vivo Capital, in (purportedly) entering into the SPA, the Shareholders Agreement (and related agreements) and in (purportedly) purchasing and subscribing for the PIPE Shares, as well as the Vivo Funds, in (purportedly) purchasing the Vivo Capital Shares, knowingly assumed the risk that (i) the Former Incumbent Directors did not have authority to approve the Company's entry into, and Mr Yin did not have authority to sign on behalf

18

of the Company, the SPA, the Shareholders Agreement (or any related agreements) and that (ii) the Former Incumbent Directors did not have authority to allot or issue the PIPE Shares, and that such purported corporate acts would later be found to be invalid or ineffective.

79.    The Former Incumbent Directors further did not have any authority to appoint Mr Shan Fu as an additional director of the Company.

**L.      The SPA is invalid by reason of the Former Incumbent Directors' breaches of duty**

80.    In (purportedly) causing the Company to enter into the SPA and to issue the PIPE Shares to Prime Success and Vivo Capital, the Former Incumbent Directors acted for the purpose, or substantially for the purpose, of increasing the number of shares held by members of the Management Consortium (or their affiliates) so as to consolidate the Management Consortium's control of the Company and, ultimately, with a view to defeating any future resolution for the removal of the Former Incumbent Directors and/or to improve the chances of successfully implementing a future privatisation acquisition offer by the Management Consortium (the "**Improper Purpose**")

81.    In support of the contention that the (purported) entry into the SPA and the (purported) issue of the PIPE Shares were carried out for the Improper Purpose, the following matters in particular are relied upon:

81.1.    The PIPE was procured by the Former Incumbent Directors forming part of the Management Consortium.

81.2.    Vivo Capital and Prime Success were members of the Management Consortium (or, alternatively, affiliates of members of the Management Consortium).

81.3.    Preparations for the PIPE began almost immediately after the AGM on 6 February 2018, where a clear majority of shareholders had voted to remove the Former Incumbent Directors and appoint the New Directors instead.

81.4.    At that stage, it had also become apparent that the Management Consortium lacked support among the general body of shareholders and would not achieve the necessary two-thirds majority to pursue the proposed amalgamation under the Amalgamation Agreement. The Company's announcement of the purported PIPE on 3 July 2018 specifically included a quote by Mr Yin that the PIPE transaction was concluded as a result of recognising that "*the going-private transaction may not complete*".

81.5.    The offer of shares pursuant to the PIPE was made only in favour of Vivo Capital and Prime Success / Advantech, without any of the other existing shareholders outside of the Management Consortium being offered the opportunity to participate.

81.6.    The price of US$7.35 per common share paid by Vivo Capital and Prime Success did not reflect market value or the best price reasonably obtainable by the Company. In support of that contention, reliance is placed on the following:

81.6.1. The Sinobioway Consortium had offered to pay US$8 per common share.

81.6.2. On 29 June 2018, the Company's closing trading price was US$7.46 per common share, and its 30-day, 60-day and 90-day volume weighted average prices were US$7.95, US$7.79 and US$7.95, respectively.

81.6.3. Accordingly, the price of US$7.35 per common share implies a discount to the 29 June 2018 closing stock price, and the 30-day, 60-day and 90-day volume weighted average prices of 1.5%, 7.6%, 5.7% and 7.5%, respectively, and was significantly below the recent high of US$8.66 per common share on 8 June 2018.

81.6.4. The Company's trading price was artificially suppressed by the Former Incumbent Directors' failure to announce, or properly to announce, the positive outcome of the phase III trial of the Company's new polio vaccine. Preliminary result of the phase III trial had been available to the Former Incumbent Directors since April 2018.

81.7.    The effect of the purported issue of the PIPE shares was to increase the proportion of the Company's total issued share capital controlled by the Management Consortium from 30.87% to 42.35%, effectively ensuring (if the PIPE was valid) that the Former Incumbent Directors would be able to defeat any future resolution for their removal (or to secure their reappointment).

81.8.    Vivo Capital and Prime Success (purportedly) participated in the PIPE on terms of the SPA, under which both gave undertakings regarding the way in which each would vote on any resolution for the appointment of directors nominated by the Board of Directors of the Company. Paragraphs 65 and 66 above are repeated.

20

81.9. The (purported) entry into the SPA and issue of the Prime Success Shares and the Vivo Capital Shares was not warranted by any genuine need on the part of the Company to raise capital, or, alternatively any genuine need to raise capital to the extent of the US$86,730,000 raised under the SPA. In support of the contention that the Company did not have a genuine need to raise capital, reliance is placed on the following:

81.9.1. As of 30 June 2018, the Company and its group had US$88.1 million of cash and cash equivalents. In its unaudited financial results for the six months ended 30 June 2018, the Company reported that it expected its current cash position would be able to support its operations for at least the next 12 months.

81.9.2. As of 31 December 2018, the Company and its group had US$158.2 million of cash and cash equivalents (excluding short-term investments of US$18.9 million) according to the Company's audited financial results for the financial year ended 31 December 2018.

81.9.3. In the period from June 2018 until the financial year ended 31 December 2021, the Company and its group were profitable and generated positive cash flow through its product sales.

81.9.4. At no point during the period when the Former Incumbent Directors remained in *de facto* control of the Company were the proceeds of the PIPE utilised or deployed in any way in furtherance of any business or financing needs of the Company.

82. By acting for the Improper Purpose, the Former Incumbent Directors, as purported directors of the Company, breached their fiduciary duty to exercise the power to allot shares in the Company under by-law 1.1 for the purpose for which the power in question was conferred, and instead exercised that power for an improper and/or collateral purpose.

83. Further, or in the alternative, by procuring the allotment of the PIPE Shares to Prime Success and Vivo Capital and in (purportedly) causing the Company to enter into the SPA, the Former Incumbent Directors, as purported directors of the Company, breached their fiduciary duty to act honestly and in good faith with a view to the best interests of the Company. In support of that contention, the following matters in particular are relied upon:

83.1. Paragraph 81 above is repeated.

21

83.2.    The (purported) transaction with Advantech / Prime Success and Vivo Capital was not an arm's length transaction, given their and the Former Incumbent Directors' relationship as members of the Management Consortium, and as illustrated by the favourable price paid by Vivo Capital and Prime Success (as to which paragraph 81.6 above is repeated).

83.3.    In particular, in so acting, the Former Incumbent Directors failed to act fairly as between the different members of the Company:

83.3.1. The effect of the issue of the PIPE Shares, which was only made in favour of Prime Success and Vivo Capital, was to dilute the shareholdings of the existing shareholders, none of whom was offered the opportunity to participate.

83.3.2. The effect of the issue of the PIPE Shares was to frustrate the purpose of the members of the Company that had voted against the re-election of the Former Incumbent Directors and for the election of the New Directors by seeking to ensure that any attempt in the future to pass similar resolutions would be defeated.

84.    Further, in the premises, the Former Incumbent Directors purported to exercise the power to allot and issue shares under by-law 1.1 of the Company's by-laws in breach of the implied term set out in paragraph 10.2 above.

85.    In the premises, by reason of the aforesaid breaches of fiduciary duty and/or the breach of the implied term set out in paragraph 10.2 above:

85.1.    Mr Yin, who purported to sign the SPA and the Shareholders Agreement (as well as the related agreements) on behalf of the Company, in fact had no authority to do so.

85.2.    Any instructions given to the Company's transfer agent purportedly on behalf of the Company to record the allotment and issue of the PIPE Shares to Prime Success and Vivo Capital in the Company's register of shareholders were in fact unauthorised.

**M.    Conclusion on sections K and L above**

86.    In the premises, by reason of the facts and matters set out in section K above; further or alternatively, by reason of the facts and matters set out in section L above:

86.1.   Each of the SPA and the Shareholders Agreement (as well as the related agreements) is, and always has been, invalid, never having been entered into by the Company.

86.2.   Further or alternatively, each of the SPA and the Shareholders Agreement (as well as the related agreements) is void, having been purportedly entered into by the Former Incumbent Directors in breach of their fiduciary duties as purported directors.

86.3.   The purported allotment and issue of the PIPE Shares was, and the continuing purported existence of those shares is in breach of OrbiMed's and 1Globe's rights as shareholders of the Company.

86.4.   The purported allotment and issue of the PIPE Shares to Prime Success and Vivo Capital was invalid and/or should be set aside.

86.5.   The register of shareholders of the Company should be rectified under section 207 of IBCA 1982 by:

86.5.1. The deletion of any entries in respect of the purported allotment and transfers of the Vivo Capital Shares; and

86.5.2. The deletion of any entries in respect of the purported allotment and transfers of the Prime Success Shares (save for the 48,577 Prime Success Shares which are no longer beneficially owned by Prime Success or its affiliates).

86.6.   The purported appointment of Mr Shan Fu as an additional director of the Company on or around 3 July 2018 was ineffective and invalid.

**N.     The SLS convertible loans**

87.   At all material times, until on or around 7 December 2020, Sinovac Life Sciences Co., Ltd. ("**SLS**") was an indirect wholly-owned subsidiary of the Company. The Company's interest in SLS was, and continues to be, held via Sinovac Biotech (Hong Kong) Limited ("**Sinovac Hong Kong**"), a direct wholly-owned subsidiary of the Company registered in Hong Kong. In 2024, Sinovac Holding Group Co., Ltd., a direct wholly-owned subsidiary of Sinovac Hong Kong registered under the laws of the PRC, was inserted as an intermediate holding company above SLS Ltd.

88.   SLS (formerly named "Sinovac Research and Development Co., Ltd.") is a limited liability company incorporated under the laws of the PRC.  At all material times, until on or around 7

December 2020, Mr Yin was the sole director of SLS. SLS's business includes human vaccine research as well as the development, manufacturing and sales of human vaccines. It is a key operating subsidiary of the Company, having, among other matters, developed, marketed and sold "CoronaVac", a vaccine against Covid-19.

89. On or around 18 May 2020, SLS entered into (i) a loan agreement with Prime Success and (ii) a loan agreement with Vivo Capital Fund IX (together the "**Convertible Loan Agreements**"). Pursuant to the Convertible Loan Agreements:

89.1. Each of Prime Success and Vivo Capital Fund IX made a convertible loan to SLS in the principal amount of US$7.5 million.

89.2. Each loan under the Convertible Loan Agreements bore simple interest at a rate of 8% per annum.

89.3. Each loan under the Convertible Loan Agreements had a maturity date of 24 months (capable of a 12-month extension by mutual agreement).

89.4. On the maturity date, each loan under the Convertible Loan Agreements could be converted into 7.5% of the total equity interest in SLS at Prime Success's and Vivo Capital Fund IX's election, respectively.

90. In connection with the Convertible Loan Agreements, the Former Incumbent Directors purported to cause the Company to enter into a guarantee agreement with each of Prime Success and Vivo Capital Fund IX, guaranteeing the punctual performance by SLS of its obligations under the Convertible Loan Agreements (the "**Purported Guarantees**").

91. On 22 May 2020, the Former Incumbent Directors caused the Company to issue a press release announcing that Advantech Capital and Vivo Capital invested US$15 million into SLS purportedly so as *to further the development of ... CoronoaVac*". The press release noted that:

> "*Sinovac has made significant process in the development of CoronaVac. Preclinical results regarding CoronaVac were recently published in the peer-reviewed academic journal Science in an article noting that the vaccine candidate is safe and provides protection to rhesus macaques (monkeys) through an animal challenge study.*
>
> *Sinovac received approval from governmental authorities to conduct both Phase I and Phase II human clinical trials in China. The Phase I clinical trial, which evaluates the safety, tolerance, and preliminary immunogenicity of CoronaVac, commenced in April.*

24

> *After preliminary observation of the safety profile of CoronaVac in the Phase I study, the*
> *Phase II clinical trial commenced in May. … Sinovac is constructing a commercial*
> *vaccine production plant that is expected to manufacture up to 100 million doses of*
> *CoronaVac annually."*

92. At the beginning of the Covid-19 pandemic, the Company and/or SLS were selected by the government of the PRC as the preferred contractor for supplying a vaccine against Covid-19. The government of the PRC provided financial as well as regulatory support for the rapid development of a vaccine against Covid-19. Throughout 2020, the Former Incumbent Directors caused the Company to issue a number of further press releases also announcing positive outcomes in the clinical trials relating to CoronaVac, indicating that the Company (and SLS) remained optimistic that CoronaVac was on track for approval. In June 2020, CoronaVac became the first vaccine approved for emergency use in the PRC. On 5 February 2021, CoronaVac received conditional marketing authorisation in the PRC.

93. On or around 7 December 2020, Sino Biopharmaceutical Limited, a company listed on the Hong Kong Stock Exchange, via its Hong-Kong registered subsidiary, Talent Forward Limited, invested c. US$515 million in SLS in exchange for 15.03% of the total equity interest in SLS.

94. According to a press release that the Former Incumbent Directors caused the Company to issue on 7 December 2020, Sino Biopharmaceutical Limited's investment was intended to fund the further development, capacity expansion and manufacturing of CoronaVac as well as other development and operational activities.

95. Prior to Sino Biopharmaceutical Limited's investment (through Talent Forward Limited) in SLS, each of Prime Success's and Vivo Capital Fund IX's loan under the Convertible Loan Agreements was converted into 7.5% of the total equity interest in SLS.

96. Since December 2020, following the conversion of the loans under the Convertible Loan Agreements into equity in SLS, Sino Biopharmaceutical Limited's investment in SLS and the issue of further shares by SLS to Keding Investment (Hong Kong) Limited ("**Keding**") in connection with SLS's employee share ownership plan, the equity in SLS was held as follows:

   96.1. Sino Biopharmaceutical Limited (via Talent Forward Limited) held 15.03% of the total equity interest in SLS.

96.2.    An associate of Sino Biopharmaceutical Limited, who invested together with Sino Biopharmaceutical Limited, held 0.35% of the total equity interest in SLS.

96.3.    Keding held 12.69% of the total equity interest in SLS.

96.4.    Vivo Capital Fund IX held 6.345% of the total equity interest in SLS.

96.5.    Prime Success held 6.345% of the total equity interest in SLS.

96.6.    Sinovac Hong Kong (the Company's wholly-owned subsidiary) held 59.24% of the total equity interest in SLS.

97.    Pending further disclosure, it is averred that between December 2020 and June 2024, SLS paid dividends totalling c. US$6.7 billion to its shareholders, of which c. US$850 million was paid to Vivo Capital Fund IX and Prime Success / Advantech (the "**SLS Dividends**").

## O.    The Former Incumbent Directors' lack of authority

98.    It is to be inferred, and so the Claimants do positively allege, that at all material times, the Former Incumbent Directors had effective control of SLS and its board of directors, or, alternatively, had the ability to exert such control. In support of that contention, the following matters in particular are relied upon:

98.1.    Until on or around 7 December 2020, SLS was a wholly-owned subsidiary of the Company.

98.2.    The Former Incumbent Directors remained in *de facto* control of the Company until the Privy Council's judgment in the Antiguan Proceedings.

98.3.    At all material times until on or around 7 December 2020, Mr Yin was the sole director of SLS.

98.4.    Until the Privy Council's judgment in the Antiguan Proceedings, Mr Yin, as sole director of SLS, treated the Former Incumbent Directors as if they remained the duly appointed directors of the Company.

98.5.    Between 2008 and March 2025, two of the Former Incumbent Directors, namely Mr Yin and Yuk Lam Lo, were the directors of Sinovac Hong Kong together with Nan Wang Nan (who was also the CFO of the Company).

26

99. It is further to be inferred, and so the Claimants do positively allege, that the Former Incumbent Directors procured, caused and/or allowed SLS to enter into the Convertible Loan Agreements and to subsequently pay the SLS Dividends. In support of that contention, the following matters in particular are relied upon:

99.1. The facts and matters set out in paragraph 98 above.

99.2. The fact that the Former Incumbent Directors purported to approve the Company's provision of the Purported Guarantees in connection with the Convertible Loan Agreements.

99.3. The Company's press releases in relation to the Convertible Loan Agreements, including press releases dated 22 May 2020 and 7 December 2020.

100. In circumstances where, as the Privy Council found, the Former Incumbent Directors had ceased to be directors of the Company on 6 February 2018, the Former Incumbent Directors did not have any authority to (i) approve the Company's entry into, or to cause the Company to enter into, the Purported Guarantees or (ii) to procure, cause and/or allow SLS, (purportedly) as directors of, and on behalf of, the Company, to enter into the Convertible Loan Agreements or to pay the SLS Dividends.

101. Accordingly, the person who purported to sign the Purported Guarantees on behalf of the Company in fact had no authority to do so.

102. Each of Prime Success and Vivo Capital Fund IX knew or ought to have known, or, alternatively they knew that there was, at least, a significant risk, that on 6 February 2018 the Former Incumbent Directors had ceased to be directors of the Company and the New Directors had been elected as directors, and they each also knew or ought to have known that a finding and declaration to this effect might in due course be the outcome of the Antiguan Proceedings. Paragraph 77 above is repeated.

103. In the circumstances, each of Prime Success and Vivo Capital Fund IX, in (purportedly) accepting the Purported Guarantees knowingly assumed the risk that the Former Incumbent Directors did not have authority to approve the Company's entry into, and the person who signed the Purported Guarantees did not have authority to sign on behalf of the Company, the Purported Guarantees, and that such purported corporate acts would later be found to be invalid or ineffective.

**P.    The Former Incumbent Directors' breaches of duty**

104.   In (purportedly) causing the Company to enter into the Purported Guarantees and in procuring, causing and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends, the Former Incumbent Directors as purported directors of the Company, breached (i) their fiduciary duty to act honestly and in good faith with a view to the best interests of the Company under section 95(1)(a) of IBCA 1982 and (ii) their duty to exercise reasonable care, diligence and skill under section 95(1)(b) of IBCA 1982. In support of that contention, the following matters in particular are relied upon:

104.1.   The valuation of SLS at US$100 million, which underpinned the Convertible Loan Agreements, significantly undervalued SLS. The valuation of SLS will be a matter for expert evidence at trial, but pending the production of such expert evidence the Claimants contend as follows:

104.1.1. The valuation failed to give adequate weight to the real prospect of SLS obtaining approval for CoronaVac shortly, and the revenues which SLS would be able to generate by CoronaVac sales in due course. Paragraph 92 above is repeated.

104.1.2. A valuation of SLS at US$100 million failed to give adequate weight to or reflect the fact that valuations of other companies in the business of developing vaccines against Covid-19 had dramatically increased in the first half of 2020. The mean and the median increase of the enterprise values of BioNTech, Moderna, Novavax and CanSino Biologics between 31 December 2019 and 18 May 2020 was US$9,144.5 million and US$5,237.8 million, respectively.

104.1.3. Less than 7 months later, Sino Biopharmaceutical Limited invested US$515 million for a 15.03% stake in SLS, i.e. Sino Biopharmaceutical Limited's investment proceeded on the basis of a valuation of SLS at US$3.426 billion.

104.2.   The effect of the Convertible Loan Agreements, and the subsequent conversion of the loans into 15% of the total equity interest in SLS pursuant to them, was to unfairly dilute the shareholding of Sinovac Hong Kong and, consequently, the interest of the Company, in SLS.

28

104.3.    The entry into the Convertible Loan Agreements was not warranted by any genuine need on the part of SLS to raise capital from Prime Success or Vivo Capital Fund IX. In support of the contention that SLS did not have a genuine need to raise capital from outside the Company's group, reliance is placed on the following:

104.3.1. As at 31 March 2020, the Company and its group had cash and cash equivalents of US$165.3 million (excluding short-term investments of US$21.2 million).

104.3.2. As at 30 June 2020, the Company and its group had cash and cash equivalents of US$141.3 million (excluding short-term investments of US$35.4 million).

104.3.3. Excluding the net proceeds of Prime Success's and Vivo Capital Fund IX's loans totalling US$15 million advanced pursuant to the Convertible Loan Agreements, the Company and its group had cash and cash equivalents of US$126.6 million as at 30 June 2020 (excluding short-term investments of US$35.4 million).

104.3.4. In the period from June 2018 until the financial year ended 31 December 2021, the Company (and its group) were profitable and generated positive cash flow through product sales. The Company's and its group's cash flow was positive throughout the third and fourth quarter of 2020 even when discounting the net proceeds of the loans received pursuant to the Convertible Loan Agreements of US$15 million and Sino Biopharmaceutical Limited's US$515 million investment.

## Q.    Conclusion on sections O and P above

105.    In the premises, by reason of the facts and matters set out in section O above; further or alternatively, by reason of the facts and matters set out in section P above:

105.1.    The Purported Guarantees are, and always have been, invalid, never having been entered into by the Company.

105.2.    Further or alternatively, the Purported Guarantees are void, having been purportedly approved by the Former Incumbent Directors in breach of their fiduciary duties as purported directors.

105.3.    The Former Incumbent Directors had no authority to procure, cause and/or allow SLS, purportedly as directors of, and on behalf of, the Company to enter into the Convertible Loan Agreements or to pay the SLS Dividends.

105.4.    The Former Incumbent Directors, as purported directors of the Company, acted in breach of their duty under section 95(1)(a) and (b) of IBCA 1982 in procuring, causing and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends.

**R.    Amendments and further claims**

106.    The Claimants fully reserve their rights to amend this Statement of Claim, including by adding new claims against the Defendants, whether as a result of the New Directors' further investigations into the Company's affairs and the Former Incumbent Directors' actions or otherwise.

**AND THE CLAIMANTS CLAIM:**

(1)    A declaration that each of the SPA, the Shareholders Agreement (and any related agreements) is, and always has been, invalid and/or void.

(2)    A declaration that the issue of the PIPE Shares should be set aside.

(3)    Rectification of the Company's register of shareholders to delete any entries in respect of the purported allotments and transfers of the PIPE Shares (save for the 48,577 Prime Success Shares which are no longer beneficially owned by Prime Success or its affiliates).

(4)    A declaration that the purported appointment of Mr Shan Fu as an additional director of the Company on or around 3 July 2018 was ineffective and invalid.

(5)    A declaration that the Purported Guarantees are, and always have been, invalid and/or void.

(6)    A declaration that the Former Incumbent Directors had no authority to procure, cause and/or allow SLS to enter into the Convertible Loan Agreements or to pay the SLS Dividends, acting as purported directors of, and (purportedly) on behalf of, the Company.

(7)    A declaration that the Former Incumbent Directors, as purported directors of the Company, acted in breach of their duties under section 95(1)(a) and (b) of IBCA 1982 in procuring,

causing and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends.

(8) Such other relief as to the Court seems fit.

(9) Costs.

**Dated the 6th day of May, 2025**

CRAIG L. JACAS
**STAPLETON CHAMBERS**
**ATTORNEYS-AT-LAW**
**FOR THE CLAIMANTS**


**CERTIFICATE OF TRUTH**

I, **CRAIG L. JACAS**, Attorney-at-Law for the Claimants certify that:

(a) the Claimants believe that the facts stated in this Statement of Claim are true; and
(b) this Certificate is given on the Claimant's instructions.
The Claimants cannot give the Certificate because they are outside the jurisdiction and not available to sign this claim form.

**Dated the 6th day of May 2025**

CRAIG L. JACAS
**STAPLETON CHAMBERS**
**ATTORNEYS-AT-LAW**
**FOR THE CLAIMANTS**


Filed by **CRAIG L. JACAS**, Attorney-at-Law, Stapleton Chambers, Stapleton Lane, St. John's, Antigua. Telephone No. 1(268)562-7185 Fax 1 268 562-7967 email: craig.jacas@stapletonchambers.com  Attorney for the above named Claimants whose address for service is the same.

31

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS
CORPORATIONS ACT 1982

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2023/

BETWEEN:

(1) SINOVAC BIOTECH LTD.
(2) ORBIMED PARTNERS MASTER FUND LIMITED
(3) 1GLOBE CAPITAL, LLC

Claimants

AND

(1) VIVO CAPITAL LLC
(2) VIVO CAPITAL FUND VIII, L.P.
(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.
(4) VIVO CAPITAL FUND IX, L.P.
(5) PRIME SUCCESS, L.P.
(6) CEDE & CO

Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>STATEMENT OF CLAIM</u>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEYS-AT-LAW
FOR THE CLAIMANTS

Case Number :ANUHCV2025/0200

**FILED**
HIGH COURT
ANTIGUA AND BARBUDA

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200

Submitted Date:06/05/2025 16:22

Filed Date:07/05/2025 08:30

IN THE MATTER OF SINOVAC BIOTECH LTD.Fees Paid:17.00
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

BETWEEN:

**(1) SINOVAC BIOTECH LTD.**
(a company registered in Antigua and Barbuda)
**(2) ORBIMED PARTNERS MASTER FUND LIMITED**
(a company registered in Bermuda)
**(3) 1GLOBE CAPITAL, LLC**
(a company registered in Delaware, United States of America)

Claimants

AND

**(1) VIVO CAPITAL LLC**
(a company registered in Delaware, United States of America)
**(2) VIVO CAPITAL FUND VIII, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(4) VIVO CAPITAL FUND IX, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(5) PRIME SUCCESS, L.P.**
(a limited partnership registered in the Cayman Islands)
**(6) CEDE & CO**
(a partnership registered in New York, United States of America)

Defendants

---

**CERTIFICATE FOR SERVICE OUT OF THE JURISDICTION
PURSUANT TO CPR 7.6**

---

I, **CRAIG L. JACAS** of Stapleton Chambers, Attorneys-at-Law, Stapleton Lane, St. John's, Antigua
**HEREBY CERTIFY AS FOLLOWS:**

1. I believe that the Claimants have a good cause of action.

2.  The provisions on which the Claimants rely listed in CPR rule 7.3 are  7.3(7) and 7.3(10).

3.  I believe that the court is the appropriate forum for the trial.

4.  I believe that the proposed methods of service do not infringe the laws of the foreign states, being the Cayman Islands, and Delaware and New Jersey, United States of America.

**Dated the 6th day of May, 2025**

...................................................

**CRAIG L. JACAS**
**STAPLETON CHAMBERS**
**ATTORNEY AT LAW**
**FOR THE CLAIMANT**

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS
CORPORATIONS ACT 1982

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200

BETWEEN:
(1) SINOVAC BIOTECH LTD.
(2) ORBIMED PARTNERS MASTER FUND LIMITED
(3) 1GLOBE CAPITAL, LLC

Claimants

AND

(1) VIVO CAPITAL LLC
(2) VIVO CAPITAL FUND VIII, L.P.
(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.
(4) VIVO CAPITAL FUND IX, L.P.
(5) PRIME SUCCESS, L.P.
(6) CEDE & CO

Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**CERTIFICATE FOR SERVICE
OUT OF THE JURISDICTION
PURSUANT TO CPR 7.6**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEYS-AT-LAW
FOR THE CLAIMANTS

Case Number :ANUHCV2025/0200

```
┌─────────────────────┐
│        FILED        │
│     HIGH COURT      │
│ ANTIGUA AND BARBUDA │
└─────────────────────┘
```

### THE EASTERN CARIBBEAN SUPREME COURT
### IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200

Submitted Date:06/05/2025 15:48

Filed Date:06/05/2025 15:48

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

Fees Paid:52.00

BETWEEN:

(1) SINOVAC BIOTECH LTD.
(a company registered in Antigua and Barbuda)
(2) ORBIMED PARTNERS MASTER FUND LIMITED
(a company registered in Bermuda)
(3) 1GLOBE CAPITAL, LLC
(a company registered in Delaware, United States of America)

Claimants

AND

(1) VIVO CAPITAL LLC
(a company registered in Delaware, United States of America)
(2) VIVO CAPITAL FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(4) VIVO CAPITAL FUND IX, L.P.
(a limited partnership registered in Delaware, United States of America)
(5) PRIME SUCCESS, L.P.
(a limited partnership registered in the Cayman Islands)
(6) CEDE & CO
(a partnership registered in New York, United States of America)

Defendants

---

### CLAIM FORM

---

The Claimants:    (1) **SINOVAC BIOTECH LTD** of c/o APN Corporate and Management Services Limited, Winter Medical Centre, Fort Road, Antigua (**2**) **ORBIMED PARTNERS MASTER FUND LIMITED** of c/o Walkers Corporate (Bermuda) Limited, Park Place, Third Floor, 55 PAR-La-Ville Road, Hamilton, HM 11, Bermuda; and (**3**)

**1GLOBE CAPITAL, LLC** of c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801

**Claim against**

**The Defendants:**     (1) **VIVO CAPITAL LLC** of c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801, United States of America; (2) **VIVO CAPITAL FUND VIII, L.P.** of c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801, United States of America; (3) **VIVO CAPITAL SURPLUS FUND VIII, L.P.** of /o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801, United States of America; (4) **VIVO CAPITAL FUND IX, L.P.** of /o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, New Castle, Delaware 19801, United States of America; (5) **PRIME SUCCESS, L.P.** of c/o Walkers Corporate Limited 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands and (6) **CEDE & CO** of 570 Washington Boulevard, Jersey City, NJ 07310, United States of America

1.   In summary, the Claimants allege that (i) the issue of 5,900,000 common shares in the First Claimant (the "**Company**") to each of the First Defendant and the Fifth Defendant (the "**PIPE Shares**") pursuant to a purported private placement of shares in the Company announced on 3 July 2018 (the "**PIPE**") should be set aside, (ii) the related Securities Purchase Agreement and Shareholders Agreement, both dated 2 July 2018, purportedly entered into by the Company with the First Defendant and the Fifth Defendant (the "**SPA**" and "**SHA**") are invalid and/or void, as there was no valid resolution by the board of directors of the Company authorising (a) the allotment or issue of the PIPE Shares to the First and Fifth Defendants or (b) the Company's entry into the SPA or the SHA, and (iii) the guarantees (the "**Purported Guarantees**") purportedly given by the Company in connection with two convertible loan agreements dated 18 May 2020 (the "**Convertible Loan Agreements**") between (a) the Fourth Defendant and Sinovac Life Sciences Co., Ltd. ("**SLS**") (then a wholly-owned subsidiary of the Company) and (b) the Fifth Defendant and SLS, are invalid and/or void, as there was no valid resolution by the board of directors of the Company authorising entry into the Purported Guarantees, (iv) Weidong Yin, Kenneth Lee, Simon Anderson, Yuk Lam Lo and Mei Meng (together the "**Former Incumbent**

**Directors**") (who, despite having ceased to be directors of the Company at its AGM on 6 February 2018, continued to purport to act as the board of directors of the Company) did not have any authority, as the purported board of directors of the Company, to procure, cause and/or allow SLS to enter into the Convertible Loan Agreements or (following the conversion of the convertible loans into equity in SLS under the Convertible Loan Agreements) to procure, cause and/or allow SLS to pay dividends totalling more than US$850 million to the Fourth and Fifth Defendants and acted in breach of their duties under section 95 of the International Business Corporations Act 1982.

2. The Claimants claim pursuant to section 207 of the International Business Corporations Act 1982 and the inherent jurisdiction of the Court.

3. The facts on which the Claimants rely are set out in the Claimants' Statement of Claim.

4. The Claimants claim the following relief:

    (1) A declaration that the SPA, the SHA (and any related agreements) is, and always has been, invalid and/or void.

    (2) A declaration that the issue of the PIPE Shares should be set aside.

    (3) Rectification of the Company's register of shareholders to delete any entries in respect of the purported allotments and transfers of the PIPE Shares (save for the 48,577 Prime Success Shares which are no longer beneficially owned by Prime Success or its affiliates).

    (4) A declaration that the purported appointment of Mr Shan Fu as an additional director of the Company on or around 3 July 2018 was ineffective and invalid.

    (5) A declaration that the Purported Guarantees are, and always have been, invalid and/or void.

    (6) A declaration that the Former Incumbent Directors had no authority to procure, cause and/or allow SLS to enter into the Convertible Loan Agreements or to pay the SLS Dividends, acting as purported directors of, and (purportedly) on behalf of, the Company.

    (7) A declaration that the Former Incumbent Directors, as purported directors of the Company, acted in breach of their duties under section 95(1)(a) and (b) of IBCA 1982 in procuring, causing

and/or allowing SLS to enter into the Convertible Loan Agreements and to pay the SLS Dividends.

(8)  Such other relief as to the Court seems fit.

(9)  Costs.

Dated the 6th day of May, 2025

**CRAIG L. JACAS**
**STAPLETON CHAMBERS**
**ATTORNEY AT LAW**
**FOR THE CLAIMANT**

**Notice to the Defendant - See the notes served with this Claim Form**

This Claim Form must contain or have served with it either a statement of claim or a copy of a court order entitling the Claimant to serve the Claim Form without a statement of claim.

If you do not complete the form of Acknowledgment of Service served on you with this Claim Form and deliver or send it to the Court Office (address below) so that they receive it within (14) FOURTEEN days of service of this Claim Form on you, the Claimant will be entitled to apply to have judgment entered against you.  The form of Acknowledgment of Service may be completed by you or a solicitor acting for you.

**You should consider obtaining legal advice with regard to this claim.**

**This Claim Form has no validity if it is not served within six months of the date below unless it is accompanied by an order extending that time.**

[Seal]

**The Court Office is at Parliament Drive, St. John's, Antigua its Telephone number is 462-0406/09.   The office is open Mondays to Thursday between 8:30.a.m. and 4:30 p.m. and On Fridays 8:30 a.m. to 3 p.m. except public holidays and Court holidays.**

**Dated the 6th day of May, 2025**

Filed by **CRAIG L. JACAS** Attorney-at-Law, Stapleton Chambers, Stapleton Lane, St. John's, Antigua. Telephone No. 1(268)562-7185 Fax 1 268 562-7967 email: info@stapletonchambers.com. Attorney for the above named Claimant whose address for service is the same.

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS
CORPORATIONS ACT 1982

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200

BETWEEN:

(1) SINOVAC BIOTECH LTD.
(2) ORBIMED PARTNERS MASTER FUND LIMITED
(3) 1GLOBE CAPITAL, LLC

Claimants

AND

(1) VIVO CAPITAL LLC
(2) VIVO CAPITAL FUND VIII, L.P.
(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.
(4) VIVO CAPITAL FUND IX, L.P.
(5) PRIME SUCCESS, L.P.
(6) CEDE & CO

Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>CLAIM FORM</u>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEYS-AT-LAW
FOR THE CLAIMANTS

**NOTES FOR DEFENDANT**

<u>**This Form is important**</u>
<u>**When you get this document you should consider getting legal advice.**</u>

**ACTION TO BE TAKEN ON RECEIPT OF THIS FORM**

The Claimant is making a claim against you in the Court.  **If you do nothing judgment may be entered against you.**  That means that the Claimant will be entitled to take steps to enforce payment from you of any money he is claiming and you will have no right to be heard except as to the amount of any costs claimed or as to the way in which you can pay the judgment unless you apply to set judgment aside.

**WHAT YOU CAN DO**
You can

**A.    Defend the Claim**
If you would like to do this you must:
Complete the form of acknowledgment of service and return it to the court office so that they receive it within 14 days of the date on which you received this Form

**AND** if a statement of claim was served on you with the claim form –

Complete the form of defence or submit some other form of defence showing why you dispute the claim and giving full details of all the facts on which you intend to rely if there is a trial.  This must be delivered or sent to the court office so that they receive it within 28 days of the date on which you received this Form

Serve a copy of the form of Defence on the Claimant's legal practitioner (or the Claimant if he has no legal practitioner) at the address given on the claim form.

If no statement of claim is served with the claim form you need not file and serve a defence until twenty eight days after the statement of claim is served on you.

After you have filed your defence you will be given details of the date, time and place of a case management conference at which a judge decide what issues have to be determined by the Court and give directions about how what needs to be done before the case is tried.   You must attend that hearing.

**B.    Admit the Whole of the Claim**
Complete the form of acknowledgement of service stating that you admit the claim and return it to the court office so that they receive it within 14/21 days of the date on which you received this Form.

If you can pay the amount stated on the claim form including fees, costs and interest you should pay this to the Claimant within 8/21 days of the date on which you received and no further steps can be taken against you.  You must add interest at the daily rate shown from the date stated on the Claim Form.

If you cannot pay this sum in full you may apply to the court to pay by instalments.  If you wish to do so you must complete the financial particulars form and return this to the court with your acknowledgment of service.
**C.    Admit part of the claim and defend the rest**

Complete the form of acknowledgment of service stating how much you admit and return it to the court office so that they receive it within 14 days of the date on which you received this Form AND complete the form of defence as under section A above.

You may also:-
Pay the amount that you admit direct to the Claimant OR apply to pay that sum by instalments.  If so you should follow the procedure indicated under B.

**D.**      **Make a claim against the Claimant**

**If you would like to do this you must:**
Complete the form of acknowledgement of service and return it to the court office so that they receive it within 14 days of the date on which you received this Form.

Complete the form of defence giving details of your defence (if any) to the claim as under A above and also the claim that you are making against the Claimant and return it to the court office so that they receive it within 28 days of the date on which you received this Form.

If you admit the Claim but wish to counterclaim you should say so.  If your counterclaim is for a lower sum than the claim you may pay the difference between the amount that the claimant claims from you and the amount that you claim form him direct to the Claimant OR apply to pay that sum by instalments.  If so you should follow the procedure indicated under B.

You will then be given details of the date, time and place of a case management conference at which a judge will decide what issues have to be determined by the Court and give directions about what needs to be done before the case is tried.

**REMEMBER.  IF YOU DO NOTHING, JUDGEMENT MAY BE ENTERED AGAINST YOU WITHOUT ANY FURTHER WARNING.**

Filed by **CRAIG L. JACAS**, Attorney-at-Law, Stapleton Chambers, Stapleton Lane, St. John's, Antigua. Telephone No. 1(268)562-7185 Fax 1 268 562-7967 email: craig.jacas@stapletonchambers.com  Attorney for the above named Claimants whose address for service is the same

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO: ANUHCV2025/0200

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

BETWEEN:

(1)  SINOVAC BIOTECH LTD.
(a company registered in Antigua and Barbuda)
(2)  ORBIMED PARTNERS MASTER FUND LIMITED
(a company registered in Bermuda)
(3)  1GLOBE CAPITAL, LLC
(a company registered in Delaware, United States of America)

Claimants

and

(1)  VIVO CAPITAL LLC
(a company registered in Delaware, United States of America)
(2)  VIVO CAPTIAL FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(3)  VIVO CAPITAL SURPLUS FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(4)  VIVO CAPITAL FUND IX, L.P.
(a limited partnership registered in Delaware, United States of America)
(5)  PRIME SUCCESS, L.P.
(a limited partnership registered in Cayman Islands)
(6)  CEDE & CO
(a limited partnership registered in New York, United States of America)

Defendants

## ACKNOWLEDGMENT OF SERVICE

**WARNING:**     If this form is not fully completed and returned to the court at the address below within 14 FOURTEEN days of service of the Claim Form on you, the Claimant will be entitled to apply to have judgment entered against you.  If the Claimant does so, you will have no right to be heard by the Court except as to costs or the method of paying any judgment unless you apply to set judgment aside.

| | | |
|---|---|---|
| 1. | Have you received the Claim Form with the above claim number? | YES/NO |
| 2. | If so, when? | ----/----/--- |
| 3. | Did you also receive the Claimant's Statement of Claim? | YES/NO |
| 4. | If so, when? | ----/----/---- |
| 5. | Are your names properly stated on the Claim Form? | YES/NO |

If not, what are your full names?

………..……………….……...........…………………….

6.    Do you intend to defend the claim?                                                      YES/NO
      If so you must file a defence within twenty eight/forty two days
      of the service of the Claim Form on you.

7.    Do you admit the whole of the claim?                                                    YES/NO
      If you do you should either -
      (a) pay the claim direct to the Claimant or the Claimant's solicitor; OR
      (b) complete the application form to pay the claim by installments.
      If you pay the whole debt together with the costs and interest as shown on the Claim Form within
      fourteen/twenty eight days you will have no further liability for costs.

8.    Do you admit any part of the claim?                                                      YES/NO
      If you do you may -

      (a) pay the money that you admit direct to the Claimant or his solicitor; OR

      (b) complete the application form to pay the Claim by installments.

9.    If so, how much do you admit?
      ……………………………………………………………………………………
      If you dispute the balance of the claim you must also file a defence within **TWENTY EIGHT** days of
      service of the Claim Form on you or judgment may be entered against you for the whole amount
      claimed.

10.   What is your own address?
      ………………..………..…………………………………………………………..

11.   What is your address for service?
      ………………..………………………………………………………………………

      If you are acting in person you must give an address within 3 miles of the Court Office to which
      documents may be sent either from other parties or from the court.  You should also give your
      telephone number, FAX number, if any.

Dated ……………………..…………

Signed  ……………………………………

[Defendant in person][Defendant's solicitor]

The Court Office is at Parliament Drive, St. John's, Antigua its Telephone number is 462-0406/09.  The
office is open Mondays to Thursday between 8:30.a.m. and 4:30 p.m. and On Fridays 8:30 a.m. to 3 p.m.
except public holidays and Court holidays.

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO: ANUHCV2025/0200

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

BETWEEN:

(1)  SINOVAC BIOTECH LTD.
(a company registered in Antigua and Barbuda)
(2)  ORBIMED PARTNERS MASTER FUND LIMITED
(a company registered in Bermuda)
(3)  1GLOBE CAPITAL, LLC
(a company registered in Delaware, United States of America)

Claimants

and

(1)  VIVO CAPITAL LLC
(a company registered in Delaware, United States of America)
(2)  VIVO CAPTIAL FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(3)  VIVO CAPITAL SURPLUS FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(4)  VIVO CAPITAL FUND IX, L.P.
(a limited partnership registered in Delaware, United States of America)
(5)  PRIME SUCCESS, L.P.
(a limited partnership registered in Cayman Islands)
(6)  CEDE & CO
(a limited partnership registered in New York, United States of America)

Defendants

## APPLICATION TO PAY BY INSTALMENTS

The Applicant ................................................................. (Full Names)
of: ................................................................. (Full Address)
owes the Claimant the amount of $ ................. claimed on the Ancillary Claim Form and cannot pay the amount in one lump sum.

The Applicant applies to the court for an order to pay the amount due by instalments of $............... per week/month and provides the following information:

1.    Marital status: Married ☐   Single ☐   Other ☐ (specify)

2.    Age:

3.      Dependants:  Children:

| Name | Age |
|------|-----|
|      |     |
|      |     |
|      |     |
|      |     |

4.      Other Dependants:

| Name | Age | Relationship |
|------|-----|--------------|
|      |     |              |
|      |     |              |
|      |     |              |
|      |     |              |

5.      If employed state nature of employment and name and address of employer:

6.      If self-employed, give particulars of annual receipts of the business:

7.      Give details of any job other than main job:

8.      Give details of:  (a) contracts and other work in hand; and
                          (b) any sums due for work done.

9.      If unemployed, say how long unemployed:

10.     Pensioner Yes ☐  No ☐

11.     List cash assets:

12.     I live in my own property ☐  jointly owned property ☐  rented property ☐ lodgings ☐ other ☐
        (*specify*)
        (a)  My usual take Home Pay is                    $.................
        (b)  My Pension(s)                                $.................
        (c)  Other Income                                 $.................
                              **Total Income**            $.................

13.     My regular expenses are as follows:
        (a)  Mortgage(s)                                  $.................
        (b)  Rent                                         $.................
        (c)  Electricity                                  $.................
        (d)  Water                                        $.................
        (e)  Cooking Gas                                  $.................
        (f)  Telephone                                    $.................

(g)  Hire Purchase Repayments          $.................
(h)  Food                              $.................
(i)   School Fees                      $.................
(j)   Travelling Expenses              $.................
(k)  Children's Clothing               $.................
(l)   Maintenance Payments             $.................

(m)  Others (do not include Court Orders   $.................
       and debts listed in 14, 15 and 16)
       ....................................   $.................
       ....................................   $.................
       ....................................   $.................
       ....................................   $.................

              **Total Expenses**           $.................

14.  I am in arrears as follows:
(a)  Rent Arrears                      $.................
(b)  Mortgage Arrears                  $.................
(c)  Water Arrears
                                       $.................
(d)  Electricity Arrears               $.................
(e)  Telephone Arrears                 $.................
(f)   Maintenance Arrears              $.................
(g)  Others                            $.................
       ...................              $.................
       ...................              $.................
       ...................              $.................
       ...................              $.................

              **Total Arrears**            $.................

15.  I am making court ordered payments
     as follows: (*specify particulars of case(s)*
     *and instalments or amounts ordered*
     *to be paid*)                          $.................

16.  I have loans and credit card debts as follows:
       ...................              $.................
       ...................              $.................
       ...................              $.................
       ...................              $.................

     Of the above payments, I am behind with payments to:
     (*please list*)
       ...................
       ...................

....................
....................

17.     Declaration:   I declare that the details I have given above are true to the best of
                       my knowledge.

Signed: ...................................
*(Applicant)*

Position or office held *(if signing on behalf of firm or company):*
.............................................................................................................................

Dated: .....................................

**NOTICE:**

This Application will be heard by [the Judge in Chambers][a Master] on the ……………... day of …………………..., 20..... …….. at ………. a.m/pm at [                                        ]

**If you do not attend this hearing an order may be made in your absence.**
**OR**

The [Judge in Chambers] [a Master] will deal with this application by -


**NB**    **This notice of application must be served as quickly as possible on the respondent to the application.**


                                                                              [Seal]


The Court Office is at Parliament Drive, St. John's, Antigua its Telephone number is 462-0406/09. The office is open Mondays to Thursday between 8:30.a.m. and 4:30 p.m. and On Fridays 8:30 a.m. to 3 p.m. except public holidays and Court holidays.

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO: ANUHCV2025/0200

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

BETWEEN:

(1)  SINOVAC BIOTECH LTD.
(a company registered in Antigua and Barbuda)
(2)  ORBIMED PARTNERS MASTER FUND LIMITED
(a company registered in Bermuda)
(3)  1GLOBE CAPITAL, LLC
(a company registered in Delaware, United States of America)

Claimants

and

(1)  VIVO CAPITAL LLC
(a company registered in Delaware, United States of America)
(2)  VIVO CAPTIAL FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(3)  VIVO CAPITAL SURPLUS FUND VIII, L.P.
(a limited partnership registered in Delaware, United States of America)
(4)  VIVO CAPITAL FUND IX, L.P.
(a limited partnership registered in Delaware, United States of America)
(5)  PRIME SUCCESS, L.P.
(a limited partnership registered in Cayman Islands)
(6)  CEDE & CO
(a limited partnership registered in New York, United States of America)

Defendants

<u>DEFENCE</u>

I dispute the claim on the following grounds -

I certify that all the facts set out in my defence are true to the best of my knowledge information and belief.

**My address for service is** ...................................................................................

**Telephone No.** .......................................

Dated ...............................................

Signed ...............................................
[Defendant in person]

We are acting for the defendant, our address for service is:

......................................................

Signed ........................................
[Solicitors for the defendant]
The Court Office is at Parliament Drive, St. John's, Antigua its Telephone number is 462-0406/09.  The office is open Mondays to Thursday between 8:30.a.m. and 4:30 p.m. and On Fridays 8:30 a.m. to 3 p.m. except public holidays and Court holidays.


## <u>COUNTERCLAIM</u>

I claim against the claimant

(set out details of the remedy or relief sought)

on the following grounds -

**I certify that all the facts set out in my counterclaim are true to the best of my knowledge information and belief and that I am entitled to the remedy claimed.**

Dated ....................................................

Signed  ....................................................
[Defendant in person]


We are acting for the defendant, our address for service is: ..........................................

Signed ........................................
(Solicitors for the defendant)

**Notes:**

(a)  The defendant may set out the defendant's defence in another manner - it is not necessary to use this form.

(b)  The defendant must -
  - state which allegations in the claim are admitted
  - which are denied
  - which are neither admitted or denied because the defendant does not know whether they are true
  - identify any documents which he considers necessary to his case

(c)  The defendant must give his reasons for denying any allegations made by the Claimant.

(d)  The defendant must set out clearly all the facts on which the defendant relies to dispute the Claim and must set out any different version of events on which the defendant relies.

(e)  The defendant may not be allowed to give evidence about any fact which is not set out in the defence.

(f)  If the defendant wishes to counterclaim the defendant must -
  - specify any remedy that the defendant seeks against the claimant
  - include a short statement of all facts on which the defendant relies
  - identify any documents which the defendant considers necessary to the defendant's case

(g)  Where the defendant is represented by a solicitor the defendant must also sign the Form and give the defendant's address for service.

Case Number :ANUHCV2025/0200

FILED
HIGH COURT
ANTIGUA AND BARBUDA

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200

Submitted Date:17/06/2025 12:30

Filed Date:17/06/2025 12:34

IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT 1982

BETWEEN:

**(1) SINOVAC BIOTECH LTD.**
(a company registered in Antigua and Barbuda)
**(2) ORBIMED PARTNERS MASTER FUND LIMITED**
(a company registered in Bermuda)
**(3) 1GLOBE CAPITAL, LLC**
(a company registered in Delaware, United States of America)

Claimants

and

**VIVO CAPITAL LLC**
(a company registered in ~~Delaware~~ California, United States of America)
**(2) VIVO CAPITAL FUND VIII, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.**
(a limited partnership registered in Delaware, United States of America)
**(4) VIVO CAPITAL FUND IX, L.P.**
(a limited partnership registered in Delaware, United States of America )
**(5) PRIME SUCCESS, L.P.**
(a limited partnership registered in the Cayman Islands)
**(6) CEDE & CO**
(a partnership registered in New York, United States of America)

Defendants

---

**AMENDED CERTIFICATE FOR SERVICE OUT OF THE
JURISDICTION PURSUANT TO CPR 7.6**

---

I, **CRAIG L JACAS** of Stapleton Chambers, Attorney-at-Law, Stapleton Lane, St. John's, Antigua,
**HEREBY CERTIFY AS FOLLOWS:**

1. I believe that the Claimants have a good cause of action.

2. The provisions on which the Claimants rely listed in CPR rule 7.3 are 7.3(7) and 7.3(10).

3. I believe that the Court is the appropriate forum for the Trial.

4. I believe that the proposed methods of service do not infringe the laws of the foreign states, being the Cayman Islands, and California and Delaware and New Jersey, United States of America.

Dated the 17th day of June, 2025

...................................
CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEY AT LAW
FOR THE CLAIMANTS

Filed by CRAIG L. JACAS Attorney-at-Law, Stapleton Chambers, Stapleton Lane, St. John's, Antigua. Telephone No. 1(268)562-7185 Fax 1 268 562-7967 email: info@stapletonchambers.com Attorney for the above named Claimants whose address for service is the same.

2

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA
CLAIM NO. ANUHCV 2025/0200


IN THE MATTER OF SINOVAC BIOTECH LTD.
AND IN THE MATTER OF THE INTERNATIONAL
BUSINESS CORPORATIONS ACT 1982

BETWEEN:

(1) SINOVAC BIOTECH LTD.
(2) ORBIMED PARTNERS MASTER FUND LIMITED
(3) 1GLOBE CAPITAL, LLC

**Claimants**

AND

(1) VIVO CAPITAL LLC
(2) VIVO CAPITAL FUND VIII, L.P.
(3) VIVO CAPITAL SURPLUS FUND VIII, L.P.
(4) VIVO CAPITAL FUND IX, L.P.
(5) PRIME SUCCESS, L.P.
(6) CEDE & CO

**Defendants**

_____

**AMENDED CERTIFICATE FOR SERVICE
OUT OF THE JURISDICTION PURSUANT TO CPR 7.6**

_____


CRAIG L. JACAS
STAPLETON CHAMBERS
ATTORNEY AT LAW
FOR THE CLAIMANTS